UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------X
UNITED STATES OF AMERICA                **MEMORANDUM AND ORDER**


        - against -                     10-cr-809 (S-3)(KAM)


CHRISTOPHER BARRET et al.,
            Defendants.
-----------------------------------X
**MATSUMOTO, United States District Judge:**

        Defendants Christopher Barret, Kareem Forrest, Ryan
Anderson, Kerry Gunter, Charles Jones, Latoya Manning, Leon
Scarlett and Omar Mitchell (collectively, "defendants") are
charged with various narcotics trafficking crimes in a third
superseding indictment (the "Superseding Indictment") filed on
November 23, 2011.  (*See generally* ECF No. 304, Superseding
Indictment ("S-3").)  Pending before the court are the parties'
motions *in limine* and renewals of certain motions previously
denied by the court.  For the reasons set forth below, the court
grants in part and denies in part the government's motions *in
limine*; denies Barret's renewed motion to strike his aliases
from the Superseding Indictment; and denies Anderson, Jones and
Scarlett's renewed motions for severance.

# BACKGROUND[1]

## I.     The Charges Against Defendants

Count One of the Superseding Indictment charges Barret with knowingly and intentionally engaging in a continuing criminal enterprise in violation of 21 U.S.C. §§ 848(a) and (c)[2] and 18 U.S.C. § 3551 *et seq.*[3] (S-3 ¶¶ 1-21.) Count Two charges all defendants with conspiracy to distribute marijuana in violation of 21 U.S.C. §§ 841(b)(1)(A)(vii)[4] and 846,[5] and 18 U.S.C. § 3551 *et seq.* (*Id.* ¶ 22.) Counts Three and Four charge Barret and Manning with maintaining and conspiring to maintain a stash house in violation of 21 U.S.C. §§ 846 and 856(a)-(b),[6] and

---

[1] Because the court assumes the parties' familiarity with the alleged facts underlying the Superseding Indictment as presented by the government and outlined by the court in its Memorandum and Order dated 11/16/2011, the court provides abbreviated background information here based on a sworn affidavit submitted by the government in support of its motions *in limine*. *See United States v. Barret*, No. 10-cr-809, --- F. Supp. 2d ---, 2011 WL 5579079, at *2-4 (E.D.N.Y. Nov. 16, 2011); ECF No. 339, Affidavit of Joelle Ando in Support of Motion for Anonymous and Partially Sequestered Jury ("Ando Aff.").

[2] 21 U.S.C. § 848(a) makes it unlawful to engage in a continuing criminal enterprise. Under 21 U.S.C. § 848(c), an individual engages in a "continuing criminal enterprise" if he violates the felony drug laws as part of a "continuing series of violations" together with five or more persons who act in concert, and he is an organizer, supervisor, or other manager with respect to those individuals, and obtains "substantial income or resources" from the continuing series of violations.

[3] 18 U.S.C. 3551 *et seq.* generally provides penalties for offenses described in any federal statute.

[4] Under 21 U.S.C. § 841(b)(1)(A)(vii), any violation of 21 U.S.C. § 841(a)(1) that involves "1000 kilograms or more of a mixture or substance containing a detectable amount of marijuana, or 1,000 or more marijuana plants regardless of weight" is punishable by a term of imprisonment of at least ten years, or at least twenty years "if death or serious bodily injury results from the use of such substance."

[5] 21 U.S.C. § 846 provides that the penalties for conspiracy match those for the substantive underlying offense.

[6] 21 U.S.C. § 856(a) makes it unlawful to "knowingly . . . use[] or maintain any place . . . for the purpose of manufacturing, distributing, or using any controlled substance" or to "manage or control any place, . . . as a[] . . .

18 U.S.C. § 3551 *et seq.* (*Id.* ¶¶ 23–24.) Count Five charges Barret, Forrest, Anderson, Gunter, Jones, Manning and Scarlett with distributing or possessing with intent to distribute marijuana in violation of 21 U.S.C. §§ 841(a)(1)[7] and 841(b)(1)(A)(vii), and 18 U.S.C. §§ 2[8] and 3551 *et seq.* (*Id.* ¶ 25.) Count Six charges Barret, Forrest, Anderson, Gunter, Jones, Scarlett and Mitchell with possessing, brandishing and discharging a firearm in relation to drug trafficking crimes in violation of 18 U.S.C. §§ 924(c)(1)(A)(i),[9] 924(c)(1)(A)(ii), 924(c)(1)(A)(iii), 2 and 3551 *et seq.* (*Id.* ¶ 26.) The Superseding Indictment also contains criminal forfeiture allegations pursuant to 21 U.S.C. §§ 853(a), (p);[10] 18 U.S.C. § 924(d);[11] and 28 U.S.C. § 2461(c).[12] (*Id.* ¶¶ 27–30.)

---

lessee . . . or make available for use, with or without compensation, the place for the purpose of unlawfully manufacturing, storing, distributing, or using a controlled substance."

[7] 21 U.S.C. § 841(a)(1) makes it unlawful for any person to "knowingly or intentionally . . . manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance."

[8] 18 U.S.C. § 2 provides, in relevant part: "Whoever . . . aids, abets, counsels, commands, induces or procures [the] commission" of an act or "willfully causes an act to be done" against the United States is punishable as a principal.

[9] Under 18 U.S.C. § 924(c)(1)(A)(i)-(iii), the use, possession, brandishment and discharge of a firearm in relation or in furtherance of a drug trafficking crime is punishable by a term of imprisonment of at least five years.

[10] Under 21 U.S.C. § 853(a), any person convicted of the offenses charged in Counts One or Two of the Superseding Indictment must forfeit to the United States "any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of such violation; any of the person's property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violation; and in the case of a person convicted of engaging in a continuing criminal enterprise . . . any of his interest in, claims against, and property or contractual rights affording a source of control over, the continuing criminal enterprise." 21

3

The instant charges arise from defendants' alleged activities in connection with a Jamaican gang known as the "Fatherless Crew," of which Barret is allegedly the leader, or "Don." (*See* ECF No. 339, Affidavit of Joelle Ando in Support of Motion for Anonymous and Partially Sequestered Jury ("Ando Aff.") ¶ 3.) According to the government, the "Fatherless Crew" has a structured hierarchy; beneath the "Don," there are many armed enforcers or soldiers, including Barret's co-defendants. (*Id.* ¶ 5.) Together, "Fatherless Crew" members allegedly "generate[] revenue through a variety of criminal endeavors-- particularly narcotics trafficking[,] and routinely use firearms, violence and intimidation to preserve and expand their power." (*Id.*)

The government asserts that the "Fatherless Crew" has nearly one hundred members in the United States, Jamaica, Canada and the United Kingdom, and more than a dozen members of the "Fatherless Crew" remain at large in the United States. (*Id.* ¶ 4.) Barret allegedly recruited at least fifteen crew members to illegally enter the United States from Jamaica and carry out

---

U.S.C. § 853(p) provides that if, as a result of any act or omission of the defendant, property subject to forfeiture under subsection (a) is diminished in value or unavailable to the court, such property may be substituted by other property belonging to defendant.
[11] 18 U.S.C. § 924(d) provides for the seizure and forfeiture of any firearm involved in any knowing violation of 18 U.S.C. § 924.
[12] Under 28 U.S.C. § 2461(c), if a defendant is convicted of an offense to which criminal forfeiture provisions apply, the court shall order the relevant forfeiture of property as part of the defendant's sentence.

acts of violence in furtherance of his narcotics operation in Queens. (*Id.* ¶ 6.) The government also claims that even after leaving Jamaica, Barret continued to direct the criminal activities of the 'Fatherless Crew' in Jamaica. (*Id.*) Specifically, Barret allegedly used proceeds from his Queens-based narcotics enterprise to finance ongoing operations of the 'Fatherless Crew' in Jamaica, and he smuggled weapons used by his United States-based enforcers into Jamaica for his crew members' use and to ensure that the guns would not be traced to crimes committed in the United States. (*Id.* ¶¶ 6-7.)

The government's affidavit in support of its motions *in limine* is unclear as to whether Barret continued to control the "Fatherless Crew" in Jamaica following his arrest on October 7, 2010. (*Id.*) The affidavit demonstrates, however, that Barret and members of the "Fatherless Crew" who remain at large in the United States threatened potential government witnesses in the weeks and months following Barret's arrest. (*Id.* at ¶¶ 9-14.)

## II. The Instant Motions

The following is a summary of the pending motions, each of which the court will discuss in turn.

The government moves: (1) to admit as direct evidence of the charged crimes (a) certain acts allegedly committed by

the defendants in furtherance of the conspiracy and
(b) Forrest's 2007 marijuana conviction; or in the alternative
to admit such evidence pursuant to Federal Rule of Evidence
404(b); (2) to admit, pursuant to Federal Rule of Evidence
404(b), evidence relating to (a) defendants' membership in the
"Fatherless Crew" in Jamaica prior to moving to the United
States, (b) Barret and Scarlett's incarceration together with an
individual named Clifton Williams in the General Penitentiary in
Jamaica, (c) Barret's 2003 attempt to shoot a rival drug dealer,
which resulted in the death of an innocent bystander, and (d)
defendants' prior convictions for marijuana and firearms crimes,
discussed in greater detail *infra* in Section III.B.3; (3) for
leave pursuant to Federal Rule of Evidence 609 to cross-examine
any defendants who elect to testify regarding their criminal
convictions; and (4) for empanelment of an anonymous and
partially sequestered jury. (*See* ECF No. 299, Government's
Motions *in Limine* ("Gov't Mem.").)

Barret renews his motion to strike from the
Superseding Indictment references to his aliases, which the
court initially addressed and denied in its November 16, 2011

ruling.[13]  (*See* ECF No. 321, Letter Brief in Opposition by Barret ("Barret's Second Opp'n") at 1.)[14]

Anderson, Jones and Scarlett renew their motions for severance.  (*See* ECF No. 317, Memorandum of Law in Opposition by Leon Scarlett ("Scarlett Opp'n") at 21-22; ECF No. 300, Motion *in Limine* by Ryan Anderson ("Anderson Mem.") at 5-6; ECF No. 322, Letter Brief in Opposition by Charles Jones ("Jones Opp'n") at 1.)

**DISCUSSION**

### I.  Motion in Limine

The purpose of a motion *in limine* is to allow the trial court to rule in advance of trial on the admissibility and relevance of certain forecasted evidence.  *Luce v. United States*, 469 U.S. 38, 40 n.2 (1984); *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996) (same); *Nat'l Union Fire Ins. Co. v.*

---

[13] *See* ECF No. 289, Memorandum and Order dated 11/16/2011.

[14] On November 28, 2011, the court granted all parties a one-week extension to file their respective oppositions to motions *in limine* in light of the then-recent filing of a third superseding indictment and an extension request from Barret's counsel.  (*See* Order dated 11/28/2011.)  Because some defendants, including Barret, had already filed opposition papers (Barret's first opposition submission is at ECF No. 310), the court specifically ordered that "to avoid piecemeal submissions, each party shall file only ONE brief in opposition on his or her own behalf.  Therefore, for example, if Barret's counsel wishes to add to his current submission in opposition to the government's motions in limine, he shall withdraw his current submission and submit a revised brief that incorporates all of his legal arguments . . . ." (*Id.*)  Counsel for Barret disregarded the court's orders and on December 4, 2011, submitted the second part of his opposition to the government's motions *in limine*, without withdrawing the first opposition submission or incorporating its contents into the second submission.  Although the court is reluctant to review the piecemeal submissions submitted by Barret's counsel in violation of the court's unequivocal orders, the court will nevertheless do so in the interest of justice.

*L.E. Myers Co. Grp.*, 937 F. Supp. 276, 283 (S.D.N.Y. 1996)

(same). "Evidence should be excluded on a motion *in limine* only

when the evidence is clearly inadmissible on all potential

grounds." *United States v. Paredes*, 176 F. Supp. 2d 179, 181

(S.D.N.Y. 2001). Indeed, courts considering a motion *in limine*

may reserve decision until trial, so that the motion is placed

in the appropriate factual context. *See Nat'l Union Fire Ins.

Co.*, 937 F. Supp. at 287. Further, the court's ruling regarding

a motion *in limine* is "subject to change when the case unfolds,

particularly if the actual testimony differs from what was

[expected]." *Luce*, 469 U.S. at 41.

## II. Admissibility of Proffered Evidence as Direct Evidence of Charged Crimes

The government seeks to introduce as direct proof of

the charged crimes evidence of: (1) Forrest's 2007 conviction

for possession of marijuana; (2) the 2009 attempted murder of a

drug dealing rival by two of Barret's soldiers at his behest, in

which both the rival and the rival's driver were shot;

(3) Barret's alleged issuance of a contract to murder Marlon

Jones, his former drug trafficking partner, in retaliation for a

perceived theft in 2009; (4) numerous other acts of violence

that the defendants allegedly bragged about to co-conspirators

to "enhance their stature within the narcotics organization";

and (5) various examples of criminal activity committed by

defendants and their associates that related to and occurred during the charged conspiracy, as detailed below in Section II.B.5. (Gov't Mem. at 9-21.)

The government argues that because these violent acts were "part and parcel to the narcotics conspiracy and continuing criminal enterprise charged," they are "highly probative of the existence of the conspiracy [and] the lengths that defendants would go to defend the drug trafficking operation." (*Id*. at 17.) In particular, the government contends that narcotics-related shootings that occurred during the timeframe of the charged conspiracy demonstrate "instances of the defendants brandishing and discharging firearms in furtherance of the operation of a narcotics trafficking conspiracy--the exact charge that is contained in Count Six of the superseding indictment." (ECF No. 336, Reply to Government's Motion *in Limine* ("Gov't Reply") at 34.) In addition, the government argues that the proffered evidence is relevant as direct evidence of Barret's leadership of the continuing criminal enterprise, defendants' participation in the conspiracy and their respective roles in the enterprise. (*See id*. at 36-38.)

Moreover, the government contends, the probative-prejudice balancing analysis required by Federal Rule of Evidence 403 favors admission of the evidence because the probative value of the uncharged crimes is great, particularly

with respect to evidence of the defendants' involvement in drug-related shootings.  (Gov't Mem. at 20.)  In addition, because defendants are charged with discharging firearms in furtherance of drug trafficking, the "government must be allowed to provide evidence proving that the defendants took exactly those actions."  (*Id.*)  The government further argues that the proposed evidence is not substantially outweighed by the danger of unfair prejudice to the defendants because the evidence does not involve conduct that is any more sensational or disturbing than the crimes charged.  (*Id.* at 19.)  Finally, in the event that the court finds any of the aforementioned evidence inadmissible as direct evidence, the government moves to admit such evidence as "other act" evidence pursuant to Federal Rule of Evidence 404(b).  (*Id.* at 23.)

Defendants oppose the admission of the proffered evidence primarily on grounds that: (1) the evidence is inadmissible as direct evidence because the underlying acts did not arise out of the same transactions charged, are not inextricably intertwined with evidence of the charged offenses, and are not necessary to complete the story of the crimes charged in this case; (2) even if the evidence is relevant, the danger of unfair prejudice outweighs its probative value because the proposed evidence is more serious than the charged crimes; (3) the proffered evidence would be unnecessarily cumulative for

purposes of establishing a relationship among the defendants or as background to the conspiracy because seizures, video recordings and cooperating witnesses are available to prove the same; and (4) some evidence may have pre-dated the charged conspiracy, which is alleged in the Superseding Indictment to have begun in approximately November 2006. (*See* Barret's Second Opp'n at 3-4; Jones Opp'n at 1; ECF No. 318, Letter Brief in Opposition by Omar Mitchell ("Mitchell Opp'n") at 1; Scarlett Opp'n at 6-10.)

## A. Legal Standard

It is well settled in the Second Circuit that where an indictment contains a conspiracy charge, "[a]n act that is alleged to have been done in furtherance of the alleged conspiracy" is considered "part of the very act charged." *United States v. Diaz*, 176 F.3d 52, 79 (2d Cir. 1999) (internal quotation marks and alterations omitted); *see United States v. Thai*, 29 F.3d 785, 812 (2d Cir. 1994) (in conspiracy cases, "uncharged acts may be admissible as direct evidence of the conspiracy itself"). Consequently, evidence of uncharged criminal conduct is relevant and not considered "other crimes" evidence under Federal Rule of Evidence 404(b) ("Rule 404(b)") if the uncharged conduct "arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged

offense, or if it is necessary to complete the story of the crime on trial." *United States v. Khan*, 591 F. Supp. 2d 202, 205 (E.D.N.Y. 2008) (quoting *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000)); *see United States v. Nektalov*, 325 F. Supp. 2d 367, 370 (S.D.N.Y. 2004) (same).

Acts of violence are frequently deemed to have been performed as overt acts in furtherance of, and thus are direct evidence of, an alleged drug distribution conspiracy. The Second Circuit has recognized that "[b]ecause narcotics conspiracies are illicit ventures, disputes are frequently settled by force or the threat of force" and that "advancing the aim of a narcotics conspiracy can involve performing ancillary functions such as . . . enforcing discipline and chastising rivals." *United States v. Santos*, 541 F.3d 63, 72 (2d Cir. 2008) (quoting *United States v. Soto-Beníquez*, 356 F.3d 1, 18 (1st Cir. 2003)); *see United States v. Sureff*, 15 F.3d 225, 228-29 (2d Cir. 1994) (noting that "drug trafficking is often attended by violence"); *Khan*, 591 F. Supp. 2d at 205 ("Intimidation, violence, and the payment of debts is generally understood to be intertwined with the management and operation of narcotics conspiracies. . . .").

Moreover, the Second Circuit has noted that "[v]iolence furthers such a conspiracy when used to collect debts directly . . . or [to] send[] the message that those

suspected of stealing from the conspiracy would be treated harshly." *Santos*, 541 F.3d at 72 (internal citation and quotation marks omitted).  In addition, "testimony about violent acts and firearm possession during or around the time of a narcotics conspiracy appropriately establishe[s a co-conspirator's] conduct during the charged conspiracy." *United States v. Gadsden*, 300 F. App'x 108, 110 (2d Cir. 2008).

Although relevant, evidence of uncharged acts may nonetheless be inadmissible pursuant to Federal Rule of Evidence 403 if "its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403; *see also United States v. Bourne*, No. 08-CR-888, 2011 WL 4458846, at *12 (E.D.N.Y. Sept. 23, 2011) ("Evidence of uncharged acts may be admissible, subject to limitations imposed by Rule[] 403 . . . ."). "The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief v. United States*, 519 U.S. 172, 180 (1997).  To determine whether evidence is unduly prejudicial, the court considers it in the context of the crime alleged.  Evidence shall be excluded as unduly prejudicial when it is "more inflammatory than the charged crime." *United States v. Livoti*, 196 F.3d 322, 326 (2d Cir. 1999); *cf. United States v. Pitre*, 960 F.2d 1112, 1120 (2d

Cir. 1992) (finding no unfair prejudice where "evidence of prior narcotics transactions 'did not involve conduct any more sensational or disturbing than the crimes with which [the appellants were] charged.'") (quoting *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990)).

### B. Application

#### 1. Forrest's 2007 Conviction for Possession of Marijuana

The government seeks to admit evidence that Forrest was convicted in September 2007 of Criminal Possession in the Fifth Degree in Kings County Criminal Court as direct evidence on grounds that the conviction "proves that within the time frame of the conspiracy Forrest actually possessed the type of controlled substance he is charged with conspiring to distribute and possess with intent to distribute." (Gov't Mem. at 13, 18.) In opposition, Forrest argues that the prior conviction is irrelevant to the issue of Forrest's purported participation in the charged narcotics distribution conspiracy because the misdemeanor conviction arose in the context of an incident in which Forrest was *smoking* marijuana. (ECF No. 301, Letter Brief in Opposition by Kareem Forrest ("Forrest Opp'n") at 2.)

Possession of marijuana in the fifth degree is a class B misdemeanor under New York State Penal Law, which prohibits possession of marijuana that is "burning or open to public view"

in a public place or possession of a mixture or compound of marijuana in an aggregate weight of more than twenty-five grams. NYPL § 221.10. The court finds that Forrest's use of such a limited quantity of marijuana is not probative of whether he possessed marijuana for purposes of distributing the same in furtherance of the charged conspiracy, particularly in light of the government's allegations that he was a "top lieutenant" in Barret's crew who was "heavily involved" in controlling, weighing, packaging and distributing large quantities of marijuana. (Gov't Mem. at 7.) Therefore, the court denies the government's motion to introduce evidence of Forrest's prior misdemeanor possession as direct evidence of the crimes with which he is charged. Moreover, as discussed *infra* in Section III.B.3.a, the court finds this evidence inadmissible as "other act" evidence under Rule 404(b).

### 2. Attempted Murder

The government seeks to introduce evidence that in 2009, at Barret's behest, two soldiers planned an ambush to kill a rival who refused to work for Barret, and as a result, both the rival and his driver were shot. (Gov't Mem. at 9.) The government alleges that Barret ordered this murder because he "wanted everyone in Queens to sell marijuana for his crew" and he employed violence against those who refused to cooperate with his efforts. (*Id.*)

The court finds that evidence of an order from Barret to his soldiers to murder of one of Barret's rivals is relevant as direct evidence of the conspiracy because it shows the nature and existence of the conspiracy as well as Barret's leadership in the organization. *See United States v. Miller*, 116 F.3d 641, 682 (2d Cir. 1997) (finding no abuse of discretion in district court's conclusion that proof of murders of persons considered to be threats to the gang was "relevant to show the existence and nature of the enterprise and the conspiracy"); *see also Khan*, 591 F. Supp. 2d at 205 (finding uncharged murders and threats relevant to demonstrate defendant's alleged leadership role). Furthermore, evidence that the rival and his driver were shot during the course of the attempted murder is relevant as direct evidence of Count Six of the Superseding Indictment, which charges defendants with the possession and discharge of guns in furtherance of the drug trafficking conspiracy. (S-3 ¶ 26.)

Moreover, the court finds that the probative value of this direct evidence outweighs the risk of prejudice. "[C]ourts in this circuit have repeatedly expressed disapproval of the admission of uncharged criminal conduct that is 'more serious than the charged crime.'" *Khan*, 591 F. Supp. 2d at 206 (quoting *United States v. Williams*, 205 F.3d 23, 34 (2d Cir. 2000)). In *Khan*, for example, the court excluded evidence of an uncharged

murder on grounds that it was overly prejudicial in a case against the alleged head of a "powerful, violent, cocaine trafficking organization." 591 F. Supp. 2d at 205. There, the defendant was charged in an eighteen-count indictment that included charges of "importation and possession of cocaine" and "engaging as a . . . leader of a continuing criminal enterprise in the Eastern District of New York and elsewhere." *Id*. Even though the *Khan* court found that the uncharged murder was relevant as part of the crimes charged because "violence . . . is generally understood to be intertwined with the management and operation of narcotics conspiracies," the court excluded the evidence on grounds of undue prejudice because the defendant was "not charged with any crimes of violence, intimidation or firearms." *Id*. at 205-06.

In contrast to *Khan*, all defendants in the instant prosecution, except Manning, face charges of firearms and violence. Therefore, evidence of the 2009 incident does not involve conduct that is "any more sensational or disturbing than the crimes with which [defendants are] charged.'" *Pitre*, 960 F.2d at 1120. Accordingly, the court grants the government's motion to introduce evidence as to all defendants except Manning, that Barret ordered his soldiers to kill a rival and that the rival and his driver were shot by Barret's soldiers as a result.

### 3. 2009 Contract for Murder

The government seeks to introduce evidence that in retaliation for a perceived theft, Barret offered a thirty-pound marijuana bounty for the murder of his former drug trafficking partner, Marlon Jones, in 2009. (Gov't Mem. at 9.) Barret allegedly instructed his crew to kill Marlon Jones when Barret was out of town so that he would have an alibi for the murder. (*Id*.) The government contends that as a result of Barret's "contract to murder," one of Barret's soldiers unsuccessfully attempted to kill Marlon Jones in a night club just weeks before Barret's arrest. (*Id*.)

The same principles discussed above in Section II.B.2 apply to evidence of this alleged "contract" to kill Marlon Jones, which the court finds to be "[no] more sensational or disturbing than the crimes with which [defendants are] charged.'" *Pitre*, 960 F.2d at 1120. Accordingly, the court grants the government's motion to admit evidence except as to Manning regarding Barret's alleged "contract" to kill Marlon Jones as direct evidence of the charged crimes.

### 4. Acts of Violence Asserted by Defendants

The government seeks to introduce evidence of the following shootings and other firearm-related acts of violence that defendants allegedly "bragged about to other crew members"

to "enhance their stature within the narcotics organization": (1) Scarlett allegedly "admitted to shooting a man named Jeff British at a night club and confessed to shooting a sixteen-year-old kid in front of an off-duty police officer just before he left Jamaica"; (2) Anderson allegedly "admitted that he carried guns and was involved in armed home invasion robberies" to steal marijuana from rival drug dealers; and (3) Forrest allegedly "admitted that he shot the man who stabbed his brother in Brooklyn." (Gov't Mem. at 10-11, 15.)

Scarlett contends that such evidence should be excluded because it is "highly prejudicial" and has "no correlation to the marijuana conspiracy in this case." (Scarlett Opp'n at 9.) He notes in particular that because the alleged shooting of the sixteen-year-old occurred in Jamaica, it "bears no relevance on either the domestic marijuana conspiracy or the 924(c) count of this incident." (*Id.*) Forrest opposes introduction of his alleged admission because the government does not specify the date on which Forrest allegedly made the statement and does not "represent[] that this statement is admissible as a co-conspirator statement under [Federal Rule of Evidence] 801(d)(2)(E)." (Forrest Mem. at 4.)

Upon review of the government's allegations, the court finds that there is inadequate information to find that the proffered evidence is relevant as direct evidence of the charged

conspiracy. The government's memorandum does not specify the dates on which Scarlett, Forrest or Anderson allegedly made the aforementioned statements or the dates on which the underlying events supposedly occurred. In at least one instance, as Scarlett notes, the shooting allegedly occurred in Jamaica and pre-dated the charged conspiracy. (*See* Scarlett Opp'n at 9; Gov't Mem. at 10-11.) Moreover, the government does not contend that any of the events underlying the statements made by Scarlett, Forrest and Anderson relate to the alleged drug conspiracy. Accordingly, the court has no basis to conclude that the underlying events "arose out of the same transaction or series of transactions as the charged offense, . . . [are] inextricably intertwined with the evidence regarding the charged offense, or . . . [are] necessary to complete the story of the crime on trial." *Khan*, 591 F. Supp. 2d at 205.

In addition, to the extent that the government argues that the defendants' boasts of undated, uncharged acts of violence were acts in furtherance of the conspiracy because defendants bragged to "enhance their stature within the narcotics organization" (*see* Gov't Mem. at 15), the court finds that the statements are remotely relevant at best, cumulative in light of other available evidence, and overly prejudicial because the underlying events may not be related to the charged conspiracy. Accordingly, the court denies without prejudice the

government's motion to introduce evidence of the aforementioned shootings and other firearm-related acts of violence that defendants allegedly "bragged about to other crew members."

For the same reasons, the court denies without prejudice the motion to introduce the foregoing evidence pursuant to Rule 404(b).

### 5. Remaining Uncharged Crimes

The government also seeks to introduce as direct evidence of the charged conspiracy the following uncharged criminal activity: (1) Barret's 2009 threat to kidnap the family member of a marijuana distributor unless a debt was paid, and the distributor's partial payment in response to that threat; (2) a March 15, 2010 gunfire exchange instigated by a conflict over a drug deal between a rival crew and members of Barret's crew, who fired into a crowd to protect Barret and helped Barret escape the scene with Gunter in a getaway car driven by Jones; (3) Forrest's possession of multiple guns, which he regularly brandished to intimidate or threaten others during the course of the conspiracy; (4) the use of firearms by Barret, Forrest, Scarlett and Anderson to protect the delivery of a marijuana shipment to the Barret Residence on October 7, 2010; (5) Barret's numerous orders to crew members--particularly Forrest and Scarlett--to severely beat and threaten one of

Barret's drug trafficking partners, Andre Wilson, over lost money and drugs; (6) Barret's threats to have someone shoot Wilson and his crew if they refused to work for Barret or tried to disassociate themselves from him and the "Fatherless Crew"; (7) Barret's assault against Mitchell a few days before Barret's October 7, 2010 arrest, over a drug debt and Barret's handling of profits gained through the alleged drug trafficking conspiracy; (8) Barret's post-arrest orders to non-incarcerated members of his crew to "find out who the 'snitch' was that gave him up" and threats made to those who were believed to be cooperating with the government; and (9) Anderson's involvement in armed home invasion robberies to steal marijuana from rival drug dealers.[15] (*See* Gov't Mem. at 9-13.)

The court finds that all of the aforementioned uncharged offenses are overt acts performed in furtherance of the conspiracy because each arose out of a drug trafficking-related dispute or was otherwise motivated by a desire to protect or enhance the conspiracy. *See Santos*, 541 F.3d at 72 ("[A]dvancing the aim of a narcotics conspiracy can involve performing ancillary functions such as . . . enforcing

---

[15] The government also seeks to introduce evidence that Mitchell "always carried a gun," which he allegedly used, together with Scarlett, to rob a truck driver in Queens for marijuana in 2003. (Gov't Mem. at 11, Gov't Reply at 41.) Following Mitchell's December 16, 2011 suppression hearing, counsel for Mitchell requested and was granted an opportunity to submit additional briefing regarding this evidence. (*See* Minute Entry dated 12/16/2011.) Accordingly, the court will issue a separate decision regarding this alleged robbery after the matter has been fully briefed.

discipline and chastising rivals."); *see also Thai*, 29 F.3d at
812-13 (finding evidence of uncharged robberies and assaults
admissible as direct evidence to show the "existence and
structure" of the conspiracy); *United States v. Estrada*, 320
F.3d 173, 183 (2d Cir. 2003) (noting that "the use of violence
to secure the organization's drug turf [and] carrying and using
firearms to enforce its control over the drug market" are overt
acts of a narcotics conspiracy).

Furthermore, the uncharged offenses that involved
firearms are directly relevant to Count Six of the Superseding
Indictment, which charges all defendants except Manning with
possessing, brandishing and discharging firearms in violation of
18 U.S.C. §§ 924(c)(1)(A)(i)-(iii). (S-3 ¶ 26.) In addition,
as the government notes, evidence of defendants' use of firearms
during the course of the conspiracy would be relevant as direct
evidence of the conspiracy even in the absence of a gun charge
in the Superseding Indictment. (Gov't Reply at 34-35.) *See
United States v. Becerra*, 97 F.3d 669, 671 (2d Cir. 1996)
(quoting *United States v. Vegas*, 27 F.3d 773, 778 (2d Cir.
1994)) (The Second Circuit has "repeatedly approved the
admission of firearms as evidence of narcotics conspiracies,
because drug dealers commonly keep firearms on their premises as
tools of the trade").

Moreover, the court does not find that the danger of unfair prejudice outweighs the probative value of the proffered evidence because, unlike other proposed evidence discussed in Sections II.B.2 and II.B.3 *supra*, the "evidence [does] not involve conduct more inflammatory than the charged crime." *Livoti*, 196 F.3d at 326. Accordingly, the court grants the government's motion *in limine* to introduce the uncharged criminal activity discussed in this section as direct evidence of the charged crimes.

## III. Admissibility of Proffered Evidence Pursuant to Rule 404(b)

### A. Legal Standard

Federal Rule of Evidence 404(b) governs the admissibility of other crimes, wrongs, and acts evidence:

> Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

Fed. R. Evid. 404(b). The rule provides no explicit temporal limitation regarding the relationship of the "other" crimes, wrongs or acts to the offenses charged. *See id.* Thus, other acts occurring *before* the offense charged are not excluded from the scope of Rule 404(b).

The Supreme Court has set forth four requirements for
courts to follow in exercising their discretion under Rule
404(b): "Prior bad-acts evidence must be (1) offered for a
proper purpose, (2) relevant, and (3) substantially more
probative than prejudicial.  In addition, (4) at the defendant's
request, the district court should give the jury an appropriate
limiting instruction." *United States v. Downing*, 297 F.3d 52,
58 (2d Cir. 2002) (citing *Huddleston v. United States*, 485 U.S.
681, 691–92 (1988)); *United States v. Garcia*, 291 F.3d 127, 136
(2d Cir. 2002) (similar).

The Second Circuit has "adopted an inclusionary
approach to evaluating Rule 404(b) evidence." *United States v.
Edwards*, 342 F.3d 168, 176 (2d Cir. 2003); *see also Garcia*, 291
F.3d at 136 (same).  Under this inclusionary approach,
"uncharged bad acts may be admitted into evidence for any
relevant purpose other than propensity, provided that the
probative value of the evidence outweighs the danger of unfair
prejudice." *United States v. Graziano*, 391 F. App'x 965, 966
(2d Cir. 2010); *see also Edwards*, 342 F.3d at 176 (quoting
*Garcia*, 291 F.3d at 136) (stating that the inclusionary approach
"allows evidence to be received at trial for any purpose other
than to attempt to demonstrate the defendant's 'criminal
propensity'").  Additionally, the district court has broad
discretion to admit evidence pursuant to Rule 404(b), and its

25

ruling will not be overturned on appeal absent abuse of discretion. *See Carboni*, 204 F.3d at 44. The court evaluates the government's request to admit evidence of "other acts" in light of these considerations.

### B. Application

#### 1. Admissibility of Defendants' Membership in the "Fatherless Crew" in Jamaica and Barret and Scarlett's Incarceration with Clifton Williams

The government seeks to admit evidence regarding the membership of Barret, Anderson, Jones, Gunter and Scarlett in the "Fatherless Crew" and Barret and Scarlett's incarceration in the General Penitentiary in Jamaica "to show the background of the conspiracy and to explain the basis for the co-conspirators' relationship of mutual trust." (Gov't Mem. at 24-25.) The government also moves to introduce evidence regarding the formation and operation of the "Fatherless Crew" in Jamaica on grounds that "the currently charged continuing criminal enterprise is, in essence, an expansion of the activity the 'Fatherless Crew' undertook in Jamaica," as demonstrated by (1) the overlap in membership, (2) continuing ties between the Queens-based "Fatherless Crew" and its base in Jamaica, (3) Barret's delivery of funds and firearms to crew members in Jamaica to support and sustain the foreign base and to hide firearms used in the commission of crimes in the United States,

and (4) the crew's use of violence to expand and control territory in both locales. (*Id.* at 25-26.)

The government also seeks to introduce evidence that Barret and Scarlett were incarcerated in Jamaica with Clifton Williams, who later became a marijuana supplier for Barret and his crew during the course of the charged conspiracy. (*Id.* at 26.) The government alleges that Scarlett was a member of the "Fatherless Crew" in Jamaica and one of Barret's enforcers or "soldiers" in the charged conspiracy, and that such evidence is admissible pursuant to Rule 404(b) to explain how the three came to participate in the charged conspiracy together. (*Id.*)

Barret, Jones and Scarlett object to admission of this evidence on grounds that the "acts of violence in Jamaica" and the "fact that rival 'posses' in Jamaica engaged in a rival war in Kingston, Jamaica" pre-date, and therefore bear no relevance to, the charged crimes, and that the "highly prejudicial" nature of the evidence "far outweighs" any probative value. (Barret's Second Opp'n at 2-3; Jones Opp'n at 1; Scarlett Opp'n at 6-8.) Barret, Jones, Mitchell and Scarlett also argue that the government's true purpose in offering this additional evidence-- particularly the reference to "meeting at a foreign penitentiary years before this incident"--would be to "improperly inflame the passions of the jury and induce them to convict the defendants on that impermissible basis." (*Id.*) They also assert that the

court should exclude such evidence because it would be cumulative in light of the availability of seizures, video recordings and cooperating witnesses to furnish evidence of the co-conspirators' relationship and background. (Barret's Second Opp'n at 3-4; Jones Opp'n at 1; Mitchell Opp'n at 1; Scarlett Opp'n at 6-9.) Barret further contends that the government's proof is insufficient to support a finding that Barret actually committed the extrinsic acts asserted by the government. (Barret's Second Opp'n at 4.)

"[I]t is within the court's discretion to admit evidence of prior acts to inform the jury of the background of the conspiracy charged, in order to help explain how the illegal relationship between participants in the crime developed, or to explain the mutual trust that existed between coconspirators." *United States v. Rosa*, 11 F.3d 315, 334 (2d Cir. 1993). In *Rosa*, the Second Circuit found no error in the district court's admission of evidence that (1) the founder of an organized drug distribution conspiracy had known the defendant, his lieutenant, for almost fifteen years; (2) the two had stolen cars together as teenagers; and (3) the founder had once sold a few ounces of heroin to the defendant's then-partner in the drug trade. *Id*. at 333-34. Rather, the Second Circuit held that "the evidence of [defendant's] prior dealings with [the founder] was properly admitted to explain how the illegal relationship between the two

had developed and to explain why [the founder] had appointed [defendant] to a leading position in the Organization." *Id*. at 334.

The court finds that, except as limited below regarding murders in Jamaica, evidence of Barret, Anderson, Jones, Gunter and Scarlett's membership in the "Fatherless Crew" in Jamaica is relevant to help the jury understand the historical development of the illegal relationships and levels of trust among the co-conspirators, and the conspiracy itself. *See United States v. Pipola*, 83 F.3d 556, 565-66 (2d Cir. 1996) (finding no error in trial court's admission of evidence of co-conspirators' prior acts, including "committing crimes including armed robberies and a burglary, and using and selling stolen and counterfeit credit cards," because the challenged evidence "explained to the jury how the relationship between Pipola and his underlings evolved" and "made the . . . conspiracies to commit armed robberies [later committed by the co-conspirators] more plausible"). Accordingly, the court finds that the probative value of this background evidence significantly outweighs any risk of prejudice that the evidence may pose.

The court does find, however, that any proffered evidence regarding the background and organization of the "Fatherless Crew" that references murder in Jamaica prior to the dates of the acts charged in the Superseding Indictment must be

excluded because the probative value of such evidence is significantly outweighed by the risk of prejudice to defendants given the nature of the instant charges and the fact that such alleged murders pre-dated the charged conspiracy. "[P]rejudice is informed by the crimes with which the defendant has been charged." *United States v. Sanpedro*, 352 F. App'x 482, 485 (2d Cir. 2009) (citing *Roldan–Zapata*, 916 F.2d at 804). Accordingly, the court precludes the government from introducing any Rule 404(b) evidence that references murder prior to the dates of the charged conspiracy.

Moreover, the court finds that evidence of the prior incarceration of Barret and Scarlett in a foreign penitentiary poses a danger of undue prejudice. The jury will be left to speculate as to Barret's and Scarlett's past criminal history, which may result in an impermissible finding of a criminal propensity. *Cf. United States v. Price*, No. 05-CR-492, 2009 WL 973370, at *1 (E.D.N.Y. Apr. 10, 2009) (concluding that evidence regarding prior periods of incarceration was "not unduly prejudicial to the Defendant" in trial of defendant charged with racketeering and racketeering conspiracy, murder, drug trafficking, illegal use of a firearm, and witness tampering in connection with his alleged participation in a criminal organization).

Accordingly, the government's motion is granted in part and denied in part. The government may introduce evidence regarding the formation and operation of the "Fatherless Crew" and the membership of Barret, Anderson, Jones, Gunter and Scarlett in the "Fatherless Crew." For the reasons stated above, however, the government is precluded from introducing evidence of (a) Barret and Scarlett's prior incarceration in a foreign penitentiary and (b) murders that occurred in Jamaica that pre-date the charged conspiracy.

### 2. Admissibility of Barret's 2003 Attempt to Shoot a Rival Drug Dealer

The government seeks to introduce evidence that "Barret discharged a firearm at a rival drug dealer in 2003, which resulted in the death of an innocent bystander" when Barret and two other members of the "Fatherless Crew" chased and fired multiple shots at the rival. (Gov't Mem. at 26-27.) The government first contends that such evidence is relevant to show "Barret's knowledge that drug dealing is dangerous, which will inform the jury as to why he carries a gun and has his enforcers carry firearms," and that it "provides evidence that he possessed firearms and mandated that the other defendants possess firearms in furtherance of the drug trafficking activity." (*Id.*) Second, the government asserts that such evidence demonstrates Barret's knowledge of firearms, which is

probative of the fact that in 2010 he fired his gun at a rival drug dealer, but not out of some mistake or accident. (*Id.* at 26-28.)  Third, the government argues that "the fact that [in the 2003 incident] Barret directed other members of the 'Fatherless Crew' to retaliate after a rival shot at him shows Barret's leadership position in the charged enterprise." (*Id.* at 28.)  Fourth, the government states that the evidence is probative to demonstrate Barret's motive to harm rival drug dealers. (*Id.* at 26-27.)

Barret's arguments in opposition are set forth *supra* in Section III.B.1.

Notwithstanding the government's arguments, the court finds that the evidence regarding the 2003 sohoting, which includes the death of an innocent bystander, poses a substantial risk of prejudice that outweighs the probative value of such evidence.  Moreover, in light of these *in limine* rulings--which permit the introduction of evidence regarding multiple shootings involving Barret, the use and discharge of firearms by numerous co-conspirators, and evidence that the co-conspirators were aware of the dangers attending the drug trafficking trade--the court finds that there is sufficient other, "less prejudicial evidence that makes the same point." *United States v. Gotti*, 399 F. Supp. 2d 417, 419 (S.D.N.Y. 2005) (citing *Old Chief*, 519 U.S. at 182-83).  Accordingly, the government's motion to admit

evidence of Barret's attempt to shoot a rival drug dealer in 2003 and the resulting death of an innocent bystander is denied.

### 3. Admissibility of Prior Convictions

The government seeks to introduce evidence of various prior convictions relating to (1) possession of marijuana; (2) criminal sale of controlled substances; and (3) criminal possession of a loaded firearm. (Gov't Mem. at 13-14, 22, 28-31.) The government argues that these prior convictions are relevant to prove the defendants' intent, knowledge and absence of mistake during the charged offenses, particularly because "many of the defendants have already raised an 'innocent association' defense as evidenced by their moving papers and/or arguments during detention hearings." (*Id*. at 28-29.)

"Under [Federal Rule of Evidence] 404(b), evidence of 'other crimes' . . . though inadmissible to prove . . . criminal propensity, may be admitted at trial to show that a defendant who claims that his conduct had an innocent explanation had the knowledge or intent necessary to commit the charged offense." *United States v. Gordon*, 987 F.2d 902, 908 (2d Cir. 1993). The Second Circuit's inclusionary approach to Rule 404(b) evidence "does not invite the government 'to offer, carte blanche, any prior act of the defendant in the same category of crime,'" however. *United States v. McCallum*, 584 F.3d 471, 475 (2d Cir. 2009) (quoting *Garcia*, 291 F.3d at 137). Rather, the Second

Circuit has instructed that the third *Huddleston* prong, the probative-prejudice balancing analysis, demands "particularly searching, conscientious scrutiny" in the context of prior crimes evidence because such evidence poses a severe risk of unfair prejudice. *Id*. at 476. Indeed, when conducting this evaluation, the district court must remain attentive to the potential for "undermin[ing] the fairness of the trial" with "classic, and powerful, evidence of propensity." *Id*. at 477. Thus, even where a defendant has not conceded the issues of knowledge or intent, where abundant other evidence of guilt exists, a district court may not casually admit evidence for the "ostensible" purpose of proving knowledge and intent without confirming that those issues are seriously in dispute. *Id*.

### a. Admissibility of Prior Possession Convictions

The government moves to admit evidence of Forrest's 2007 conviction for possession of marijuana in the fifth degree in Kings County Criminal Court. (Gov't Mem. at 13, 18.) As discussed *supra* in Section II.B.1, this violation is a class B misdemeanor under New York State Penal Law, which prohibits possession of marijuana that is "burning or open to public view" in a public place or possession of a mixture or compound of marijuana in an aggregate weight of more than twenty-five grams. NYPL § 221.10.

The government also moves to admit evidence of Anderson's 2005 conviction in Pennsylvania State Court for possession of drug paraphernalia and possession of marijuana. (Gov't Mem. at 29-31.) According to the government, Anderson's conviction stemmed from an incident in which Anderson was the passenger in a van that was carrying seventy pounds of marijuana. (*Id.* at 29-30.) When police stopped the van, Anderson allegedly told them that he "was aware the driver of the van transported marijuana along the route they were traveling and was aware there was something in the car on that day." (*Id.* at 30.) Anderson was also found to have a plastic bag containing one gram of marijuana on his person. (*Id.*)

The government argues that the resulting conviction and Anderson's statements upon his arrest show his familiarity with both marijuana and marijuana trafficking and constitute evidence of his intent in connection with the charged conspiracy. (*Id.*) Anderson disputes the alleged conviction and contends that "his arrest in 2006[16] in Pennsylvania resulted in a fine for possession of 1 gram of marijuana on his person" and that "[t]he arrest charges were dismissed against [Anderson] and pursued by the Commonwealth against two other individuals."

---

[16] Although the government and Anderson dispute the year of Anderson's arrest for marijuana possession, the facts proffered by both parties--particularly the site of the arrest and the involvement of one gram of marijuana found on Anderson's person--suggest that the parties are referring to the same incident.

(ECF No. 300, Affirmation of Barry Turner ("Turner Aff.") at 4.[17])  Moreover, Anderson claims that the prior act is irrelevant because he did not know Barret in 2006; rather, he met Barret in 2008, two years after his arrest in Pennsylvania.  (*Id.*)

The court finds that the foregoing possession incidents regarding Forrest and Anderson are inadmissible pursuant to Rule 404(b) because they are insufficiently similar to the distribution and distribution conspiracy charges at issue.  In so finding, the court takes guidance from *United States v. Gordon*, 987 F.2d 902 (2d Cir. 1993).  There, defendant Gordon faced charges of importing, conspiring to import, and possessing cocaine with intent to distribute crack cocaine after he was arrested at an airport where he had intended to pick up a passenger, Ghullkie, who was found to have 1,493 grams of cocaine on his person.  *Id.* at 904-05.  Gordon claimed innocence, alleging that he had never seen Ghullkie before and that he had gone to pick up Ghullkie only upon instructions from a friend.  *Id*. at 905.  Before trial, the district court ruled that evidence of Gordon's arrest sixteen months earlier, for possession of crack, was relevant to the issue of knowledge and that its probative value outweighed the risk of prejudice to Gordon.  *Id* at 905-06.

---

[17] As this document was not paginated, the page number indicated here corresponds to the page number assigned by the Electronic Case Filing system.

At trial, a detective testified that Gordon was
carrying 3.8 grams of crack cocaine at the time of his prior
arrest; that a search of his house revealed a triple-beam scale,
which is often used by narcotics distributors; and that he was
suspected of being a crack supplier. *Id*. at 906. In addition,
the trial court "painstakingly and repeatedly instructed the
jury that the detective's testimony was . . . [admitted] only to
show that [Gordon] had knowledge with regard to cocaine and the
. . . events with which he was charged and that his role in
those events was not the result of accident or mistake." *Id*.

Nevertheless, on appeal, the Second Circuit found
that, notwithstanding the district court's jury instruction, the
district court had abused its discretion by admitting evidence
of Gordon's prior arrest for crack possession because "the April
1990 crack possession itself did virtually nothing to prove that
Gordon knew Ghullkie was importing narcotics." *Id*. at 909.
First, the Circuit Court reasoned, "Gordon's April 1990
possession did not involve Ghullkie." *Id.* Second, "[t]hough
cocaine was involved on both occasions, the amount involved in
the 1990 possession, *i.e.,* less than 4 grams, was not at all
similar to the quantity Ghullkie brought in, *i.e.,* 1.5
kilograms." *Id*. Finally, "in any event, the probative value of
the crack possession was easily outweighed by its potential for

unfair prejudice and the evidence therefore should have been excluded under Rule 403." *Id.*

Likewise, the court finds that Forrest's conviction for possession of marijuana in the fifth degree is insufficiently similar to the charged acts because the amount involved, 25 grams or less, is not at all similar to the charged conspiracy, which involves more than 1000 kilograms of marijuana. The facts as alleged in the criminal complaint describe much larger quantities of marijuana; on October 7, 2010 alone, law enforcement agents seized 100 kilograms from Barret's home. (ECF No. 276, Government's Opposition to Defendants' Pre-Trial Motions, Appendix B, Criminal Complaint ("Compl.") ¶ 16.) Moreover, the government has not shown that Forrest's prior conviction related in any way to his co-defendants.

With respect to Anderson's prior conviction or arrest, the government acknowledges that the amount of marijuana found on Anderson's person in Pennsylvania was one gram, which is more indicative of possession for personal use, rather than for distribution. (Gov't Mem. at 30.) Moreover, the government has not refuted Anderson's contention that the incident pre-dated Anderson's acquaintance with Barret. Consequently, the court finds inadequate facts to support a finding that Anderson's prior possession is sufficiently relevant to prove knowledge or opportunity to distribute marijuana, or knowledge of the charged

conspiracy with Barret or the other defendants. *See United States v. Aminy*, 15 F.3d 258, 260 (2d Cir. 1994) (quoting *United States v. Kasouris*, 474 F.2d 689, 692 (5th Cir. 1973) ("Similarity, being a matter of relevancy, is judged by the degree in which the prior act approaches near identity with the elements of the offense charged. There is no necessity for synonymity but there must be *substantial* relevancy . . . .").)

Accordingly, the court denies the government's motion, pursuant to Rule 404(b), to admit evidence of (a) Forrest's 2007 conviction for possession of marijuana in the fifth degree or (b) Anderson's arrest and/or conviction for possession of marijuana.

### b. Admissibility of Scarlett's Prior Sale Conviction

The government also seeks to introduce evidence of Scarlett's 2006 conviction for criminal sale of a controlled substance in the third degree[18] in Queens County Supreme Court on grounds that such evidence demonstrates his "knowledge and intent to be engaged in marijuana trafficking." (Gov't Mem. at 13-14, 30.)

In opposition, Scarlett contends that the conviction should be excluded because it was a "routine street sale with

---

[18] Under New York Penal Law § 220.39, a person is guilty of criminal sale of a controlled substance in the third degree, a class B felony, when he knowingly and unlawfully sells a narcotic drug.

none of the signature events that are comparable to this case,"
and the risk of prejudice outweighs the probative value of such
evidence because the 2004 incident pre-dated the charged
conspiracy and did not involve any co-defendants in this case.
(Scarlett Opp'n at 12.)  He further argues that the prior
conviction bears "no factual similarity" to the instant
indictment because the conviction arose out of Scarlett's sale
of a "relatively small quantity of cocaine to an undercover
officer," and involved a different drug than that at issue in
this case.  (*Id.* at 12-13.)

The court finds Scarlett's arguments persuasive.
"Similarity, being a matter of relevancy, is judged by the
degree in which the prior act approaches near identity with the
elements of the offense charged.  There is no necessity for
synonymity but there must be *substantial* relevancy . . . ."
*Aminy*, 15 F.3d at 260 (quoting *Kasouris*, 474 F.2d at 692).
Relevant factors in comparing the similarity of a prior drug
conviction with the charged offense include the quantities of
narcotics involved, whether the narcotics were of the same type,
and the temporal proximity of the two events.  *Aminy*, 15 F.3d at
260 (noting that in *Gordon*, 987 F.2d at 906-09, the Second
Circuit found abuse of discretion in district court's admission
of Rule 404(b) evidence of defendant's possession of a small
quantity of narcotics because "not only was there a disparity

between the quantities of narcotics involved, but the narcotics were of different types and the other-act possession had occurred some 16 months before the events at issue"); *see also Garcia*, 291 F.3d at 138 ("[t]he [long] length of time between the events and the substantial difference in quantities involved detract from any potential probative value of the prior conviction" for purposes of Rule 404(b)).

Here, there is no clear indication of the amount of narcotics involved in the 2004 incident, other than it involved a "hand to hand" sale of a drug, thus indicating a smaller quantity than the kilogram quantities charged here. (Scarlett Opp'n at 13.) It is clear, however, that the 2004 conviction arose from Scarlett's sale of cocaine, which is entirely different from the distribution of marijuana at issue in the instant case. Moreover, the prior conviction occurred two years before the beginning of the charged conspiracy. Accordingly, the court finds that Scarlett's prior conviction for sale of cocaine is inadmissible as "other act" evidence pursuant to Rule 404(b) because it is insufficiently similar and therefore irrelevant.

### c. Admissibility of Jones' Prior Sale Conviction

The government also seeks to introduce evidence relating to Jones' 2004 conviction for criminal sale of

marijuana in the fourth degree[19] in Queens County Criminal Court, alleging that such evidence demonstrates his "knowledge and intent to be engaged in marijuana trafficking." (Gov't Mem. at 30.)

Where a prior conviction is offered for the purpose of establishing a defendant's knowledge or intent, the government must "identify a similarity or connection between the two acts that makes the prior act relevant to establishing knowledge of the current act." *McCallum*, 584 F.3d at 475 (quoting *Garcia*, 291 F.3d at 137); *Garcia*, 291 F.3d at 137 ("[I]f the government cannot identify a similarity or some connection between the prior and current acts, then evidence of the prior act is not relevant to show knowledge and intent.").

In *United States v. Zackson*, 12 F.3d 1178 (2d Cir. 1993), for example, the Second Circuit found that proof of a defendant's previous partnership with a co-conspirator in a marijuana distribution conspiracy was highly probative of his intent to "enter another drug conspiracy [for sale of cocaine] with the *same co-conspirator*" and to rebut the claim that the defendant's association with that person was an innocent one. *Id*. at 1182 (emphasis added). Similarly, in *Pitre*, the Second Circuit upheld the admission of evidence of prior narcotics

---

[19] Under New York Penal Law § 220.40, criminal sale of marijuana in the fourth degree is a class A misdemeanor.

transactions involving the same co-conspirators as those involved in the crimes charged. 60 F.2d at 1117-20. "Absent such pertinent similarities or connections between the two acts, however, other act evidence is not relevant and should not be received in evidence." *Edwards*, 342 F.3d at 177; *see Gordon*, 987 F.2d at 908 ("[E]vidence that the defendants had previously participated in similar drug transactions with the same coconspirators is properly admitted to show that the defendants had knowledge of the conspiracy charged.")

For example, the Second Circuit held in *Garcia* that admission of a prior conviction for sale of cocaine was abuse of discretion because the government did not establish that the prior conviction was "meaningfully probative of [the defendant's] knowledge" with respect to the charged narcotics conspiracy. 291 F.3d at 138. Specifically, the Second Circuit found that "[t]he only similarity between the two drug transactions . . . [was] that both involved cocaine" and apart from that, "[t]he government did not offer evidence of any other similarity or connection between the two transactions," such as a proffer that "the earlier transaction . . . involved the same people." *Id*.

Similarly, in the instant case, the government has not demonstrated a significant connection between Jones' prior narcotics sale and the charged conspiracy. The facts available

to the court closely mirror those in *Garcia*, because "[t]he only similarity between the two drug transactions . . . [is] that both involved [marijuana]." 291 F.3d at 138. Because the government has not shown similarity in the quantity of drugs, identity of participants or location of the alleged transactions, the court finds that the prior conviction is irrelevant to the charged conspiracy.

The court acknowledges that Jones' prior conviction for criminal sale of marijuana in the fourth degree meets certain 404(b) criteria because it is relevant to the distribution charge (Count Five), involves the same drug at issue in the instant prosecution, and shows Jones' access to drugs and knowledge of drug distribution. Nevertheless, the court finds that the risk of prejudice outweighs the probative value of such evidence. The Second Circuit has warned that "[w]here prior convictions are concerned, the line between intent or knowledge and character or propensity is often a fine one, requiring the thoughtful, focused attention of the district court" because "the introduction of prior convictions, unless carefully handled, will undermine the presumption of innocence." *McCallum*, 584 F.3d at 475. Specifically, there is concern that "[d]espite the most careful instructions from the court, . . . jurors are likely to believe that if a defendant previously was convicted of drug offenses, there is a high probability that he

is guilty of the drug offense for which he is on trial." *Id*. at 476. "Moreover, prior convictions are far more likely to be received as potent evidence of propensity than other prior bad acts routinely offered under Rule 404(b) because they bear the imprimatur of the judicial system and indicia of official reliability." *Id*.

Accordingly, the court denies the government's motion to admit pursuant to Rule 404(b) evidence of Jones' prior conviction for criminal sale of marijuana in the fourth degree.

### d. Prior Firearm Possession Convictions

The government seeks to introduce evidence of Barret's 2003 conviction for attempted criminal possession of a loaded firearm and Scarlett's 2004 conviction for criminal possession of a loaded firearm in the third degree in Queens County Supreme Court to show their "intent and knowledge of firearms and [their] access to weapons." (Gov't Mem. at 13-14, 31.)

Barret contends that the prior conviction should be excluded because it is "totally unrelated and occurred before the existence of the conspiracy in this indictment." (Barret's Second Opp'n at 3.)

Scarlett asserts that the Queens County criminal file reveals that his 2004 firearms conviction stemmed from the discovery of a loaded gun on Scarlett's person when police

accosted him in response to a report of a domestic disturbance,
not a drug deal. (Scarlett Opp'n at 11.) Because Count Six of
the Superseding Indictment explicitly references possession of
guns *during and in relation to drug trafficking*, Scarlett
contends that his prior firearm conviction has little probative
value and is "highly prejudicial and inflammatory." (*Id.* at 11-
12.)

The court finds that the proffered firearms conviction
evidence as to Barret and Scarlett is relevant to the issues of
opportunity, absence of mistake and access to firearms. Here,
as in *United States v. Barris*, 377 F. App'x 93 (2d Cir. 2010),
defendants are charged with, *inter alia*, possessing a firearm in
furtherance of the drug trafficking conspiracy. *See id.* at 95.
In *Barris,* the Second Circuit noted that evidence of the
defendant's prior conviction for firearms possession "was not
contrary to Federal Rule of Evidence 404(b)" because it was
"relevant to the firearms possession charged here and to
[defendant's] relationship with [his] alleged co-conspirator"
and had "obvious probative value" to the firearms possession
charge. *Id.* at 95-96; *see United States v. Taylor*, 767 F. Supp.
2d 428, 438 (S.D.N.Y. 2010) (finding government sufficiently
identified "a similarity or some connection between the prior
and current acts" for Rule 404(b) purposes because defendant's
prior conviction for possession of a firearm was for the same

46

criminal conduct charged, *i.e.*, using a weapon during a crime of violence, in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii)). Moreover, the court notes that the government seeks to offer this evidence for proper, non-propensity purposes, to show knowledge of firearms, intent and access to weapons.

The court also finds that the probative value of the evidence outweighs the risk of prejudice. In so finding, the court is mindful that "[e]vidence that the defendant in a criminal case has committed other crimes is highly prejudicial," especially where, as here, "the other crime is identical to that for which the defendant is on trial." *United States v. Nachamie*, 101 F. Supp. 2d 134, 142 (S.D.N.Y. 2000). Nevertheless, "evidence of prior crimes--especially crimes nearly identical to those presently charged--may be offered for the proper purpose of proving the defendant's knowledge or absence of mistake." *United States v. Tsekhanovich*, 251 F. App'x 706, 707 (2d Cir. 2007); *see Taylor*, 767 F. Supp. 2d at 438 (finding evidence of defendant's prior gun possession in connection with different offense admissible under Rule 404(b) because it was "directly relevant to the issue of opportunity and absence of mistake and also admissible to demonstrate [defendant's] ability to access such a weapon").

Therefore, the court in its discretion finds that the probative value of the prior convictions outweighs the

prejudicial effects.  Accordingly, the government's motion to admit evidence of Barret and Scarlett's prior firearm possession convictions is granted.

## IV.  Leave to Cross-Examine Testifying Defendants Regarding Criminal Convictions

The government seeks leave to cross-examine any testifying defendants regarding their prior convictions for impeachment purposes pursuant to Federal Rule of Evidence 609(a)(1).  (Gov't Mem. at 34-36.)

Before evidence of prior convictions may be admitted at trial pursuant to Federal Rule of Evidence 609(a)(1), the court must weigh the probative value of a prior conviction against the prejudicial effect to the defendant.  Fed. R. Evid. 609(a)(1).  "To perform this balancing, the court must know the precise nature of the defendant's testimony, which is unknowable when . . . the defendant does not testify."  *Luce*, 469 U.S. at 41.

Because it is presently uncertain that the government will even have an opportunity to cross-examine the defendant, the government's motion is denied without prejudice with the understanding that the government may renew its motion if it becomes apparent that a defendant will take the stand at trial and the precise nature of the testimony can be ascertained.

## V.  **Anonymous and Partially Sequestered Jury**

The government moves for the empanelment of an anonymous and partially sequestered jury.  (Gov't Mem. at 3, 36-49.)  Specifically, the government requests that "(1) the identities of all prospective jurors--including names, addresses, and places of employment--not be revealed to either the parties or their attorneys; and (2) from the time each juror is empaneled until the conclusion of the trial, the jurors be escorted by representatives of the United States Marshals Service to and from the courthouse each day and at all times during recesses."  (*Id*.)  At the court's request, the government submitted evidence in support of its assertions, including the affidavit of Drug Enforcement Administration (DEA) Special Agent Joelle Ando in support of its motion.  (*See* Ando Aff.).

All defendants except Anderson filed briefs to oppose the empanelment of an anonymous and partially sequestered jury, primarily on grounds that:  (1) the defendants have not been charged with jury tampering or obstruction of justice, (2) the government has based its motion on conjecture regarding the means and inclination of defendants to interfere with the judicial process; (3) there has been no media interest in the case and the mere possibility of future media interest does not justify the empanelment of an anonymous and partially sequestered jury; (4) the defendants' interest in conducting a

meaningful *voir dire* would be jeopardized if defendants did not have access to the names, addresses and places of employment of potential jurors; and (5) the use of partial sequestration would instill fear in jurors and violate the defendants' Sixth Amendment right to a fair and impartial jury. (*See* ECF No. 310, Memorandum of Law Regarding *in Limine* Motion for an Anonymous and Partially Sequestered Jury by Christopher Barret ("Barret's First Opp'n") at 2-8; Forrest Opp'n at 4-6; Scarlett Opp'n at 17-18; Mitchell Opp'n at 1; Jones Opp'n at 1; *see generally* ECF No. 308, Defendant Latoya Manning's Memorandum of Law in Opposition to Government's Motion for an Anonymous and Partially Sequestered Jury ("Manning Opp'n").)

### A. Legal Standard

"In resolving motions for anonymous and partially sequestered juries, courts must balance 'the defendant's interest in conducting meaningful *voir dire* and in maintaining the presumption of innocence, against the jury's interest in remaining free from real or threatened violence and the public interest in having the jury render a fair and impartial verdict.'" *United States v. Khan*, 591 F. Supp. 2d 166, 168 (E.D.N.Y. 2008) (quoting *United States v. Quinones*, 511 F.3d 289, 295 (2d Cir. 2007)). The law is clear in this Circuit, however, that "when genuinely called for and when properly used, anonymous juries do not infringe a defendant's constitutional

rights." *Thai*, 29 F.3d at 800-01 (quoting *United States v. Vario,* 943 F.2d 236, 239 (2d Cir. 1991)).

Generally, a court should not order empanelment of an anonymous jury without "(a) concluding that there is strong reason to believe the jury needs protection, and (b) taking reasonable precautions to minimize any prejudicial effects on the defendant and to ensure that his fundamental rights are protected." *United States v. Paccione*, 949 F.2d 1183, 1192 (2d Cir. 1991). Within those parameters, however, "the decision whether or not to empanel an anonymous jury is left to the district court's discretion." *Id.*

Courts in this Circuit typically consider the following factors when determining whether the jury needs the protection of anonymity:  "(1) the seriousness of the charges; (2) the dangerousness of the defendant[s]; (3) the defendant[s'] ability to interfere with the judicial process by [themselves] or through [their] associates; (4) previous attempts to interfere with the judicial process by the defendant[s] or [their] associates; and (5) the amount of public and media attention expected during the trial that might expose the jurors to extraordinary pressures that could impair their ability to be fair." *United States v. Cacace*, 321 F. Supp. 2d 532, 534 (E.D.N.Y. 2004); *see Thai*, 29 F.3d at 801; *United States v. Persico*, 621 F. Supp. 842, 878 (S.D.N.Y. 1985).

## B. Application

### 1. An Anonymous Jury is Warranted

Applying these principles to the instant case, the court finds that the first two factors--the seriousness of the charges and the dangerousness of the defendants--weigh in favor of empanelment of an anonymous jury. In *United States v. Barnes*, the Second Circuit affirmed the use of an anonymous jury in a fifteen-defendant trial in which the lead defendant was charged with operating a "continuing criminal enterprise," numerous defendants were charged with conspiring to distribute narcotics and one defendant was charged with carrying a firearm during the commission of a federal felony. 604 F.2d 121, 130 (2d Cir. 1979). The Circuit Court noted in particular that the charges that defendants faced were "serious[:] the distribution of massive quantities of narcotics on the streets of Harlem and the South Bronx from which enormous profits were realized [in] an operation which had continued over a period of years." *Id*. at 134. Likewise, defendants in the instant case face serious charges; the Superseding Indictment alleges that defendants participated in a lengthy narcotics distribution conspiracy and that the majority of defendants possessed, brandished and discharged firearms during the course of the drug trafficking conspiracy. (*See* S-3 ¶ 26.)

Moreover, the court finds ample evidence that the defendants are dangerous. Their "involvement with and leadership of a criminal organization indicates [their] propensity for violence." *Khan*, 591 F. Supp. 2d at 170-71; *see United States v. Wilson,* 493 F. Supp. 2d 397, 400 (E.D.N.Y. 2006) (noting that "[d]efendant's criminal history and his participation in a large scale criminal enterprise without question show that he is dangerous and weigh heavily in favor of using an anonymous, partially-sequestered jury . . . ."). A number of defendants themselves concede that "members of the group may have committed acts of violence against themselves or against drug-dealing associates" (*see* Forrest Opp'n at 5) and that "the historical use of violence by co-defendant Barret is troubling" (*see* Scarlett Opp'n at 20). The government's affidavit also indicates that Barret is the leader or "don" of the "Fatherless Crew," which has nearly one hundred members in the United States, Jamaica, Canada and the United Kingdom, and that his co-defendants are among his "armed enforcers." (Ando Aff. ¶¶ 3-4.) Moreover, the government submits that the "Fatherless Crew" under Barret's leadership "routinely use[s] firearms, violence and intimidation to preserve and expand their power." (*Id*. ¶ 5.) Therefore, the second factor also weighs in favor of empanelment of an anonymous jury.

The third and fourth factors, the ability of defendants and their associates to interfere, and any previous attempts to interfere, with the judicial process, weigh in favor of an anonymous jury. The government provides numerous examples of threats and a sexual assault that defendants or their associates have made against potential government witnesses since October 7, 2010, when the majority of defendants were arrested.

For example, the government advises that immediately after Barret's arrest, he accused an individual (a confidential source, or "CS1") with whom he was incarcerated as being a "snitch" and warned CS1 to remain silent because the individual "still has family in Jamaica." (Ando Aff. ¶ 9.) The government submits that the volume at which Barret issued the threat indicated that he intended to communicate the message to all of the co-defendants with whom he was incarcerated. (*Id.*) Moreover, according to the government, CS1 received death threats for several months after the October 2010 arrests, and immediately moved away from his or her residence in December 2010, when CS1 saw two members of the "Fatherless Crew," at least one of whom was carrying a firearm, in front of CS1's residence in December 2010. (*Id.* ¶ 10.) Months later, several members of the "Fatherless Crew" left a threatening note at the business where CS1's mother worked in Jamaica; the note said in

sum and substance that CS1 was a "snitch" and would never live to testify. (*Id.* ¶ 11.)

The government has also indicated that in late 2010, a former marijuana distributor (a second confidential source, or "CS2") who previously worked for Barret's crew received threatening phone calls and text messages from members of the "Fatherless Crew" who remained at large. (*Id.* ¶ 13.) In addition, the government has provided the court with more than thirty-five threatening text messages sent to CS2 and the mother of his children, which included threats to kill them both. (*Id.*; Gov't Reply at 13-15.) The text messages indicate, and the mother of CS2's children has confirmed, that in conjunction with the threatening text messages, "four Jamaican men she did not know came up to her on the street, pointed a gun at her face and fondled her breasts while threatening to kill her if she did not tell them the whereabouts of her boyfriend (CS2)." (Ando Aff. ¶ 14; Gov't Reply at 13-15.) Such allegations and the proffered evidence demonstrate that although five defendants, including Barret, are currently incarcerated, they possess the means as well as the inclination to interfere with the judicial process.

Moreover, the argument that the third and fourth factors weigh against empaneling an anonymous jury because defendants have not been charged with jury tampering (*see*

Barret's First Opp'n at 6-8) is unavailing. As another court in this district has held, "to support a finding that an anonymous jury is warranted, obstruction of justice need not relate to prior jury tampering efforts, but instead may relate solely to efforts to tamper with witnesses . . . ." *United States v. Prado*, No. 10-CR-74, 2011 WL 3472509, at *3 (E.D.N.Y. Aug. 5, 2011). Consequently, "[a] court . . . may appropriately consider a defendant's propensity to threaten witnesses or otherwise to tamper with the judicial process in evaluating the need for an anonymous jury." *Quinones*, 511 F.3d at 296 n.6; *see United States v. Aulicino*, 44 F.3d 1102, 1116-17 (2d Cir. 1995) (upholding use of anonymous jury where defendants attempted to tamper with witnesses); *see also United States v. Blackshear*, 313 F. App'x 338, 343 (2d Cir. 2008) (finding that "[i]t does not seem unreasonable to infer that jurors might also be threatened" by defendant previously found to intimidate potential witnesses); *Prado*, 2011 WL 3472509, at *2 (granting motion for anonymous and partially sequestered jury "in light of defendants' and their associates' alleged history of witness tampering . . . combined with their alleged membership in a large-scale, violent gang with numerous members still at liberty--who have both the means and a demonstrated willingness to obstruct justice").

The only factor that does not support empaneling an anonymous jury is the amount of public and media attention that this case has received and is expected to receive.  Defendants correctly note that there has been little or no publicity regarding this case despite many months of litigation.  (*See* Scarlett Opp'n at 19; Forrest Opp'n at 5; Barret's First Opp'n at 8-9.)  Although the government cites numerous articles in support of its contention that there has been "extensive prior international and local media coverage" regarding this case (*see* Gov't Reply at 21-26), upon review of the articles, the court notes that such media coverage does not weigh in favor of empaneling an anonymous jury.  Many of the cited articles are more than two (and as many as nine) years old and published outside of the United States in publications or media outlets such as *Jamaican News Weekly*, *La Tribune des Antilles*, *The Herald Scotland* and BBC News.  (*See id.* at 21-24.)  Moreover, the cited articles that were published in the New York area discuss shootings in which some of the defendants allegedly participated, but do not name or mention any of the defendants or the "Fatherless Crew."  (*See id.* at 24-25.)  Consequently, the court disagrees with the government's claim that these examples of media attention demonstrate that "there is, in fact, strong reason to believe that media coverage will surround the

[instant] trial" and that "the current lack of specific press attention is unlikely to last." (*Id.* at 24.)

Nevertheless, because the amount of media attention is merely one of several factors to be considered, courts have empaneled anonymous juries even where a case has not generated any publicity. *See, e.g.*, *United States v. Melendez*, 743 F. Supp. 134, 138 (E.D.N.Y. 1990) (employing use of anonymous and partially sequestered jury even though case attracted virtually no publicity primarily in light of "serious allegations" that "[t]here have been contracts to kill witnesses"). After considering the parties' submissions and weighing all the relevant factors as set forth above, the court in its discretion finds that there is strong reason to believe that the jury needs protection and that an anonymous jury is warranted.[20]

In addition, because "the same reasons that warrant the use of an anonymous jury also warrant partial sequestration of the jury," *Prado*, 2011 WL 3472509, at *11, the court will partially sequester the jury. Specifically, the court will

---

[20] The fact that the allegations supporting empanelment of an anonymous jury appear to stem exclusively from actions taken on Barret's behalf or upon his orders does not warrant a different result or violate the rights of other co-defendants who will be tried with Barret, as Manning contends. (*See* Manning Opp'n at 5.) "[W]here one co-defendant warrants an anonymous jury, the other co-defendant's due process rights are not violated by a refusal to sever." *United States v. Scala*, 405 F. Supp. 2d 450, 453 n.18 (S.D.N.Y. 2005); *see also Aulicino*, 44 F.3d at 1116 (finding no error in empanelment of anonymous jury even though government did not proffer evidence linking a co-defendant in a conspiracy case to any efforts to obstruct justice).

direct the United States Marshals Service to escort empaneled jurors between the courthouse and a central undisclosed location each day and at all times during recesses. *See, e.g.*, *Paccione*, 949 F.2d at 1191 (affirming district court's partial sequestration of jurors by "having the jurors transported at the end of each trial day to an undisclosed central location from which they could go home"); *United States v. Antico*, No. 08 CR 559, 2010 WL 2545877, at *5 (E.D.N.Y. June 11, 2010) (ordering that anonymous jury be picked up and dropped off by the United States Marshals at an undisclosed central location before and after trial each day); *United States v. Tomero*, 486 F. Supp. 2d 320, 325 (S.D.N.Y. 2007) (same); *United States v. Muyet*, 945 F. Supp. 586, 590 (S.D.N.Y. 1996) (same).

## 2. Precautionary Measures

Having found that the balance of relevant factors weighs in favor of an anonymous and partially sequestered jury, the court must "tak[e] reasonable precautions to minimize any prejudicial effects on the defendant and to ensure that his fundamental rights are protected," *United States v. Stewart*, 590 F.3d 93, 124 (2d Cir. 2009) (citation omitted). Such precautions include "conducting a thorough *voir dire* and providing the jurors with a plausible and nonprejudicial reason for not disclosing their identities." *United States v. Gotti*, 459 F.3d 296, 345 (2d Cir. 2006) (citing *Paccione*, 949 F.3d at

1183); *see Prado*, 2011 WL 3472509, at *5 ("reasonable precautions" include "extensively questioning jurors during *voir dire* to explore prospective jurors' biases and providing the jurors with a neutral explanation for the anonymity that does not negatively implicate the defendants").

### a. Thorough *Voir Dire*

The use of thorough questioning during the *voir dire* process will ensure that the use of an anonymous jury does not infringe on the defendants' Sixth Amendment right to a fair and impartial jury. In *United States v. Wong*, for example, the Second Circuit reviewed a district court's decision to preclude disclosure of the jurors' names, addresses, and employers, and to "question[] prospective jurors about their familiarity with the case, the defendants and the crime scenes, and inquired about their neighborhoods, marital status, employment, spouse's and children's employment, education, organizational affiliations, ethnicity, military service" and other matters. 40 F.3d 1347, 1377 (2d Cir. 1994). The Second Circuit found that the district court took "adequate precautions to safeguard the defendants-appellants' constitutional rights" and determined that the "extensive *voir dire* adequately explored prospective jurors' bias as to issues in the case and as to the defendants, and was more than sufficient to enable the defendants to exercise their challenges meaningfully, and to obtain a fair and

impartial jury." *Id.* (internal citations, alterations and
quotation marks omitted); *see Vario*, 943 F.2d at 241-42 ("[T]he
district court conducted a searching *voir dire* which
sufficiently enabled Vario to exercise his challenges
meaningfully and to obtain a fair and impartial jury.").

The court will adopt a similar approach in the instant
case. In so ruling, the court notes that it is not an abuse of
discretion to withhold the jurors' names, addresses and places
of work from the parties and their counsel. *See Vario*, 943 F.2d
at 239-242 (finding no error in district court's empanelment of
anonymous jury in which jurors did not reveal their names,
addresses, or places of work to the parties or counsel because
such limitations were reasonable in light of the court's
"searching" *voir dire* that was "designed to uncover bias as to
issues in the cases and as to the defendant himself"); *see also
Barnes*, 604 F.2d at 142-43 (no error in *voir dire* procedure in
which "[b]oth the prosecutor and defense were equally in the
dark as to names and addresses of the prospective panelists"
because counsel for both parties "had an arsenal of information
about each person that was based on his responses to questions
concerning his own life, as well as his attitudes about the
issues that would arise in the case").

### b. Neutral Explanation

In addition, the court will offer to the jury a neutral explanation similar to that which the Second Circuit approved in *United States v. Tutino*, 883 F.2d 1125 (2d Cir. 1989):

> It is a common practice followed in many cases in the Federal court to keep the names and identities of the jurors in confidence. This is in no way unusual. It is a procedure being followed in this case.

*Id.* at 1133. Alternatively, the court proposes that the jury be advised that for purposes of organization and convenience, the court will assign numbers to each juror during the selection process and trial, and will refer to jurors by number. The court will also advise the jurors that they will be escorted by the United States Marshal Service to and from the courthouse each day "to ensure a timely start to each day of what promises to be a long trial," *United States v. Urso*, No. 03-CR-1382, 2006 WL 1210886, at *3 (E.D.N.Y. 2006), and for the jurors' convenience given the likelihood of inclement weather. The court finds that these explanations are both "plausible and nonprejudicial," as required by the Second Circuit. *See Aulicino*, 44 F.3d at 1116 (use of anonymous jury does not infringe on defendants' constitutional rights where court

conducts a searching *voir dire* and gives jurors a "plausible and nonprejudicial reason for not disclosing their identities").

The court finds that the foregoing procedures will adequately address the need to protect the jury while minimizing the effect of such measures on the jurors' opinions of the defendants. Accordingly, the court grants the government's motion for an anonymous and partially sequestered jury.

**VI. Barret's Motion to Strike References to His Aliases**

In light of the Superseding Indictment, which includes a "continuing criminal enterprise" charge, Barret renews his motion to strike his aliases from the Superseding Indictment pursuant to Federal Rule of Criminal Procedure 7(d) as "highly prejudicial language." (*See* Barret's Second Opp'n at 1.) The court previously denied Barret's motion in its November 16, 2011 decision, which addressed the parties' pre-trial motions. (*See* Order dated 11/16/2011, at 58-61.) The court has reviewed the Superseding Indictment and finds that the same reasons that supported the court's previous denial of Barret's Rule 7(d) motion continue to apply. Accordingly, the court denies Barret's renewed motion to strike his aliases from the Superseding Indictment.

## VII. Renewal of Motions for Severance

Anderson, Scarlett and Jones renew their motions for severance. (*See* Anderson Mem. at 5-6; Jones Opp'n at 1; Scarlett Opp'n at 21-22.) Anderson relies on the same grounds he raised in his initial motion for severance. (*See* Anderson Mem. at 5-6; ECF No. 250, Defense's Pretrial Motions and Memorandum of Law in Support by Ryan Anderson.) Scarlett contends that severance is warranted in light of the government's recent revelation of the "extent of violence employed by . . . Barret," which Scarlett claims will "severely prejudice[]" Barret's co-defendants at a joint trial. (Scarlett Opp'n at 21.) Scarlett also asserts that any limiting instruction from the court would be "meaningless when a trial jury listens to these violent acts purportedly committed by the lead defendant," including multiple shootings, a threat to kidnap and orders to kill. (*Id.*)

As an initial matter, the court notes that the instant *in limine* rulings--which preclude the introduction of prejudicial evidence concerning certain murders that predate the dates alleged in the Superseding Indictment and the death of an innocent bystander--significantly reduce the risk of "spillover prejudice" that Anderson and Scarlett contend will taint them in a joint trial. Furthermore, even in light of the government's anticipated proof at trial, which concededly includes numerous

acts of violence, the court finds that severance is not warranted for the reasons stated in the court's November 16, 2011 decision. (*See* Order dated 11/16/2011, at 14-27.) Accordingly, Jones, Anderson and Scarlett's renewed motions for severance are denied.

## CONCLUSION

For the foregoing reasons, the court (1) GRANTS IN PART and DENIES IN PART the government's motion to admit (a) certain acts allegedly committed by the defendants in furtherance of the conspiracy and (b) Forrest's 2007 marijuana conviction, as direct evidence of the charged crimes; (2) GRANTS IN PART AND DENIES IN PART the government's motion to admit, pursuant to Federal Rule of Evidence 404(b), evidence relating to (a) defendants' membership in a gang called the "Fatherless Crew" in Jamaica prior to moving to the United States, (b) Barret and Scarlett's incarceration together with an individual named Clifton Williams in the General Penitentiary in Jamaica, (c) Barret's 2003 attempt to shoot a rival drug dealer which resulted in the death of an innocent bystander, and (d) defendants' prior convictions for marijuana and firearms crimes; (3) DENIES WITHOUT PREJUDICE the government's motion for leave pursuant to Federal Rule of Evidence 609 to cross-examine any defendants who elect to testify regarding their criminal

convictions; and (4) GRANTS the government's motion for an anonymous and partially sequestered jury.

In addition, the court respectfully DENIES Barret's renewed motion to strike his aliases from the Superseding Indictment as surplusage pursuant to Federal Rule of Criminal Procedure 7(d). The court also respectfully DENIES renewed motions for severance from Anderson, Jones and Scarlett.

SO ORDERED.

Dated: December 21, 2011
Brooklyn, New York

_____/s/_____
**KIYO A. MATSUMOTO**
United States District Judge
Eastern District of New York