UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------X

UNITED STATES OF AMERICA                    **MEMORANDUM AND ORDER**


            - against -                     10-cr-809 (S-4)(KAM)


CHRISTOPHER BARRET, RYAN ANDERSON,
LEON SCARLETT, and OMAR MITCHELL,

            Defendants.

------------------------------------X

**MATSUMOTO, United States District Judge:**

On February 8, 2012, after a jury trial, defendants

Christopher Barret (a/k/a "Mouthy," "Solo," or the "General"),

Ryan Anderson (a/k/a "Dre"), Leon Scarlett (a/k/a "Piggy" or

"Agony"), and Omar Mitchell (a/k/a "Sox") (collectively,

"defendants") were convicted of various narcotics-trafficking

crimes charged in a six-count Fourth Superseding Indictment (the

"Superseding Indictment").  Presently before the court are

(1) defendants' opposed motions for (a) judgment of acquittal,

pursuant to Federal Rule of Criminal Procedure 29 ("Rule 29"),

and (b) a new trial, pursuant to Federal Rule of Criminal

Procedure 33 ("Rule 33"); and (2) Mr. Barret's opposed *pro se*

motions (a) for judgment of acquittal pursuant to Rule 29,

(b) for a new trial pursuant to Rule 33, (c) for substitution of

his counsel, Jack Goldberg, Esq., in advance of sentencing, and

1

(d) to compel the government's provision of "all Section 3500 material germane to Defendant's criminal prosecution." (*See* ECF No. 473 ("Scarlett Rule 29 Mem."); ECF No. 479 ("Scarlett Rule 33 Mem."); ECF No. 500 ("Scarlett Reply"); ECF No. 478 ("Barret Mem."); ECF No. 474 ("Anderson Mem."); ECF No. 480 ("Mitchell Mem."); ECF No. 498 ("Gov. Rule 29 and 33 Opp'n"); ECF No. 503 ("First *Pro Se* Barret Mem."); ECF No. 508 ("Second *Pro Se* Barret Mem."); ECF No. 517 ("Third *Pro Se* Barret Mem."); ECF No. 506 ("First Goldberg Resp."); ECF No. 515 ("Second Goldberg Resp."); ECF No. 513 ("Gov. Opp'n to *Pro Se* Mems.").)  For the reasons set forth below, defendants' motions are denied.

## I.  Background

### A. The Charges

The Superseding Indictment (ECF No. 395, Superseding Indictment ("S-4")), filed on December 27, 2011, charged defendants with various narcotics-trafficking crimes.  Count One charged Mr. Barret with knowingly and intentionally engaging in a continuing criminal enterprise between November 2006 and November 2010 (the "relevant period"), in violation of 21 U.S.C. §§ 848(a) and (c).  (*Id.* ¶ 1.)  Count One also alleged twenty-one violations, including conspiracy to distribute marijuana, maintaining a stash house, attempted possession of marijuana, distribution of marijuana, and manufacture of marijuana on various dates.  (*Id.* ¶¶ 2-22.)

2

Count Two charged Mr. Barret, Mr. Anderson, Mr. Scarlett, and Mr. Mitchell with conspiracy to distribute 1,000 kilograms of marijuana between November 2006 and November 2010, in violation of 21 U.S.C. §§ 841(b)(1)(A)(vii) and 846. (*Id.* ¶ 23.) Counts Three and Four charged Mr. Barret with conspiring to maintain (Count Three) and maintaining (Count Four) a stash house between November 2006 and October 2010, in violation of 21 U.S.C. §§ 846 and 856(a)-(b). (*Id.* ¶¶ 24-25.)

Count Five charged Mr. Barret, Mr. Anderson, and Mr. Scarlett with distributing or possessing with intent to distribute 100 kilograms of marijuana on October 7, 2010, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(vii), and 18 U.S.C. § 2. (*Id.* ¶ 26.) Count Six charged Mr. Barret, Mr. Anderson, Mr. Scarlett, and Mr. Mitchell with possessing, brandishing and discharging a firearm in relation to drug-trafficking crimes in violation of 18 U.S.C. §§ 924(c)(1)(A)(i)-(iii) and 2. (*Id.* ¶ 27.)

**B. The Trial**

After selection of an anonymous and partially sequestered jury, trial commenced with opening statements on January 9, 2012. The government presented numerous exhibits, including documents and video tapes, as well as testimony from United States Postal Inspectors James Buthorn (Trial Transcript ("Tr.") at 66-576, 597-687, 712-69), Vincent Blas (*id.* at 577-

96), Robert Moriarty (*id.* at 2063-70), and Christopher Nielsen (*id.* at 2110-50); New York State Police Officer Francisco Diaz (*id.* at 1255-65); Sergeant Michael Sykora (*id.* at 2040-47) and Detectives Mark Lotter (*id.* at 2047-63), Peter Galasso (*id.* at 1692-1722), Joseph Jordan (*id.* at 1669-92), Dustin Genco (*id.* at 2151-82), and Eric Semler (*id.* at 2422-40) of the New York City Police Department; Drug Enforcement Administration Special Agents Michael Dunn (*id.* at 1266-78), Eric Baldus (*id.* at 1320-56), and George McMillin (*id.* at 2071-87); cooperating witnesses Melbert Palmer (*id.* at 770-1254), Clifton Williams (*id.* at 1359-1669), Leemax Neunie (*id.* at 1739-2039), and Kareem Forrest (*id.* at 2192-2416); and commercial mailbox store owner Frank Chen (*id.* at 2417-2421). The government rested on January 26, 2012. (*Id.* at 2441.)

No defendant called witnesses, but several defendants entered exhibits or read stipulations into evidence.[1] All defendants rested on January 26, 2012. (*Id.* at 2443, 2468.)

---

[1] Mr. Barret entered into evidence (1) a stipulation stating that between March 15, 2007, and September 15, 2007, Mr. Barret was incarcerated at Rikers Island; and (2) a post-office receipt. (Tr. at 1663-64, 2441; Mr. Barret Ex. B.) Mr. Anderson entered into evidence (1) a medical examiner's DNA report, which showed that no fingerprints were found on either gun recovered during the course of the underlying investigation; and (2) a stipulation stating that on the morning of October 7, 2010, Mr. Anderson brought his two-year-old daughter to a medical clinic in Richmond Hill, New York, to receive vaccinations and to be physically examined. (Tr. at 648-49, 2442; Mr. Anderson Exs. A, B.) Mr. Scarlett entered into evidence a stipulation stating that between September 16, 2005, and September 15, 2008, he had been "in the custody of the New York State Criminal Justice System," and that he remained on parole until September 16, 2010. (Tr. at 2186; Court Ex. 1.)

## C. The Verdict

After four days of deliberations, the jury returned its verdict. Mr. Barret was convicted of Count One, intentionally engaging in a continuing criminal enterprise, and the jury found that all violations alleged in Count One, except Violation Six and Violation Twenty-One, were proven. (ECF No. 463, Verdict, at 1-5.)

The jury convicted Mr. Barret, Mr. Scarlett, Mr. Anderson, and Mr. Mitchell of Count Two, conspiracy to distribute 1,000 kilograms of marijuana between November 2006 and November 2010. (*Id.* at 6.) The jury also convicted Mr. Barret of conspiracy to maintain (Count Three) and maintaining (Count Four) a stash house. (*Id.* at 7.) Mr. Barret, Mr. Scarlett, and Mr. Anderson were convicted of Count Five, distribution or possession with intent to distribute 100 kilograms of marijuana on October 7, 2010. (*Id.* at 8.)

Finally, the jury convicted Mr. Barret and Mr. Anderson – and acquitted Mr. Mitchell and Mr. Scarlett – of Count Six, use of a firearm in relation to drug-trafficking crimes. (*Id.* at 9-12.) With respect to Count Six, the jury unanimously concluded that Mr. Barret used or carried, and brandished – but did not discharge - a firearm, and that Mr. Anderson used or carried – but did not brandish or discharge - a firearm. (*Id.* at 9-10.)

5

### D. Evidence at Trial[2]

#### 1.   Marijuana Deliveries to the Barret Residence

The government presented evidence of various surveillance operations, executions of search warrants, and arrests made in connection with a narcotics investigation jointly undertaken in 2010 by the United States Postal Inspection Service, the Drug Enforcement Administration (DEA), and the New York City and New York State Police Departments (collectively, "investigators").  (Tr. at 70-72.)   The investigation primarily focused on activities at (1) a residential property at 133-37 147th Street in Jamaica, Queens (the "Barret Residence"), where Mr. Barret lived with his wife, Latoya Manning (a/k/a "Toya") ("Manning"), and their two children, Latoya Manning's brother, Fabian Manning, and Kerry Gunter (a/k/a "Parker"); (2) a residential property at 259-64 148th Drive in Rosedale, Queens, where Andre Wilson (a/k/a "Mario") ("Wilson"), Kwaume Wilson, Vincent Quinones (a/k/a "Rock"), and Leemax Neunie (a/k/a "Jukes") resided; and (3)

---

[2] This summary is limited to evidence adduced at trial that is necessary to discuss issues raised in the defendants' Rule 29 and Rule 33 motions. Furthermore, in summarizing the evidence at trial, the court is mindful that "[i]n reviewing a challenge to the sufficiency of the evidence underlying a guilty verdict [pursuant to Rule 29, the court] 'must review the evidence in the light most favorable to the government, drawing all reasonable inferences in its favor.'" *United States v. Cain*, 671 F.3d 271, 302 (2d Cir. 2012) (quoting *United States v. Gaskin*, 364 F.3d 438, 459 (2d Cir. 2004)).

several commercial mail receiving agencies ("CMRA") in Flushing and Bayside, Queens.  (*Id*. at 73, 75-77, 79, 312, 337-38, 1840.)

The investigation commenced after Postal Inspectors in Phoenix, Arizona, identified three suspicious parcels that a male suspect, who was later identified as Clifton Williams, had brought to multiple post offices for delivery on January 5, 2010.  (*Id*. at 349, 578.)  One parcel was addressed to a Bronx location, while the other two parcels were addressed to "Ming's Party Supplies, 159-09 Northern Boulevard, Box 146, Flushing, New York, 11358-1636."  (*Id*. at 579, 583, 586, 589.)  A postal record database search revealed that the parcels' physical delivery and return addresses were valid, but the addressees named on the parcels were inconsistent with postal records. (*Id*. at 579.)  Moreover, a narcotic-detection canine that examined the parcels gave positive alerts, suggesting the presence of narcotics.  (*Id*. at 578-79.)  After executing a search warrant on the three parcels, Inspector Blas opened the parcels, each of which contained bales of marijuana nestled in foam packing peanuts.  (*Id*. at 580-81.)  Each marijuana bale was wrapped in layers of clear cellophane wrapping, hot sauce to disguise the scent of marijuana, carbon paper, and contact paper.  (*Id*. at 581-83, 621.)  Altogether, Postal Inspectors seized seventeen kilograms of marijuana from the three parcels. (*Id*. at 206; Government Exhibit ("GX") 18-20.)

Following the January 2010 seizure of marijuana from
Williams's parcels in Phoenix, investigators used mail records
to track certain parcels mailed from specific zipcodes in
Arizona to CMRAs in Flushing, including the CMRA located at 159-
09 Northern Boulevard, Box 146.  (Tr. at 541-58; GX 517.)
Inspector Buthorn testified about numerous dates on which
investigators conducted visual surveillance at the CMRA
locations, the Barret Residence, and the Wilson Residence.  (Tr.
at 541-58.)  The government also introduced video footage from a
pole camera that was installed at the Barret Residence, which
allowed investigators to view the Barret Residence from a remote
location.  (*Id*. at 79-80; GX 1.)  Together, the evidence showed
that:

- On July 27, 2010, investigators observed Mr.
  Mitchell walking back and forth between the front of
  the Barret Residence and a nearby street corner.
  (Tr. at 319-20; GX 723, 723-A.)  When an individual
  arrived in a silver Chrysler, Mr. Mitchell conversed
  with the individual, then motioned to allow the
  individual to back the Chrysler into the driveway of
  the Barret Residence.  (Tr. at 320.)  At that time,
  a second individual removed from the vehicle and
  brought into the Barret Residence a cardboard box

consistent in size and appearance with boxes later found to contain marijuana.  (*Id*. at 320-21.)

- On August 26, 2010, four parcels that together weighed approximately 100 pounds were tendered at a post office in Phoenix.  (GX 517.)  Two days later, the parcels arrived at a CMRA in Flushing[3] on August 28, 2010, and at 1:37 p.m. that day, Wilson backed his white Cadillac Escalade into the driveway at the Barret Residence and unloaded the boxes into the house.  (Tr. 543; GX 1, 517.)

- On August 28, 2010, three parcels that together weighed approximately 75 pounds were tendered at a post office in Phoenix.  (GX 517.)  The parcels arrived at a CMRA in Flushing two days later on August 30, 2010, and at 1:37 p.m. that day, Wilson backed his white Cadillac Escalade into the driveway at the Barret Residence and unloaded boxes into the house.  (GX 1, 517.)

- On September 2, 2010, three parcels that together weighed approximately 75 pounds were tendered at a post office in Phoenix.  (GX 517.)  The parcels arrived at a CMRA in Flushing two days later on

---

[3] All relevant CMRAs were applied for and opened by Tracy Chin, the girlfriend of Kwaume Wilson, Andre Wilson's brother.  (Tr. at 616.)

September 4, 2010, and at 1:59 p.m. that day, Wilson backed his white Cadillac Escalade into the driveway at the Barret Residence and unloaded boxes into the house. (GX 1, 517.)

- On September 18, 2010, one parcel that weighed approximately 30 pounds was tendered at a post office in Phoenix. (GX 517.) The parcel arrived at a CMRA in Flushing two days later on September 20, 2010, and at 1:02 p.m. that day, Wilson delivered the box to the Barret Residence. (GX 1, 517.)

- On September 20, 2010, five parcels that together weighed approximately 135 pounds were tendered at a post office in Phoenix. (GX 517.) The parcels arrived at a CMRA in Flushing two days later on September 22, 2010, and at 4:37 p.m. that day, a black sedan backed into the driveway at the Barret Residence and boxes were unloaded into the house. (*Id.*) Approximately one hour later, at 5:35 p.m. that same day, Wilson backed his white Cadillac Escalade into the driveway at the Barret Residence and unloaded boxes into the house. (GX 1, 517.)

- On September 21, 2010, three parcels that together weighed approximately 75 pounds were tendered at a post office in Phoenix. (GX 517.) The parcels

arrived at a CMRA in Flushing two days later on September 23, 2010, and at 7:07 p.m. that day, Wilson backed his white Cadillac Escalade into the driveway at the Barret Residence and unloaded boxes into the house. (GX 1, 517.)

- On September 24, 2010, one parcel that weighed approximately 22 pounds was tendered at a post office in Phoenix. (GX 517.) On September 27, 2010, investigators surveilled and followed Wilson to the CMRA at 2:30 p.m. that day (*id.*); however, Wilson left the CMRA without any boxes because the parcel had not yet arrived. Investigators observed that the parcel was delivered to the CMRA later that afternoon on September 27, 2010, at 3:23 p.m. (*Id.*)

- On September 28, 2010, three parcels that together weighed approximately 75 pounds were tendered at a post office in Phoenix. (*Id.*) The parcels arrived at two CMRAs in Flushing on the afternoon of September 30, 2010, and on that date, investigators observed Wilson pick up the parcels from the two CMRAs and deliver them in a black BMW to the Barret Residence. (GX 1, 517; Tr. at 345-49.)

- On October 5, 2010, ten parcels that together weighed approximately 265 pounds were tendered at a

post office in Phoenix.  (GX 517.)  The parcels

arrived at three CMRAs in Flushing two days later on

October 7, 2010, and on the afternoon of October 7,

2010,[4] investigators observed Wilson pick up nine of

the parcels from two CMRAs and deliver the parcels

to the Barret Residence.  (GX 1, 517.)  On November

19, 2010, investigators recovered the tenth parcel

from the third CMRA, located at 42-06A Bell

Boulevard, and seized approximately 10 kilograms of

marijuana from the parcel.  (Tr. at 205-06, 307-11;

GX 464, 517.)

In addition, the government introduced testimony about
evidence collected from the garbage left outside of the Barret
Residence during periodic "trash pulls" that investigators
conducted on August 19, September 2, and September 23, 2010.
(Tr. at 321-22, 332-33, 342-43.)  The trash pulls yielded bags
containing "marijuana shake," the remnants of marijuana that
fall off the bale as it is being processed or packaged; pieces
of cardboard; plastic bags with marijuana residue; and discarded
rubberbands.  (Tr. at 322-23, 332-36, 342-44; GX 469-70, 472-
78.)  Inspector Buthorn testified that "a powerful smell of
marijuana" emanated from some of the bags recovered during the
trash pulls.  (Tr. at 334-37.)

---

[4] The arrests and executions of search warrants that followed on October 7,
2010, are discussed in greater detail, *infra*, in Section I.D.2.

### 2.    Events of October 7, 2010

On October 7, 2010, according to cooperating witness Mr. Forrest, numerous individuals gathered at the Barret Residence in anticipation of a large delivery of marijuana. (Tr. at 2196-97.) Upon Mr. Forrest's arrival, Mr. Barret instructed Mr. Forrest to retrieve two firearms from Mr. Barret's bedroom dresser and to carry the guns while accompanying other co-conspirators in the delivery of marijuana to the Barret Residence. (Tr. at 2198-2201.) Mr. Forrest identified Government Exhibits 42 and 43 as the firearms that he retrieved and carried on October 7, 2010.[5] (*Id.* at 2199.)

At approximately noon, Palmer arrived at the Barret Residence with $1,500 to purchase marijuana. (*Id.* at 909-10.) When Palmer arrived, Mr. Barret informed Palmer that he did not have marijuana yet, but a shipment was due "in a few," so Palmer should stay and wait. (*Id.* at 910.) While waiting, Palmer observed Mr. Barret conversing with a group of individuals, including Gunter, "Back-It," Charles Jones (a/k/a "Speedy"), Constantine Branch (a/k/a "Butu"), and Kevin Lee (a/k/a "Bala Boy"). (*Id.* at 909-11, 915, 2197.) Mr. Barret instructed Mr. Scarlett, Mr. Forrest, Back-It, and Donovan Downer to accompany

---

[5] During the execution of a search warrant at the Barret Residence in the afternoon of October 7, 2010, investigators recovered one of the firearms in the backyard adjacent to the Barret Residence backyard. (Tr. at 129-32, 144, 2072-77; GX 42, 43.) Investigators also recovered the other firearm, which was loaded, on the floor of the living room, under a chair, during the search of the Barret Residence. (*Id.*)

Wilson to pick up the marijuana at the CMRAs "to make sure everything [ran] smoothly." (*Id.* at 910-11, 2198, 2203.) Palmer also heard Mr. Barret instruct Mr. Forrest to retrieve the two guns, and give one to Mr. Scarlett and one to Mr. Anderson. (*Id.* at 911.)

After Wilson arrived at the Barret Residence, he left for the CMRAs with escorts: Downer and Mr. Scarlett followed Wilson in a Nissan Quest, and Back-It and Mr. Forrest followed Wilson in a separate vehicle. (*Id.* at 2203-04.) Together, Back-It, Mr. Forrest, Downer, and Mr. Scarlett drove to two different CMRAs, where they watched Wilson unload the boxes into his white Cadillac Escalade. (*Id.* at 2204-05.) Investigators conducting surveillance at the CMRAs observed Wilson as he picked up the parcels and loaded them into his vehicle. (*Id.* at 75-77, 159-60, 557.) The surveillance team also observed Downer and Mr. Scarlett in a vehicle, following Wilson from the CMRA to the Barret Residence. (*Id.* at 264-65.)

On the way back to the Barret Residence, Wilson and each of his escorts circled the neighborhood to ensure that all was clear. (*Id.* at 2205.) Video evidence from the pole camera and Mr. Barret's own home surveillance system, which investigators later seized, showed the arrival of Wilson's white Escalade and Mr. Scarlett and Downer in the Nissan Quest, at approximately 12:50 p.m. on October 7, 2010. (GX 1, 278; Tr. at

555-56, 913, 915, 2208-09.)  Mr. Scarlett exited the passenger
side of the Nissan Quest, picked up a box, and carried it into
the kitchen of the Barret Residence.  (*Id*. at 761-62.)  Mr.
Forrest and Jones also returned, and Mr. Anderson arrived at
approximately the same time.  (*Id*. at 2206.)  Palmer, Downer,
Mr. Forrest, and Jones then unloaded boxes from Wilson's vehicle
and carried them into the kitchen of the Barret Residence.  (*Id*.
at 566-67, 911-12, 916-19, 2206, 2209-10; GX 278.)

     As instructed by Mr. Barret, Mr. Forrest and Branch
cut open the boxes and removed both the address labels and the
marijuana.  (Tr. at 911, 919-21, 2206-08.)  Mr. Barret also
directed Palmer to burn the labels.  (*Id*. at 920-21, 2207.)  Mr.
Barret then left the Barret Residence with an individual known
to Palmer as "Blacks."  (*Id*. at 921.)  Shortly thereafter,
investigators stopped and arrested Mr. Barret and an individual
named Kareem Reid several blocks from the Barret Residence as
they drove in Mr. Barret's Nissan Quest.  (*Id*. at 1255-60.)
Before his arrest, however, Mr. Barret called Lee, who was at
the Barret Residence, and told him to "Run, run, run."  (*Id*. at
912, 922.)

     Shortly after arresting Mr. Barret and Reid,
investigators sent a SWAT team into the Barret Residence to
execute a search warrant.  (Tr. at 1268-70.)  Mr. Anderson, Mr.
Scarlett, Gunter, Downer, Lee, Manning, Fabian Manning, Mr.

Forrest, Jones, Palmer, and Branch were arrested inside or near the Barret Residence. (*Id*. at 85-87, 160-64, 1271.) Palmer and Mr. Scarlett attempted to flee when the raid began, but both were apprehended in the yard adjacent to the Barret Residence backyard. (*Id*. at 762, 923-24.) Mr. Barret's home surveillance footage showed that Mr. Anderson was in the backyard when the search warrant was executed, and as the investigators approached the Barret Residence, Mr. Anderson rushed toward the back door, moving his hands toward his waistband area. (*Id*. at 164, 571-73; GX 278.) He encountered Manning at the back door, then both disappeared into the Barret Residence, and the back door closed behind Mr. Anderson. (Tr. at 164, 571-73, 660, 762-63; GX 278.) Several seconds later, Mr. Anderson calmly and slowly emerged from the back door with his hands above his head as law enforcement officers approached to handcuff him. (Tr. at 164, 571-73, 660, 762-63; GX 278.)

### a. Search of the Barret Residence

The government presented extensive testimony, as well as physical and video evidence, of items investigators recovered upon executing a search warrant at the Barret Residence on October 7, 2010. Investigators found an open parcel and one bale of marijuana, wrapped in duct tape, on the kitchen counter, and another bale of marijuana on the floor. (Tr. at 83-85, 176-77, 201.) One of the bales, cut open to show each layer of

packaging, had an outer layer of duct tape that concealed underlying layers of plastic wrap and hot sauce. (*Id.* at 195-98; GX 205-09.) Investigators opened the remaining parcels that Wilson had delivered to the Barret Residence from two CMRAs on October 7, 2010, and found that each parcel contained similarly wrapped bales of marijuana. (Tr. at 83-85, 198-99, 619.) The total gross weight of the marijuana bales found in the Barret Residence on October 7, 2010 exceeded 95.7 kilograms. (*Id.* at 203.)

During the October 7, 2010 search of the Barret Residence, investigators also found a garbage bag containing approximately 8.4 kilograms of marijuana, approximately 12 kilograms of marijuana packaged in Ziploc bags, two digital scales, foam packing peanuts, FoodSaver vacuum sealing machines, and rolls of vacuum sealing bags. (*Id.* at 91-96, 100, 102-03, 123, 196-98, 203; GX 4-6, 13-14, 36, 39-41.) In addition, investigators discovered a gun box in a back bedroom on the second floor. (Tr. at 121-22.)

In the Barret Residence on October 7, 2010, investigators also found a home surveillance system with multiple camera angles that showed activity in the backyard, backdoor, front, and driveway of the Barret Residence. (GX 278; Tr. at 110-14, 119-20.) Real-time footage from the surveillance system appeared on monitors in multiple rooms within the home,

including the master bedroom and the kitchen.  (GX 278; Tr. at 110-14, 119-20.)

During the October 7, 2010 search of the Barret Residence, investigators recovered a firearm in the backyard adjacent to the Barret Residence backyard.  (Tr. at 129-32, 144; GX 43.)  They also recovered a loaded firearm on the floor of the living room, under a chair.  (GX 42; Tr. at 129-32, 144, 2072-77.)  The gun was located approximately ten feet from the backdoor.  (Tr. at 2072-77.)

Investigators also recovered a total of fifty-seven cellular phones from the Barret Residence and the arrestees present at the time of the search.  (*Id*. at 252-75, 280, 283-98).  Data later recovered from one of the cell phone revealed a series of text messages containing bank names and account holders' names and account numbers.  (*Id*. at 270.)  Inspector Buthorn testified that the investigators later ascertained that an individual named "Prezi"[6] had used one of the cell phones to send to Mr. Barret and Manning text messages bearing bank account information so that Mr. Barret could send money back to "Prezi" in Arizona.  (*Id*. at 270.)

In addition, data downloaded from Mr. Barret's phone revealed text messages bearing the address of "Tanya wang's nail & spa, 42-06A bell blvd, Bayside NY 11361 Suite #243."  (*Id*. at

---

[6] Mr. Barret's Arizona-based marijuana supplier, Clifton Williams, testified that one of his nicknames is "Prez."  (Tr. at 1360.)

293; GX 310, 344.)  Moreover, documents recovered from the living room floor of the Barret Residence during the search included a piece of paper that read, "Ying's Party Supply, 42-06A Bell Blvd #230, Bayside, NY 11361."  (GX 307; Tr. at 227-28.)  The Bell Boulevard locations listed in the text messages and document matched the address of a CMRA to which other parcels containing marijuana had been delivered – including a tenth parcel of marijuana delivered on October 7, 2010.[7]  (Tr. at 205-06, 298, 307-11; GX 464, 517.)

### b. Search of Wilson Residence

Before executing the search warrant at the Barret Residence, investigators set up another surveillance team on October 7, 2010, at the Wilson Residence.  (Tr. at 77, 178, 557.)  Investigators later executed a search warrant at the Wilson Residence, where they found one bag with a pound of marijuana and another bag with approximately one ounce of marijuana.  (*Id*. at 179.)  Investigators also recovered a business card bearing the address of "42-06 A Bell Boulevard, Bayside, New York 11361" in the basement bedroom of the Wilson Residence.  (*Id*. at 307.)

---

[7] As discussed *supra* in Section I.D.1, Wilson was arrested before picking up this tenth parcel on October 7, 2010, and on November 19, 2010, investigators recovered the tenth parcel from the CMRA on Bell Boulevard, and seized approximately ten kilograms of marijuana from the parcel.  (Tr. at 205-06, 307-11; GX 464, 517.)

### c. Vehicle Searches

At the time of Wilson's arrest, he was on the phone with Neunie, who testified that he (Neunie) then called Kwaume Wilson to inform him that "Mario [Wilson] just got locked up by Mouthy [Mr. Barret]." (Tr. at 1767.) Kwaume Wilson and Neunie then loaded the marijuana that had been stored in the Wilson Residence into Neunie's car to dispose of it, but they were apprehended and arrested three-quarters of a mile away from the Wilson Residence. (*Id*.) Investigators searched the vehicle, a black BMW that had been observed picking up packages during surveillance operations on numerous previous dates. (*Id*. at 178, 1768.) The search of the black BMW revealed a scale, a black garbage bag that contained approximately eight kilograms of marijuana, and a cardboard box that contained a bale of marijuana that weighed approximately fourteen kilograms. (*Id*. at 178-79, 204-05, 226, 241; GX 39.) Neunie explained at trial that the marijuana found in his vehicle was not from Mr. Barret; rather, it was non-Arizona grade marijuana from Neunie's supplier in Los Angeles. (Tr. at 1768.)

When investigators executed a search warrant on a gold Nissan Maxima that belonged to Mr. Barret and that had been observed on numerous occasions during the course of the investigation, they found a hydraulic trap, or hidden compartment, above the speedometer. (Tr. at 243-46, 298-99; GX

281, 546.)  The hidden compartment, when opened, was six to eight inches across and approximately six to eight inches deep. (Tr. at 246.)

### 3.  Mr. Mitchell's Arrest

Because Mr. Mitchell was not present at the Barret Residence on October 7, 2010, he was not arrested with his co-defendants at that time.  (Tr. at 166.)  When Mr. Mitchell was later apprehended, however, Mr. Mitchell waived his *Miranda* rights and agreed to make a statement to investigators, which was admitted at trial.  (*Id*. at 439-42.)

In his post-arrest statements, Mr. Mitchell identified himself in photographs taken during the July 27, 2010 surveillance at the Barret Residence.  (*Id*. at 442.)  Mr. Mitchell also correctly identified photographs of numerous other persons arrested on October 7, 2010, including Kwaume Wilson, Neunie, Lee, Palmer, Gunter, and Clifton Williams, whom Mr. Mitchell claimed to have seen at the Barret Residence.  (*Id*. at 444-46.)

Mr. Mitchell further stated that he had seen an individual named Stewie bring $9,000 to the Barret Residence to buy marijuana, and that he had seen Gunter and Back-It with firearms at that location.  (*Id*. at 443, 450.)  Mr. Mitchell also told investigators that he had seen Manning with money at that location and that she occasionally gave him $200, and that

he had seen Wilson bring boxes to the Barret Residence. (*Id.* at 443-44.)

### 4. Additional Evidence of the Marijuana Distribution Conspiracy

#### a. Suppliers

##### i. "Junior"

Until 2008, Mr. Barret acquired marijuana at a wholesale level from an individual named "Junior." (Tr. at 1798-99, 1839-40, 2217.) Although Junior and Mr. Barret were once friends, Junior later became a rival, which resulted in conflict and violence. (*Id.* at 1798.) In 2009, a feud developed between Junior and Mr. Barret when Mr. Barret sent money for marijuana to Junior, and Junior sent a box of rice and peas instead of delivering narcotics. (*Id.* at 1810-11.) In response, Mr. Barret sent a crew to break into Junior's house. (*Id.* at 1811.)

In March 2010, Junior came to a club called Rapture, looking for Mr. Barret, who was not present at the time. (*Id.* at 1812, 1816.) One of Mr. Barret's friends, "Pluggy," started arguing with Junior after hearing Junior refer to Mr. Barret as an idiot. (*Id.* at 1816.) As the fight escalated, Junior went to his car to retrieve an AK-47 assault rifle and began to shoot. (*Id.* at 1816-17.) Following the shooting incident at Rapture, Mr. Barret offered to give thirty pounds of marijuana

to anyone who killed Junior.  (*Id*. at 1818.)  Neunie testified
that following Mr. Barret's establishment of a thirty-pound
marijuana bounty, Mr. Scarlett told Neunie that Junior was a
baby and if Mr. Scarlett caught Junior, Junior would be dead.
(*Id*. at 1818.)

### ii. Clifton Williams ("Driver")

Clifton Williams, known to Mr. Barret and others as
"Driver" or "Prezi," testified as a cooperating witness and told
the jury that he sold and shipped marijuana from various cities
in Arizona for a living from 2008 until his arrest in January
2011.  (Tr. at 1360, 1366-67.)  Williams purchased the marijuana
for approximately $500 per pound from multiple suppliers in
Mexico.  (*Id*. at 1362, 1413.)

Beginning in 2008, Williams began to sell his Arizona-
grade marijuana to Mr. Barret for approximately $550 per pound.
(*Id*. at 1413, 1839-40, 2217.)  Williams shipped the marijuana
from Arizona to Mr. Barret in New York through the U.S. postal
mail or UPS.  (*Id*. at 1360-61, 1477.)  Mr. Barret supplied
Williams with destination addresses, all of which were "mailbox
stores," or CMRAs.  (*Id*. at 1362-63.)

Williams sent parcels containing 80-100 pounds of
marijuana to Mr. Barret approximately twice per month between
2008 and 2010.  (*Id*. at 1363-64.)  In addition, on several
occasions, Williams sent more than 200 pounds of marijuana at

23

once. (*Id.* at 1363.) Before shipping the marijuana, Williams packaged it in white or brown cardboard boxes, each of which contained a single block of marijuana that weighed approximately twenty pounds. (*Id.* at 1361-62.) To prepare each marijuana bale for shipment, Williams wrapped the bale in cellophane, covered the cellophane with hot sauce to prevent drug-sniffing dogs from detecting the marijuana, wrapped the bale in more cellophane, then covered the entire bale with duct tape. (*Id.* at 1399-1403.) Williams then placed the bale into a cardboard box, nestled in foam packing peanuts. (*Id.* at 1401-02.)

In early 2010, after Williams had been supplying Mr. Barret with marijuana for some time, Williams brought Mr. Barret to visit one of his Mexican suppliers in Phoenix, Mr. Barret "looked on [the marijuana] and say he like it," and purchased approximately 100 pounds of marijuana from the Mexican supplier. (*Id.* at 1364-65.) Williams transported Mr. Barret's marijuana purchase back to Williams's house in Arizona, where Williams packaged it and sent it to Mr. Barret via U.S. postal mail. (*Id.* at 1366.)

### b. Wilson's Role

Before Wilson began working with Mr. Barret, Wilson opened multiple CMRAs in Flushing and Bayside, Queens, for which he paid monthly. (Tr. at 1840.) Each mailbox was associated with the name of a business. (*Id.*) After opening several CMRA

24

accounts, Wilson arranged for the delivery of small quantities of marijuana to the CMRAs to test them. (*Id.* at 1841.) Wilson then shared his use of the CMRAs with Mr. Barret, who had the steady source of marijuana that Wilson lacked. (*Id.*)

Consequently, Mr. Barret arranged to have marijuana shipped to designated business names and addresses, each affiliated with a CMRA that Wilson provided. (*Id.* at 1842.) When boxes arrived at the CMRA, the CMRA store owner contacted Wilson, and either Wilson or Neunie retrieved the parcels and brought them to the Barret Residence to be weighed and distributed. (*Id.*) Mr. Barret paid Wilson $500 for each box that Wilson delivered from the CMRAs. (*Id.* at 1465-66, 1846.) In addition, Mr. Barret often gave Neunie and Wilson marijuana to be sold by Neunie, Wilson, Kwaume Wilson, or Quinones. (*Id.* at 1842-43.)

After selling the marijuana, Wilson brought payment to Mr. Barret, or Mr. Barret, Manning, or Mr. Forrest went to the Wilson Residence to collect payment on Mr. Barret's behalf. (*Id.* at 1842, 1844.) Neunie recalled that when Mr. Barret visited the Wilson Residence to collect money, Mr. Barret always carried a gun and had someone else accompany him because the sums of money he collected were so large: Mr. Barret once collected between $30,000 and $40,000 from Wilson at one time. (*Id.* at 1844.)

25

### c. Sales in New York

Mr. Forrest and Palmer testified that whenever Wilson delivered parcels of marijuana to the Barret Residence, Mr. Barret instructed Mr. Forrest to cut off the box labels and burn them, and transfer the marijuana to garbage bags. (Tr. at 886-87, 2221, 2223.) Mr. Forrest also cut the boxes down and tied them up with duct tape, disposed of the foam peanuts in a garbage bag, and drove elsewhere to dump the paraphernalia. (*Id*. at 2221, 2223.)

Mr. Forrest and Wilson then weighed the marijuana by the pound. (*Id*. at 886-87, 2221, 2223.) When customers came to the Barret Residence to pick up marijuana from Mr. Barret, the marijuana was stored in a Ziploc bag, which was placed into a garbage bag, which was then handed to the customers in a shopping bag. (*Id*. at 817-18, 2223.) Usually Mr. Barret, Mr. Forrest, or Gunter distributed the marijuana to customers, who paid Mr. Barret approximately $900-950 per pound of marijuana. (*Id*. at 815, 819, 2224.) When customers tendered payment, Mr. Barret instructed Mr. Forrest or Manning to count the money for him. (*Id*. at 821, 832-33, 2224.)

When Neunie and Wilson began to work for Mr. Barret in 2008, they sold approximately 100 pounds of marijuana for Mr. Barret every week. (*Id*. at 1846.) At the time of their arrest in 2010, they were selling approximately 400 pounds per week or

week-and-a-half for Mr. Barret.  (*Id.*)  Mr. Forrest also

estimated that in 2009, approximately two boxes of marijuana

like those in evidence were delivered to the Barret Residence

every two weeks.  (*Id.* at 2220.)

### 5.    Other Co-Conspirators

Cooperating witnesses Mr. Forrest, Palmer, and Neunie

acknowledged that they sold marijuana for Mr. Barret, and

identified Mr. Anderson, Mr. Scarlett, Mr. Mitchell, Gunter,

Jones, Wilson, Branch, Downer, Manning, Back-It, and Lee as

individuals who were also involved in this conspiracy.  (Tr. at

773, 799, 881, 1755-56, 2193-96.)  Palmer testified that he met

Mr. Barret in approximately 2001 or 2002, and he began

purchasing marijuana from Mr. Barret in 2008.  (*Id.* at 791,

816.)  Between 2008 and 2010, Palmer purchased marijuana from

Mr. Barret approximately twenty or thirty times, and he sold

approximately 100 pounds of marijuana purchased from Mr. Barret.

(*Id.* at 771-73, 819.)

Mr. Forrest was perceived by Mr. Palmer to be Mr.

Barret's "right-hand[] man" because Mr. Barret entrusted Mr.

Forrest with tasks such as cutting up delivered boxes, giving

marijuana to customers, counting money, and making purchases for

Mr. Barret.  (*Id.* at 836-37.)  Mr. Barret also sent Mr. Forrest

to collect a payment from Wilson and once instructed Mr. Forrest

to punch Wilson in the face if Wilson did not pay.  (*Id.* at 839,

27

882, 2226.) Palmer and Mr. Forrest both indicated that in
general, if customers took too long to pay Mr. Barret for
marijuana, he "would get mad about his money and he would try to
hurt you for that." (*Id*. at 882, 2225.)

According to the testimony at trial, Mr. Anderson was
one of Mr. Barret's co-conspirators and friends, and a constant
presence at the Barret Residence. (*Id*. at 773, 881, 877-78,
1445-46, 1757, 1760, 2245.) Palmer also saw Mr. Anderson pick
up marijuana from Mr. Barret on several occasions in 2010. (*Id*.
at 773, 879-80.) Mr. Forrest testified that Mr. Barret directed
Mr. Forrest to keep a log of who received marijuana when
shipments came in from Arizona, and Mr. Forrest recalled that
Mr. Anderson receive approximately two pounds of marijuana from
Mr. Barret in 2010. (*Id*. at 2245-46.)

Palmer testified that one day in 2010, Mr. Barret
purchased a small gun and handed it to Mr. Anderson, who said
approvingly, "Yeah, man, buy this gun. Look how small it is.
We can smuggle it like when we go into a club." (*Id*. at 878-79,
1052-53.) On other occasions, Palmer saw Mr. Anderson follow
and protect Wilson when Wilson retrieved marijuana shipments
from the CMRAs. (*Id*. at 879.) Palmer testified that Mr.
Anderson, by his own admission, was "always strapped," meaning
that he always carried a gun. (*Id*. at 880.) When Palmer and
Mr. Anderson were incarcerated together after the October 7,

2010 search and arrests, Mr. Anderson told Palmer that Mr. Anderson had carried a gun on the day of the arrest, but that when the police came, Mr. Anderson threw the gun away. (*Id.*)

Between 2008 and 2010, when Mr. Scarlett was paroled from prison, he was one of Mr. Barret's "enforcers" who carried guns and accompanied Mr. Barret to protect him when he collected payments for marijuana from customers and when Mr. Barret went to clubs.[8] (*Id.* at 799-800, 808-10, 847, 858-59, 1164-65, 1742-44.) During that period, Neunie testified that he saw Mr. Scarlett carry a gun on more than twenty occasions, both at clubs and when marijuana deliveries were made to the Barret Residence. (*Id.* at 1744-45.)

Mr. Scarlett also purchased marijuana from Mr. Barret. (*Id.* at 773, 858, 862-63, 1162.) Every one to two weeks, Mr. Forrest testified that Mr. Scarlett received three to five pounds of marijuana to sell. (*Id.* at 2243-44.) Neunie sometimes sold marijuana on behalf of Mr. Scarlett, who had few customers and was unable to successfully sell it himself. (*Id.* at 1752.)

Palmer testified that during their incarceration, Mr. Scarlett confessed that he carried a gun and threw it away as he fled from law enforcement on October 7, 2010. (*Id.* at 859-60,

---

[8] Palmer also identified Gunter and Jones as two of Mr. Barret's "enforcers" who carried guns and accompanied Mr. Barret at clubs to protect Mr. Barret. (Tr. at 799-800, 808-10.)

1238.)  Palmer also heard Mr. Scarlett state that earlier in the day on October 7, 2010, Mr. Barret had given Mr. Anderson and Mr. Scarlett each a gun to protect the marijuana.  (*Id.* at 860-62.)  In addition, after their arrest, Mr. Scarlett and Mr. Barret expressed concern that Mr. Barret's home surveillance video would be seized and reveal their activities.  (*Id.* at 899; GX 278.)

Mr. Mitchell was present at the Barret Residence "pretty often" and received marijuana to sell to his own customers.  (Tr. at 867-68, 1415, 1753-54, 2239, 2278.)  Government Exhibit 1 showed Mr. Mitchell and another individual unloading cardboard boxes from Wilson's truck on September 23, 2010.  (*Id.* at 890-91.)  In addition, as discussed *supra*, investigators observed Mr. Mitchell at the Barret Residence on July 27, 2010, participating in the delivery of a parcel presumed to contain marijuana.  (*Id.* at 319-21; GX 723, 723-A.)

Palmer and Mr. Forrest testified that Mr. Mitchell's role was often that of a lookout because Mr. Barret instructed Mr. Mitchell to remain in the front yard and watch for police and robbers.  (Tr. at 867-68, 2240-41.)  Neunie testified that he observed Mr. Mitchell in the backyard of the Barret Residence and that Mr. Mitchell was "strapped" with a gun to "protect[] the drugs from other drug dealers or robbers from taking it." (*Id.* at 1754.)  Neunie also testified that in 2010, he saw Mr.

Mitchell acting as an armed lookout at a party for Mr. Barret. (*Id*. at 1755.)  Neunie observed that Mr. Mitchell primarily in the front of the club, "looking out, [to] see if anybody want to shoot up at the party or stuff like that." (*Id*. at 1755-56.) Mr. Mitchell stopped visiting the Barret Residence shortly before October 7, 2010, because Mr. Barret and Mr. Mitchell had an altercation observable on the surveillance videotape over two pounds of marijuana that Mr. Barret believed Mr. Mitchell took from Mr. Barret.  (*Id*. at 876-78, 897-99, 2241-43.)

Neunie started selling marijuana for Mr. Barret in 2007.  (*Id*. at 1796.)  One of Neunie's earliest interactions with Mr. Barret occurred in 2007, when Neunie, who worked as a cab driver, brought Mr. Barret to the Bronx at the request of Wilson, Neunie's best friend and roommate.  (*Id*. at 1740, 1796.) In the Bronx, Mr. Barret picked up two boxes that contained a total of approximately forty pounds of marijuana.  (*Id*. at 1797-98.)  Neunie then drove Mr. Barret back from the Bronx to drop off the boxes at the house on Van Wyck Boulevard where Mr. Barret then resided.  (*Id*. at 1797.)  Mr. Barret paid Neunie $100 for picking him up, and gave Neunie four or five pounds of marijuana for Wilson to sell.  (*Id*. at 1799.)

Neunie soon became more actively involved in selling marijuana because Neunie had "good customers that would put their money up" and the connection to Mr. Barret enabled Neunie

to sell "major weight." (*Id.* at 1800.) Consequently, for three years until his arrest on October 7, 2010, Neunie primarily sold Mr. Barret's marijuana. (*Id.* at 1739-40, 1801.) Neunie also bought and sold marijuana from other people, but seventy-five percent of his marijuana came from Mr. Barret. (*Id.* at 1801.)

Based on jailhouse conversations Neunie heard among all of the individuals arrested on October 7, 2010, Neunie understood that the marijuana delivered to the Barret Residence that day had been intended to be distributed in the following proportions: seventy pounds for Lee; fifteen pounds for Jones; fifteen pounds for Palmer; ten pounds for Gunter; and four pounds for Mr. Scarlett. (*Id.* at 1761-63.) Mr. Barret intended to send the remaining marijuana to the Wilson Residence to be stored and sold by Neunie, Wilson, and Kwaume Wilson. (*Id.* at 1763.) Mr. Barret also indicated that Mr. Anderson had already received his portion of the marijuana from a shipment that arrived the previous day. (*Id.* at 1763-64.)

### 6.    Proceeds from Drug Sales

The vast quantities of marijuana purchased and sold from the Barret Residence were worth millions of dollars, according to DEA Special Agent Eric Baldus, who testified as an expert in, *inter alia*, marijuana pricing and trafficking. (Tr. at 1327.) Special Agent Baldus testified that during the relevant period, the wholesale value of one pound of "Arizona-

32

quality" marijuana cost approximately $500 per pound in Arizona. (*Id.* at 1332.) The wholesale value of that marijuana doubled in New York, where the marijuana sold for $1,000 per pound. (*Id.*) Williams, Mr. Barret's supplier, also testified that he (Williams) bought marijuana for $500 per pound in Arizona, and sold it to Mr. Barret for approximately $900 per pound. (*Id.* at 1535.)

Special Agent Baldus further testified that at the retail or street level, marijuana sold in gram amounts for approximately $10 per gram. (*Id.* at 1339.) Because there are approximately 450 grams in one pound, one pound of Arizona-quality marijuana would have sold for approximately $4,500 in the New York City area between 2006 and 2010. (*Id.* at 1339-40.)

Mr. Barret used a portion of the proceeds from his marijuana sales to pay Williams for the supply of marijuana, and employed several methods to make such payments to Williams. (Tr *Id* at 1367.) At times, Mr. Barret paid individuals to serve as couriers and travel with bundles of money to destinations such as Tucson or Las Vegas, where Williams would meet the courier to collect payments. (*Id.* at 1367-70, 2227-28.) In 2010, Neunie and Wilson purchased a suitcase with hidden compartments for carrying cash when Mr. Barret instructed Wilson and Neunie to "pack a suitcase with the money" and bring to the Barret Residence $80,000 in payment for Williams. (*Id.* at 1850-51.)

From that point on, the couriers that Mr. Barret sent all traveled with the same suitcase with hidden compartments. (*Id.* at 1453-54, 2227-28.)

Quinones once traveled to Las Vegas on Mr. Barret's behalf, to deliver payments to Williams. (*Id.* at 324, 337, 1852.) Investigators conducting surveillance on August 31, 2010, followed Wilson and Quinones as they drove in a white Cadillac Escalade from the Wilson Residence to the Barret Residence, where they picked up Manning and a suitcase with hidden compartments. (*Id.* at 324, 337.) A short time later, Wilson and Manning exited the backyard with Quinones, who was carrying a suitcase. (*Id.* at 325, 1850-53.) Wilson, Manning, and Quinones then drove to JFK Airport together, and Quinones checked into a flight and passed the security checkpoint as Manning watched. (*Id.* at 325.) Flight records stipulated to by the parties showed that Quinones flew from New York to Las Vegas and returned the next day, on September 1, 2010. (*Id.* at 326-29.) In lieu of $1000 in cash, Quinones accepted two pounds of marijuana from Mr. Barret as payment for being a courier. (*Id.* at 1853.)

At other times, Williams or one of his couriers traveled to New York to collect the money from Mr. Barret at the Barret Residence. (*Id.* at 1369, 1411.) Williams testified that he frequently saw Mr. Anderson, Mr. Scarlett, and Mr. Mitchell

at the Barret Residence during these visits.  (*Id.* at 1410-11, 1415, 1446.)  Williams received the money from Manning, who sealed the cash in "foodsaver bags" which she placed into the suitcase with hidden compartments.  (*Id.* at 833-34, 1450-51.) In 2009, police seized $119,000 from a courier who was returning to Phoenix after traveling to New York to collect Williams's payment from Mr. Barret.  (*Id.* at 1459-60.)  Williams testified that approximately $90,000 of the sum seized had been collected from Mr. Barret.  (*Id.* at 1460-61.)

Another means by which Mr. Barret paid Williams was depositing money in designated bank accounts.  Between 2008 and 2010, Mr. Barret deposited money into two of Williams's bank accounts, which Williams held in the names of "Jacqueline Hendricks" and "Steve Davis."  (*Id.* at 1370-72.)  The government introduced Exhibit 405, which reflected that Mr. Forrest's cell phone contact list included one of Williams's bank account numbers under the contact name "Steve Davis."  (Tr. at 2227; GX 405.)  Mr. Forrest testified that he deposited approximately $4,000 to $5,000 into Williams's bank accounts on Mr. Barret's behalf every one or two days.  (Tr. at 2226-27.)

The testimony and evidence at trial revealed that although neither Mr. Barret nor Manning were ever known to hold legitimate jobs during the relevant period, Mr. Barret spent significant amounts of money.  (*Id.* at 833-36.)  For example,

Mr. Barret owned a motorbike and four cars: the Nissan Maxima
with the hidden compartment; the Nissan Quest driven by Downer
and Mr. Scarlett on October 7, 2011; an Infiniti; and an Audi
that Mr. Barret gave Manning for her birthday. (*Id.* at 2228-30,
836-38.)

Mr. Barret also sent money, either through Western
Union or a courier, to a lawyer in Jamaica for safekeeping.
(*Id.* at 835-36, 908-09.) Mr. Forrest testified that when Mr.
Barret transferred money via Western Union, he usually wired
money in the amount of $950 "because . . . it won't be over a
thousand dollars and he won't have to show ID." (Tr. at 2226-
28.) Mr. Forrest frequently sent money through Western Union on
Mr. Barret's behalf; Mr. Forrest recalled that he wired Mr.
Barret's money "[e]very other day, sometimes two times a day or
three." (*Id.* at 2228.)

Mr. Barret went to parties at clubs and other venues
several times per week with numerous individuals, including Mr.
Forrest, Parker, Back-It, Mr. Anderson, Mr. Scarlett, and
others, and Mr. Barret spent sizeable sums on alcohol and on
monetary gifts to girls at such parties. (*Id.* at 835-36, 2232-
33.) Neunie testified that he had seen Mr. Barret at
approximately sixty parties, and that he never saw Mr. Barret
with fewer than five people with him; most of the time, Mr.
Barret had ten or more individuals in his entourage. (*Id.* at

1747, 1806-07.)  Neunie noted that Mr. Scarlett in particular
frequently accompanied Mr. Barret at the parties.  (*Id*. at
1747.)  Mr. Barret paid for all expenses incurred by all the
people that he brought with him.  (*Id*. at 1807.)

Mr. Barret also gave Manning large sums of money to
spend on shopping, vacations, and hosting parties, including a
birthday party for Manning and Mr. Barret's son, which included
many people and large amounts of liquor, food, and gifts.  (*Id*.
at 835.)  Mr. Barret himself also hosted parties; Neunie
recalled that Mr. Barret once spent over $15,000 hosting a party
for 150 people.  (*Id*. at 1807.)

### 7.    Use of Firearms

The government presented testimony and evidence
regarding the use of firearms during the course of and in
relation to the marijuana conspiracy.  Mr. Forrest testified
that the guns recovered by investigators on October 7, 2010 were
owned by Mr. Barret, and that he had seen the guns around the
Barret Residence for approximately six months.  (Tr. at 2215,
2399.)  Mr. Forrest also testified that Mr. Barret owned and
used other guns, and occasionally mailed firearms to Jamaica.
(*Id*. at 2215-16.)

Mr. Barret gave his co-conspirators firearms to
protect both the marijuana and Mr. Barret, particularly when
marijuana was being delivered to the Barret Residence.  (*Id*. at

2215-16, 2222.)  In addition, Mr. Barret gave a gun to Wilson in 2009 after the Wilson Residence was robbed twice.  (*Id.* at 1853-55, 2216.)  According to Neunie, Mr. Barret's reasons for arming Wilson were twofold.  First, Mr. Barret visited the Wilson Residence frequently, and Mr. Barret wanted to be protected during those visits.  (*Id.* at 1855.)  Second, Mr. Barret wanted to protect the Wilson Residence from being robbed of the marijuana that was stored there.  (*Id.*)

In March 2010, when Palmer attended a baby shower at a club with Mr. Barret, Jones, Back-It, and Gunter, a gunfire exchange broke out between Mr. Barret's crew and a rival gang, over a drug debt owed by "English," one of the drug dealers under Mr. Barret's protection.  (*Id.* at 903-908.)  Mr. Barret later told Palmer that Mr. Barret planned to send the guns that had been fired to Jamaica because "[h]e [Mr. Barret] scared that they get catch with the gun . . . and get charged for the crime that the gun did."  (*Id.* at 908.)

Mr. Barret also taught Mr. Forrest how to use the hidden "trap" in the Nissan Maxima that Mr. Barret had installed to hold guns.  (*Id.* at 839, 243-46, 2230-32, 2334.)  Consequently, when Mr. Forrest accompanied Mr. Barret at parties, Mr. Forrest always drove the Maxima because Mr. Barret always ordered him to carry guns at parties.  (*Id.* at 2232)  Although Mr. Barret never specifically explained his rationale

for requiring Mr. Forrest to carry a firearm, Mr. Forrest understood that it was for protection purposes. (*Id.*) Palmer also testified that Mr. Barret hid a gun in the "stash" of the Nissan Maxima whenever he attended parties or traveled to collect money from customers. (*Id.* at 839.)

While housed in the jail facility, Neunie overheard an argument that Mr. Barret had with Mr. Anderson and Mr. Forrest. (*Id.* at 1773-74.) Mr. Barret contended that the guns recovered at or near the Barret Residence were not his, and that Mr. Forrest should take responsibility for the guns. (*Id.* at 1773.) Mr. Forrest protested, on grounds that the gun did not belong to him. (*Id.*) When Mr. Barret then suggested that Mr. Anderson should take responsibility for the guns, Mr. Anderson responded, "You told us not to bring no gun to the yard. You supply us with the gun." (*Id.* at 1773-74.) Neunie recalled that "everybody [was] looking at him [Mr. Barret] because they saying it's his [Mr. Barret's] gun. And they know it's his gun because he gave it to them and the money to protect the marijuana." (*Id.*)

The debate over who should take responsibility for the recovered firearms continued for several weeks after the October 7, 2010 search and arrests: approximately three weeks after they were arrested and while incarcerated together, Mr. Forrest and Mr. Barret discussed the gun charges they faced. (Tr. at

2211-12.)  Mr. Barret also relayed to Mr. Forrest the substance of a prior conversation between Mr. Barret and Mr. Anderson, in which Mr. Anderson said that Mr. Forrest should take the blame for the guns, and if Mr. Forrest refused, Mr. Barret should have Mr. Forrest bailed out and killed.  (*Id.*)

## DISCUSSION

### II.  Standard Governing Motions for Acquittal Pursuant to Rule 29

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  *In re Winship*, 397 U.S. 358, 364 (1970); *United States v. Glenn*, 312 F.3d 58, 64 (2d Cir. 2002).  Consequently, a "mere modicum" of evidence is insufficient to meet the Due Process requirement of proof of guilt beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 320 (1979).

In resolving Rule 29 motions, a court should "avoid usurping the role of the jury."  *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999).  A court must "defer to the jury's assessment of witness credibility and the jury's resolution of conflicting testimony."  *United States v. Bala*, 236 F.3d 87, 93-94 (2d Cir. 2000).  Moreover, a court cannot "substitute its own determination of the weight of the evidence and the reasonable inferences to be drawn for that of the jury."  *Guadagna*, 183

F.3d at 129 (citation and quotation omitted).  Therefore, the jury's verdict will be upheld even when it is based entirely on inferences from circumstantial evidence.  *Glenn*, 312 F.3d at 64; *United States v. Mariani*, 725 F.2d 862, 865-66 (2d Cir. 1984). Furthermore, "the task of choosing among permissible competing inferences is for the jury, not a reviewing court," *United States v. Salmonese*, 352 F.3d 608, 618 (2d Cir. 2003) (citation omitted), and in determining whether the government has met its burden, the court must "view pieces of evidence 'not in isolation but in conjunction.'"  *United States v. Torres*, 604 F.3d 58, 67 (2d Cir. 2010) (quoting *United States v. Maldonado-Rivera*, 922 F.2d 934, 978 (2d Cir. 1990)).  In addition, the court "must draw all favorable inferences and resolve all issues of credibility in favor of the prosecution."  *United States v. Jespersen*, 65 F.3d 993, 998 (2d Cir. 1995) (quoting *United States v. Khan*, 787 F.2d 28, 34 (2d Cir. 1986)).

In order to grant a motion for a judgment of acquittal pursuant to Rule 29, however, the court must find that "the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt."  *Guadagna,* 183 F.3d at 130; *see also United States v. Jackson,* 335 F.3d 170, 180 (2d Cir. 2003) (district court may grant Rule 29 motion for judgment of acquittal on grounds of insufficient evidence only "if it

concludes that no rational trier of fact could have found the defendant guilty beyond a reasonable doubt"). Accordingly, a conviction must be upheld if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. Consequently, "[a] defendant bears a heavy burden in seeking to overturn a conviction on grounds that the evidence was insufficient." *United States v. Aleskerova*, 300 F.3d 286, 292 (2d Cir. 2002).

### III. Application to Defendants' Rule 29 Motions[9]

#### A. Mr. Barret[10]

##### 1. Sufficiency of the Evidence

###### a. Counts Two and Five

Mr. Barret argues that the evidence at trial was insufficient for a jury to conclude that he had the specific intent necessary to join the charged conspiracy, and that there was no credible evidence to establish Mr. Barret's involvement in a conspiracy to distribute 1,000 kilograms of marijuana because "[a]t best, the testimony established limited involvement with small quantities [of marijuana]." (Barret Mem.

---

[9] At defendants' request (*see* Tr. at 3093), the court held oral argument as to Mr. Anderson, Mr. Scarlett, and Mr. Mitchell on May 10, 2012, and as to Mr. Barret on June 4, 2012. (*See* Minute Entry dated 5/10/2012; Minute Entry dated 6/4/2012; Transcript of 5/10/2012 Proceedings; Transcript of 6/4/2012 Proceedings.) At oral argument, the parties reiterated arguments made in their written submissions. (*Id.*)

[10] This section addresses arguments made by Mr. Barret's counsel in support of Mr. Barret's Rule 29 and 33 motions. Section V of this Memorandum and Order addresses arguments Mr. Barret advanced in his *pro se* Rule 29 motion.

at 8-9.)  Mr. Barret also argues that his conviction for Count Two resulted from the jury's improper "piling [of] inference upon inference," and that the jury "unjustifiably inferred Mr. Barret's guilt" because even though all four cooperating witnesses "point[ed] their crooked finger at him . . . none of [them] . . . were believable enough to support a single guilty verdict." (*Id.* at 7.)

The court finds that there was overwhelming evidence from which the jury could infer that Mr. Barret conspired with others to sell more than 1,000 kilograms of marijuana during the relevant period.  As Mr. Barret acknowledges, all four cooperating witnesses – Williams, Palmer, Neunie, and Mr. Forrest – identified Mr. Barret as the leader of the charged conspiracy and provided specific details that, in combination, provide a complete picture of the marijuana distribution operation led by Mr. Barret.  Mr. Barret procured the steady supply of marijuana from Williams; paid and/or instructed Wilson and others to coordinate the shipment and delivery of marijuana from the CMRAs to the Barret Residence, and equipped Wilson and other co-conspirators with escorts and firearms to protect the marijuana; directed the unpacking, weighing, and distribution of the marijuana; and controlled the financial proceeds from the marijuana sales.

In addition to testimonial evidence, the government produced abundant physical and video evidence – including text messages from Mr. Barret's cell phone, significant volumes of marijuana seized from the Barret Residence, and footage from Mr. Barret's own home surveillance system in which numerous individuals are seen engaging in activities to further the objectives of the conspiracy – that overwhelmingly demonstrates the existence of the charged conspiracy and Mr. Barret's leadership role in the conspiracy. There is no question that any rational trier of fact could have found, based on the evidence at trial, that Mr. Barret knowingly, willingly, and intentionally joined and led the charged conspiracy.

Although Mr. Barret conclusorily states that none of the evidence adduced from the cooperating witnesses was "believable enough to support a single guilty verdict" (*see* Barret Mem. at 7), in deciding this motion, the court must "defer to the jury's resolution of witness credibility and, where there is conflicting testimony, to its selection between competing inferences." *United States v. Tocco*, 135 F.3d 116, 123 (2d Cir. 1998).

Accordingly, Mr. Barret's identification of a single incident in which Neunie's testimony conflicted with stipulated

evidence[11] (*see* Barret Mem. at 8) does not render the balance of Neunie's testimony to be wholly incredible as a matter of law. In addition, even assuming *arguendo* that Neunie lacked all credibility, the detailed and comprehensive testimony of the remaining cooperating witnesses would be sufficient to sustain Mr. Barret's conviction on Count Two, particularly because "[a] conviction may be sustained on the basis of the testimony of a single accomplice, so long as that testimony is not incredible on its face and is capable of establishing guilt beyond a reasonable doubt." *United States v. Gordon*, 987 F.2d 902, 906 (2d Cir. 1993).

Finally, the court finds no merit in Mr. Barret's contention that "[a]t best, the testimony established [Mr. Barret's] limited involvement with small quantities [of marijuana." (Barret Mem. at 9.)  Mr. Barret's baseless assertion is belied by the fact that investigators recovered more than 100 kilograms of marijuana from the Barret Residence on the day of Mr. Barret's arrest.  In other words, on a *single day*, more than ten percent of the charged 1,000-kilogram amount was delivered to the Barret Residence.  Furthermore, pole camera evidence and postal records established that during the period

---

[11] Neunie testified that he began selling marijuana for Mr. Barret in "[a]bout 2007.  Like March, July.  Coming on that period of time." (Tr. at 1796.) The government and Mr. Barret stipulated, however, that between March 15, 2007, and September 15, 2007, Mr. Barret was incarcerated at Rikers Island. (*Id*. at 2441.)

between August 26, 2010, and October 7, 2010, more than 380 kilograms of marijuana were delivered to the CMRAS and the Barret Residence.  Thus, even though the charged conspiracy spanned four years, the government's physical and record evidence established the delivery of almost forty percent of the 1,000-kilogram amount during the forty days preceding Mr. Barret's arrest.

In addition, cooperating witnesses consistently testified that while the volume of marijuana shipments increased dramatically in 2010, Mr. Barret and his crew received and distributed marijuana at a rate of at least 160-200 pounds (72-90 kilograms) of marijuana per month between 2008 and 2010. (Tr. at 1363-64, 1846.)  This evidence, viewed in the light most favorable to the government, amply supports the jury's finding that Mr. Barret conspired to possess with intent to distribute 1,000 kilograms or more of marijuana between November 2006 and November 2010, and that Mr. Barret possessed with intent to distribute more than 100 kilograms of marijuana on October 7, 2010.  Accordingly, the court finds no merit in Mr. Barret's contentions and denies his Rule 29 motion with respect to Counts Two and Five.

### b. Count Six

Mr. Barret also argues that there was insufficient evidence for the jury to conclude that he brandished and carried

a firearm in furtherance of drug-trafficking activity because
(1) DNA testing confirmed that Mr. Barret's DNA was not found on
one of the firearms recovered from the vicinity of the Barret
Residence on October 7, 2010; and (2) Mr. Barret cannot be held
liable under a *Pinkerton* theory of liability for the use of
firearms in a gunfire exchange that broke out between members of
Mr. Barret's crew and a rival crew at a March 2010 baby shower.
(Barret Mem. at 7.)  At trial, cooperating witnesses testified
that Mr. Barret himself carried guns, and that he supplied guns
to his co-conspirators to protect both himself and the marijuana
during pick-ups and deliveries, and at the Wilson Residence and
the Barret Residence, during visits to collect payments from
customers, and at parties in which gunfights might break out
with other drug rivals.  Furthermore, two guns supplied by Mr.
Barret to his co-conspirators were found inside or near the
Barret Residence on October 7, 2010, the day of the search and
the arrest of Mr. Barret and others, and testimony from the
cooperating witnesses consistently indicate that the guns
belonged to Mr. Barret and were used by others at his direction
during the course and in furtherance of the marijuana
distribution conspiracy.

Investigators' search of Mr. Barret's Nissan Maxima
also revealed a built-in "trap" or "stash," which Mr. Barret
used to conceal firearms when he drove to parties or to conduct

drug-related business. In addition, as Mr. Barret notes, the evidence at trial included testimony regarding a baby shower at which a gunfire exchange broke out between Mr. Barret's crew and a rival gang over a drug debt owed by "English," one of the drug dealers under Mr. Barret's protection. The jury heard testimony that Mr. Barret had control over the guns used in the altercation at the baby shower; Palmer testified that Mr. Barret planned to send the guns that had been fired to Jamaica out of fear that Mr. Barret or his crew would be caught with the gun and charged with crimes associated with the gun.

In light of the foregoing, there was more than sufficient evidence for the jury to conclude that Mr. Barret had brandished and carried firearms in furtherance of drug-trafficking. Even though Mr. Barret's DNA was not found on any specific gun, there was abundant evidence that Mr. Barret himself routinely carried other guns in connection with the marijuana distribution conspiracy. In addition, the fact that Mr. Barret's DNA was not found on a particular gun is not entirely surprising given the evidence that Mr. Barret routinely mailed guns to Jamaica after using them, for fear that police might find evidence linking him to a gun-related crime.

Moreover, contrary to Mr. Barret's assertion, the application of *Pinkerton* liability was appropriate. "Under the *Pinkerton* theory of liability, a conspirator 'can be held

responsible for the substantive crimes committed by his co-conspirators to the extent those offenses were reasonably foreseeable consequences of acts furthering the unlawful agreement, even if he did not himself participate in the substantive crimes." *United States v. Masotto*, 73 F.3d 1233, 1239 (2d Cir. 1996). Here, because there was sufficient evidence at trial that the use of firearms supplied by Mr. Barret to his co-conspirators was in furtherance of the conspiracy and *ordered* by Mr. Barret himself, and therefore foreseeable to him, *Pinkerton* liability was entirely appropriate. Accordingly, the court denies Mr. Barret's Rule 29 motion for judgment of acquittal on Count Six.

### c. Counts One, Three, and Four

With respect to the remaining counts – Counts One, Three, and Four - Mr. Barret articulated no basis for granting a Rule 29 motion, and has thus failed to satisfy his "heavy burden" to establish the insufficiency of the evidence as to those counts. The court has, however, considered the evidence with respect to Counts One, Three, and Four, and finds that the government presented more than ample testimony, video recordings, and documentary evidence from which the jury could reasonably find Mr. Barret guilty of those counts.

## 2.     Constitutionality of 21 U.S.C. § 848

Mr. Barret also moves to dismiss the continuing criminal enterprise charged in Count One of the Superseding Indictment on grounds that it is "vague, indefinite, unclear, and violates the United States Constitution." (Barret Mem. at 4-5.) As the government notes, this issue is not properly raised on a motion for judgment of acquittal pursuant to Rule 29. (*See* Gov. Rule 29 and 33 Opp'n at 16.) Nevertheless, the court will address it briefly here.

Mr. Barret's argument is foreclosed by *United States v. Manfredi*, 488 F.2d 588 (2d Cir. 1973), in which the Second Circuit explicitly upheld the constitutionality of the continuing criminal enterprise statute, 21 U.S.C. § 848 ("Section 848"), against a challenge for vagueness. *United States v. Harris*, 805 F. Supp. 166, 179 (S.D.N.Y. 1992). In so holding, the Second Circuit recognized that conviction under Section 848 requires one to occupy the position of organizer, supervisor, or manager of five or more persons in committing a continuing series of felonious violations of the drug laws and acquiring "substantial income or resources" from the enterprise. *Manfredi*, 488 F.2d at 602. The Second Circuit reasoned that because Section 848 "goes to the business of trafficking in the prohibited drugs on a continuing, serious, widespread, supervisory and substantial basis[, t]he conduct reached is only

that which the violator knows is wrongful and contrary to law,"
and therefore, Section 848 is not unconstitutionally vague. *Id*.
Accordingly, having found that Mr. Barret's arguments in support
of his Rule 29 motion lack merit, the court denies Mr. Barret's
Rule 29 motion for judgment of acquittal on all counts.

### B. Mr. Anderson

After the government and all defendants rested, Mr.
Anderson moved for acquittal pursuant to Rule 29 on grounds that
(1) the government had not proven that Mr. Anderson was a member
of the conspiracy charged in Count Two, and (2) the evidence
supported Mr. Anderson's "mere presence" or "mere association"
defense. (Tr. at 2453.) Mr. Anderson also argued that the
evidence did not support a finding that Mr. Anderson was aware
of the scope of the conspiracy, because the evidence showed that
he bought marijuana and sold it on his own, and that he
purchased the "minimum amount" of one or two pounds from Mr.
Barret. (Tr. at 2453-54.) Moreover, Mr. Anderson contended
that any evidence tying him to use or possession of a firearm in
relation to drug-trafficking was "very tenuous." (Tr. at 2453.)
Mr. Anderson advances the same arguments in his post-trial
motion for acquittal. (*See* Anderson Mem. at 2.) The court
finds no merit in Mr. Anderson's contentions.

The evidence at trial supported the jury's finding
beyond a reasonable doubt that Mr. Anderson was a member of the

conspiracy charged in Count Two; that Mr. Anderson was complicit
in the distribution of 100 kilograms of marijuana on October 7,
2010, as charged in Count Five; and that he carried a gun in
furtherance of drug-trafficking activity, as charged in Count
Six.  The court is mindful that the Second Circuit has
"'repeatedly emphasized' that a defendant's 'mere presence' at a
crime scene or 'association with conspirators' does not
establish 'intentional participation in the conspiracy, even if
the defendant has knowledge of the conspiracy.'"  *United States
v. Blackwood*, 366 F. App'x 207, 210 (2d Cir. 2010) (quoting
*United States v. Samaria*, 239 F.3d 228, 235 (2d Cir. 2001),
overruled on other grounds by *United States v. Huezo*, 546 F.3d
174, 180 n.2 (2d Cir. 2008)).  Nevertheless, the jury may infer
a defendant's "knowing and willing participation in a
conspiracy" from his "presence at critical stages of the
conspiracy that could not be explained by happenstance," or by a
"lack of surprise when discussing the conspiracy with others."
*United States v. Aleskerova*, 300 F.3d 286, 293 (2d Cir. 2002).

Viewing the evidence in the light most favorable to
the government and "in its totality, not in isolation," *United
States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000), the court
concludes that the evidence at trial established beyond a
reasonable doubt that Mr. Anderson was a member of the charged
conspiracy and that his presence at critical stages of the

conspiracy was not mere happenstance. On October 7, 2010, Mr. Anderson was present at the Barret Residence with numerous other individuals, all of whom were present to aid in the unloading, weighing, measuring, and distribution of over 225 pounds of marijuana, which was of such high value that Mr. Barret sent four individuals to accompany the delivery with firearms. Moreover, both video evidence and testimony support the jury's finding that Mr. Anderson himself was given a gun to protect the marijuana, and that Mr. Anderson discarded the gun in the living room of the Barret Residence when he realized that police were present.

Notably, contrary to Mr. Anderson's assertions, his possession of a firearm during the moments immediately preceding his arrest is not "pure speculation." (*See* Anderson Mem. at 11.) Mr. Anderson's movements and behavior on the home surveillance video, combined with the location of the firearm in the living room, witness testimony, and Mr. Anderson's admissions, strongly support the inference that Mr. Anderson possessed a gun and discarded it after the search team arrived, immediately before his arrest. Moreover, this inference is further supported by Mr. Anderson's own admission in jail that

he possessed a firearm, which he later disposed of when police arrived.[12]

In addition, cooperating witnesses consistently testified that Mr. Anderson was frequently present and engaged in activities in furtherance of the conspiracy with other co-conspirators at the Barret Residence, that he received marijuana from Mr. Barret on several occasions, and that Mr. Barret distributed marijuana to Mr. Anderson the day before the arrest. Moreover, Palmer saw Mr. Anderson follow and protect Wilson on October 7, 2010, when Wilson retrieved the marijuana from the CMRAs and brought it back to the Barret Residence. Furthermore, Mr. Anderson, by his own admission, was "always strapped," meaning that he always carried a gun, and Mr. Barret supplied Mr. Anderson with the guns that he carried at the Barret Residence. The court finds that the foregoing evidence, when viewed in the light most favorable to the government, was more than sufficient to permit a rational jury to conclude that Mr. Anderson was a member of the charged conspiracy and not "merely present" at the Barret Residence on the day of his arrest.

---

[12] Mr. Anderson argues that the court erred in admitting Palmer's testimony about Mr. Anderson's jailhouse statements regarding his possession of a gun because (1) the testimony was hearsay and inadmissible as a statement made in furtherance of the conspiracy because the conspiracy had already concluded when the statement was made; and (2) the evidence of hearsay was admitted before it was established that Mr. Anderson was a member of the conspiracy. (*See* Anderson Mem. at 12.) Even assuming without deciding that Mr. Anderson's arguments are partially meritorious because the conspiracy had already concluded when the statement was made, the testimony to which Mr. Anderson objects is nevertheless admissible as a party admission under Federal Rule of Evidence 801(d)(2)(A).

Moreover, even assuming *arguendo* that Mr. Anderson indeed purchased only "minimal" quantities of marijuana from Mr. Barret, the evidence at trial nonetheless supports the jury's finding that Mr. Anderson was a member of the charged conspiracy and that the distribution of 1,000 kilograms of marijuana was foreseeable to him. "It is 'well-established law' that, in a narcotics conspiracy, a defendant is held accountable not only for that quantity of drugs which he, himself, conspires to distribute, or possess with intent to distribute, but for the entire quantity his co-conspirators conspired to distribute or possess, 'provided he knew of his co-conspirator's illicit activities or the activities were reasonably foreseeable by him.'" *United States v. Brown*, No. 04 CR 801, 2006 WL 2724025, at *6 (S.D.N.Y. Sept. 22, 2006) (quoting *Jackson*, 335 F.3d at 181). Here, the testimony of the cooperating witnesses indicates that Mr. Anderson was involved throughout the charged conspiracy and that he actively protected marijuana as it was delivered. In addition, Mr. Anderson protected Mr. Barret, the leader of the conspiracy, during parties in which marijuana-related disputes were known to arise. Taken together, these facts support a finding that even if Mr. Anderson did not personally distribute large quantities of marijuana, he was a member of the charged conspiracy and participated in and was aware of its activities such that the distribution of 1,000

kilograms of marijuana during the relevant period was
foreseeable to him.

Furthermore, contrary to Mr. Anderson's assertion, the
instant case is readily distinguishable from the facts in *United
States v. McDermott*, 245 F.3d 133 (2d Cir. 2001). In *McDermott*,
defendant McDermott, president and CEO of an investment bank,
made numerous stock recommendations to a woman named Gannon
during the course of their extramarital affair. *Id*. at 135-36.
Unbeknownst to McDermott, Gannon was simultaneously having an
affair with an individual named Pomponio, to whom Gannon passed
McDermott's stock recommendations, and Gannon and Pomponio used
McDermott's information to earn significant profits. *Id*. at
136. Although McDermott was convicted of conspiracy to commit
insider trading based on these events, the Second Circuit
reversed the judgment of conviction against McDermott because
"[t]here [was] no record evidence suggesting that McDermott's
agreement with Gannon encompassed a broader scope than the two
of them," and "the proof at trial established that McDermott had
no knowledge of Pomponio's existence." *Id*. at 138. Here, in
stark contrast, the evidence at trial shows that Mr. Anderson
worked in concert with numerous other members of the conspiracy,
including the conspiracy's leader, Mr. Barret, to protect
marijuana shipments, protect the leader, and otherwise

facilitate the perpetuation of a large-scale narcotics distribution conspiracy.

Given the evidence at trial, the court denies Mr. Anderson's Rule 29 motions, having found that there is ample record evidence for a rational jury to conclude that Mr. Anderson was a member of the charged conspiracy and that the 1,000-kilogram marijuana amount was reasonably foreseeable to him, as charged in Count Two; that Mr. Anderson constructively possessed with intent to distribute more than 100 kilograms of marijuana on October 7, 2010, as charged in Count Five; and that Mr. Anderson carried a firearm, which he discarded in the Barret Residence immediately before his arrest, in furtherance of the narcotics-trafficking activity as charged in Count Six.

### C. Mr. Scarlett

After the government and all defendants rested, Mr. Scarlett moved for acquittal pursuant to Rule 29 on grounds that there was insufficient evidence to support a finding that he conspired to possess with intent to distribute any more than "four or five kilos" of marijuana. (Tr. at 2457-58.) In his post-trial motion for acquittal of Counts Two and Five, Mr. Scarlett reasserts the arguments he made at trial.

First, with respect to Count Two, Mr. Scarlett asserts that the evidence of his involvement in the conspiracy charged in Count Two is "meager and virtually non-existent." (Scarlett

Rule 29 Mem. at 2.)  Mr. Scarlett also contends that because he was incarcerated between September 2005 and September 2008, and on parole until September 2010, it is "[o]bviously . . . not a surprise" that Mr. Scarlett was not involved in the deliveries of marijuana to the Barret Residence prior to October 7, 2010. (*Id.*)

Mr. Scarlett further notes that he was not observed on the pole camera video, which was operable between August 11, 2010 until October 7, 2010, and that nothing more than "an occasional reference to [Mr. Scarlett's] presence" at the Barret Residence or anecdotal evidence of Mr. Scarlett's "delivery of unknown quantities of money or marijuana" links him to any significant marijuana delivery to the Barret Residence.  (*Id.*) Mr. Scarlett adds that he had no involvement or contact with the Wilson Residence, apart from "limited contact with Leemax Neunie."  (*Id.*)  In essence, Mr. Scarlett argues that, given his general absence from the Barret Residence – which Mr. Scarlett attributes to his incarceration and subsequent parolee status – no rational jury could have concluded that the drug quantity charged in Count Two was "reasonably foreseeable" to him, and that the evidence "[a]t best . . . establishes [Mr. Scarlett's] limited involvement with small quantities [of marijuana]."  (*Id.* at 3.)

Mr. Scarlett also moves for judgment of acquittal with respect to Count Five, but offers no arguments in support of that motion.  (*See id*.)  In fact, Mr. Scarlett concedes that the testimonial and video evidence of activity at the Barret Residence on October 7, 2010, "raises a factual dispute regarding [Mr. Scarlett's] involvement . . . with the October 7th 100 kilogram incident."  (*Id*. at 2.)

The Second Circuit has emphasized the special need for deference to a jury's verdict on a conspiracy charge "because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." *United States v. Pitre*, 960 F.2d 1112, 1121 (2d Cir. 1992) (internal quotation marks omitted).  In order to prove conspiracy, however, "the Government must show more than evidence of a general cognizance of criminal activity, suspicious circumstances, or mere association with others engaged in criminal activity." *United States v. Ogando*, 547 F.3d 102, 107 (2d Cir. 2008) (internal quotation marks omitted). Instead, the government must show that "two or more persons agreed to participate in a joint venture intended to commit an unlawful act" and the membership of an individual defendant requires "proof of purposeful behavior aimed at furthering the goals of the conspiracy." *United States v. DeSimone*, 119 F.3d

217, 223 (2d Cir. 1997). "The existence of – and a particular
defendant's participation in – a conspiracy may be established
entirely by circumstantial evidence," and "the conspiratorial
agreement itself may be established by proof of a tacit
understanding among the participants, rather than by proof of an
explicit agreement." *Id*.

In light of these principles, and viewing the evidence
in the light most favorable to the government, the evidence at
trial adequately supports the jury's findings that Mr. Scarlett
distributed and possessed with intent to distribute 100
kilograms of marijuana on October 7, 2010, as charged in Count
Five; that Mr. Scarlett was a member of the broader conspiracy
charged in Count Two; and that the distribution of 1,000
kilograms of marijuana was foreseeable to him. The lack of pole
camera video footage depicting Mr. Scarlett lends scant support
to defendant's argument. First, Inspector Buthorn explained
that the pole camera was only in operation beginning August 11,
2010, and that its angle and scope were manually controlled only
at particular times and dates. (Tr. at 555, 608.)

The record contains testimonial evidence that on
October 7, 2010, Mr. Scarlett carried a gun supplied by Mr.
Barret as Mr. Scarlett and Downer accompanied Wilson to pick up
more than 100 kilograms of marijuana from the CMRAs in Queens.
Video evidence that shows Mr. Scarlett exiting the Nissan Quest

and carrying a box of marijuana into the Barret Residence corroborates the cooperating witnesses' testimony. Furthermore, the jury heard evidence that while in jail after his arrest on October 7, 2010, Mr. Scarlett confessed that as he fled from law enforcement, he threw away the gun that he had been carrying earlier. At that time, Mr. Scarlett and Mr. Barret also expressed concern that Mr. Barret's home surveillance video would be seized and reveal their activities. Given this evidence, a rational jury could have concluded that Mr. Scarlett was guilty of possessing with intent to distribute 100 kilograms of marijuana on October 7, 2010. Consequently, the court denies Mr. Scarlett's motion for judgment of acquittal with respect to Count Five.

The record evidence also supports the jury's finding that between 2008 and the date of Mr. Scarlett's arrest, Mr. Scarlett was a member of the broader marijuana distribution conspiracy charged in Count Two. Mr. Scarlett emphatically argues that because he was incarcerated until September 2008 and a parolee until September 2010, he had an incentive not to participate in any criminal activity. The jury was free to reject that suggested inference, however, given testimony indicating that Mr. Scarlett's status as a parolee did not inhibit him from participating in the charged conspiracy to distribute marijuana. Numerous cooperating witnesses testified

that Mr. Scarlett purchased marijuana from Mr. Barret and received three to five pounds of marijuana to sell, every one to two weeks. Although the evidence also showed that Mr. Scarlett sometimes requested that other co-conspirators sell on his behalf because he did not have enough customers, a rational jury still could have concluded that Mr. Scarlett was a member of the conspiracy and that the 1,000-kilogram amount was reasonably foreseeable to him because of his role as an "enforcer" in the conspiracy, in which Mr. Scarlett routinely carried guns to protect Mr. Barret and numerous marijuana shipments on occasions between September 2008 and 2010.

Therefore, even if Mr. Scarlett was in prison between September 2005 and September 2008, and thus did not personally participate in the conspiracy during its entire existence or distribute large quantities of marijuana, the record contains evidence of Mr. Scarlett's participation in the conspiracy as an enforcer, which furthered the objectives of the conspiracy and enabled Mr. Barret and numerous others to distribute large amounts of marijuana. Moreover, Neunie testified that he saw Mr. Scarlett carry a gun on more than twenty occasions, both at clubs and when marijuana deliveries were made to the Barret Residence. Such testimony regarding the frequency with which Mr. Scarlett was seen acting as an enforcer for and protector of Mr. Barret supports a finding that Mr. Scarlett was aware of the

scope of the conspiracy and that the distribution of 1,000 kilograms of marijuana was reasonably foreseeable to him. Accordingly, the court also denies Mr. Scarlett's Rule 29 motion with respect to Count Two.

### D. Mr. Mitchell

After the government and all defendants rested, Mr. Mitchell moved for judgment of acquittal pursuant to Rule 29 on grounds that the evidence presented at trial was insufficient to establish that Mr. Mitchell was a member of the conspiracy charged in Count Two. (Tr. at 2451.) In his post-trial motion, Mr. Mitchell argues that the evidence at trial was insufficient to support the jury's conviction of Mr. Mitchell on Count Two because the "sum total of all the evidence tying Omar Mitchell to the charged conspiracy rests exclusively on the discredited testimony of the cooperating witnesses." (Mitchell Mem. at 3.) He further argues that the evidence does not support a finding that Mr. Mitchell was aware of the scope of the conspiracy and that "[t]he proof in this case also did not establish that 100 or 1000 kilograms [of marijuana being sold] was reasonably foreseeable to Omar Mitchell." (*Id*. at 4.)

At trial, cooperating witnesses testified that Mr. Mitchell was frequently present at the Barret Residence and that he received marijuana from Mr. Barret to sell to his own customers. Like Mr. Scarlett and Mr. Anderson, however, Mr.

Mitchell's role in the conspiracy was not primarily that of a distributor; Mr. Mitchell was generally a lookout tasked with watching for, and alerting his co-conspirators to, any police or robbers.  Cooperating witnesses also testified that while at the Barret Residence, Mr. Mitchell was often "strapped" with a gun to protect the drugs from rival dealers.

Notwithstanding the foregoing evidence of Mr. Mitchell's participation in the charged conspiracy, Mr. Mitchell assails the inculpatory testimony of four cooperating witnesses, each of whom testified against Mr. Mitchell, and argues that the only non-cooperator evidence relating to Mr. Mitchell provided insufficient evidence from which to conclude that Mr. Mitchell was a member of the charged conspiracy.  (*Id*. at 1.)  In resolving Rule 29 motions, however, the court must "avoid usurping the role of the jury," *Guadagna*, 183 F.3d at 129, and must "defer to the jury's assessment of witness credibility." *Bala*, 236 F.3d at 93-94.  "[A] court may intrude on a jury's credibility function only where testimony is patently incredible or is in defiance of physical realities," *United States v. Colombo*, No. 04 Cr. 273, 2007 WL 2438374, at *2 (S.D.N.Y. Aug. 27, 2007).  The court finds that neither situation applies to the cooperating witnesses' testimony in this case.

Moreover, evidence of Mr. Mitchell's participation in the conspiracy is not limited to testimony from cooperating

witnesses.  The record also contains video evidence that showed Mr. Mitchell unloading boxes of marijuana from Wilson's truck in September 2010, and evidence that in July 2010, surveilling officers observed Mr. Mitchell acting as a gatekeeper for a marijuana delivery at the Barret Residence.

Given the testimony and evidence presented at trial, there was sufficient evidence of Mr. Mitchell's active participation in the marijuana distribution conspiracy charged in Count Two.  Moreover, contrary to Mr. Mitchell's claim that the record is devoid of evidence that he had "an awareness of the scope of the enterprise," the record contains testimony from multiple accomplices who testified to Mr. Mitchell's ongoing participation in the charged conspiracy, primarily through protection of numerous marijuana deliveries at the Barret Residence between 2008 and 2010.  Thus, the court finds that there is sufficient evidence for a rational jury to have found Mr. Mitchell guilty beyond a reasonable doubt of the charged conspiracy, particularly because a conspiracy conviction "may properly be based on the uncorroborated testimony of a single accomplice or cooperator provided the testimony 'is not incredible on its face and is capable of establishing guilt beyond a reasonable doubt.'"  *Brown*, 2006 WL 2724025, at *2 (quoting *United States v. Florez*, 447 F.3d 145, 155 (2d Cir.

2006)).  Accordingly, the court denies Mr. Mitchell's motion for judgment of acquittal with respect to Count Two.

## IV.  Defendants' Rule 33 Motions

### A. Rule 33 Standard

Rule 33(a) provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  Nevertheless, "[g]enerally, a motion for a new trial should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice."  *United States v. Triumph Capital Grp., Inc.*, 544 F.3d 149, 159 (2d Cir. 2008) (quoting *Smith v. Carpenter*, 316 F.3d 178, 183 (2d Cir. 2003)).

Although a trial court has broader discretion under Rule 33 than under Rule 29 to set aside a verdict and order a new trial, this discretion must be "exercised sparingly," "only with great caution and in the most extraordinary circumstances."  *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992).  "The defendant bears the burden of proving that he is entitled to a new trial under Rule 33," *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009), and the crucial question for the court is whether "it would be a manifest injustice to let the guilty verdict stand."  *Sanchez*, 969 F.2d at 1414.  A "manifest injustice" occurs where a trial court cannot be satisfied that

66

"competent, satisfactory and sufficient evidence" supports the jury's finding of guilt beyond a reasonable doubt, and where a "real concern" exists "that an innocent person may have been convicted." *Id.*

### B. Application

The defendants raise various arguments in support of their respective motions for a new trial pursuant to Rule 33. The court discusses each defendant's arguments below.

#### 1. Mr. Barret

##### a. Issuance of Fourth Superseding Indictment (S-4)

Mr. Barret argues that he is entitled to a new trial pursuant to Rule 33 because his due process rights were violated by the government's issuance, five days before jury selection, of a Fourth Superseding Indictment (S-4), which allegedly included "massive changes" and alterations to "90% of the dates, weeks and months" contained in the Third Superseding Indictment (S-3). (Barret Mem. at 5.) Mr. Barret contends that the "vast number of changes had the effect of undermining Mr. Barret's spirit along with his defense"; that the changes – which allegedly included eighteen new accusations – "rendered his weeks of preparation worthless and discouraging"; and that prosecution based on the belatedly issued Fourth Superseding Indictment "denied Christopher Barret a fair trial and shifted

the burden of proof to the defendant" by causing undue surprise and prejudice. (*Id*. at 5-6.)

The government counters that at the final pre-trial conference on December 5, 2011, the government gave all defendants advance notice that it intended to file the Fourth Superseding Indictment. (Gov. Rule 29 and 33 Opp'n at 47-48.) The government also notes that the Third and Fourth Superseding Indictments are largely similar, and that the differences pertaining to Mr. Barret are limited to the violations listed in Count One. (*Id*. at 48.) Specifically, the government deleted one violation from the Third Superseding Indictment; added two violations; revised dates for three violations, which did not alter the substance of the violations; and re-ordered the violations so they would appear in reverse chronological order. (*Id*. at 48-49.)

In comparing the Third and Fourth Superseding Indictments, the court found two additional minor changes not mentioned by the government in its submission opposing Mr. Barret's motion.[13] The court finds that although the government's renumbering and restructuring of the Fourth Superseding Indictment was not ideal, the court does not find that the changes or the timing of the Fourth Superseding

---

[13] The dates on Violations One and Four of the Third Superseding Indictment were changed before being included as Violations One and Three in the Fourth Superseding Indictment. (*Compare* S-3 ¶¶ 2,5 *with* S-4 ¶¶ 2, 4.)

Indictment deprived Mr. Barret of due process or the ability to prepare his defense. The date changes were minor, and in any event, the dates of each violation were approximate, and the chronological reordering of the violations did not change the substance of the violations themselves. *See United States v. Robilotto*, 828 F.2d 940, 949 (2d Cir. 1987) (perceiving no prejudicial effect caused by issuance of superseding indictment containing "substantially the same charges" with "minor technical changes").

Moreover, as the government notes, only two of the violations were new to the Fourth Superseding Indictment. Consequently, even assuming *arguendo* that the timing of the issuance of the Fourth Superseding Indictment deprived Mr. Barret of the opportunity to defend himself against those two violations, he indisputably had a full and fair opportunity to defend against the remaining nineteen violations, eighteen of which the jury found to be proven, and only three of which were necessary to be proven in order to sustain Mr. Barret's conviction on Count One. (*See* Verdict at 1-5.) Accordingly, the court finds that the issuance of the Fourth Superseding Indictment days before jury selection did not rise to the level of "manifest injustice" required to justify a new trial pursuant to Rule 33.

### b. Other Arguments

Mr. Barret also claims that he is entitled to a new trial pursuant to Rule 33 because (1) the court erred in (a) "denying Defendant Mr. Barret's motion for a bill of particulars" in the court's pre-trial Memorandum and Order dated November 16, 2011 (*see* ECF No. 289 ("11/16/2011 M&O")), (b) "sustaining numerous objections made by the Government," and (c) denying Mr. Barret's motions to dismiss, for a mistrial, for severance, and to preclude the testimony of Mr. Barret's alleged prior criminal behavior; and (2) the "interests of justice" require a new trial. (Barret Mem. at 1-2.) Each of Mr. Barret's claims are conclusory and unsupported by further facts or even argument and legal authority. Accordingly, the court finds that Mr. Barret has failed to bear his burden of proving the existence of "extraordinary circumstances" that would entitle him to a new trial under Rule 33. *See Sanchez*, 969 F.2d at 1414 (trial court must "sparingly," "with great caution, and only in the most extraordinary circumstances," exercise its discretion under Rule 33 to order a new trial).

### 2.    Mr. Anderson

In support of his motion for a new trial pursuant to Rule 33, Mr. Anderson argues that one of the court's evidentiary rulings at trial precipitated a chain of events that resulted in his unjust conviction. (Anderson Mem. at 16-19.) At trial, the

court permitted the government to adduce, as "other act" evidence pursuant to Federal Rule of Evidence 404(b) ("Rule 404(b)"), Inspector Nielsen's testimony that Mr. Anderson admitted to using a firearm in connection with drug-trafficking, provided that Inspector Nielsen refrained from referencing "home invasion[s]," which the court found would result in undue prejudice. (Tr. at 2135.) Inspector Nielsen then testified that after Mr. Anderson waived his *Miranda* rights, Mr. Anderson made post-arrest statements in which he stated that "in the past he [Mr. Anderson] used a firearm in commission of multiple drug crimes." (*Id.* at 2143.)

During deliberations, at the jury's repeated requests, the government played for the jury a brief segment of Mr. Barret's home surveillance video during the execution of the search warrant, which depicted Mr. Anderson holding the front of his waistband while running into the Barret Residence, and exiting approximately four seconds later with his hands in the air. The jury then asked to hear the portion of Inspector Nielsen's testimony regarding Mr. Anderson's prior gun activity. (Tr. at 3077.) Mr. Anderson asserts that because the jury reached a verdict within thirty minutes of receiving Inspector Nielsen's testimony, which included the references that the court permitted under Rule 404(b), the court's evidentiary

ruling "had a great impact on the jury's verdict." (Anderson Mem. at 17-18.)

Mr. Anderson provides the court with no authority to suggest that the court's evidentiary ruling was in error or that the ruling, in conjunction with other evidence, resulted in "manifest injustice." Rather, he merely appears to "use Rule 33 as a vehicle to relitigate [pretrial and] evidentiary rulings with which he disagrees." *United States v. Smith*, No. 08 Cr. 390, 2009 WL 4249120, at *8 (S.D.N.Y. Nov. 25, 2009). Accordingly, the court denies Mr. Anderson's motion for a new trial pursuant to Rule 33. *See United States v. Castro*, 669 F. Supp. 2d 288, 293 (E.D.N.Y. 2009) (denying Rule 33 motion where defendant did not claim that jury's verdict resulted in manifest injustice; profess his innocence; offer authority showing that court's allegedly erroneous rulings would support defendant's request for a new trial; or point to any extraordinary circumstances that would justify a new trial).

### 3. Mr. Scarlett

Mr. Scarlett claims that, taken together, numerous adverse pre-trial and trial rulings of this court created a "prejudicial atmosphere" against Mr. Scarlett that warrants a new trial. (Scarlett Rule 33 Mem. at 1-2.) Specifically, Mr. Scarlett contends that prejudice arose from the "combination of circumstances" created by the court's use of an anonymous and

partially sequestered jury; admission of evidence regarding Mr.

Scarlett's prior gun possession conviction pursuant to Rule

404(b); the fact that the court did not conduct a voir dire or

inquire into the impartiality of the trial jury after Mr. Barret

collapsed at the counsel table in the presence of the jury; and

the admission of testimony from Mr. Forrest after his mid-trial

guilty plea.  (*Id*. at 1-2.)

Mr. Scarlett provides the court with no authority to

suggest that the court's pre-trial and evidentiary rulings

support his request for a new trial, however.  Rather, like Mr.

Anderson, Mr. Scarlett merely appears to "use Rule 33 as a

vehicle to relitigate evidentiary rulings with which he

disagrees." *Smith*, 2009 WL 4249120, at *8.  Accordingly, the

court denies Mr. Scarlett's motion for a new trial pursuant to

Rule 33.  *See Castro*, 669 F. Supp. 2d at 293 (denying Rule 33

motion where defendant did not claim that jury's verdict

resulted in manifest injustice; profess his innocence; offer

authority showing that court's allegedly erroneous rulings would

support defendant's request for a new trial; or point to any

extraordinary circumstances that would justify a new trial).

### 4.   **Mr. Mitchell**

Mr. Mitchell moves for a new trial pursuant to Rule 33

on grounds that a "steady accumulation of . . . inflammatory and

prejudicial issues" undermined the fairness of Mr. Mitchell's

trial and a fair evaluation by the jury of the evidence against
Mr. Mitchell with respect to Count Two.  (Mitchell Mem. at 4-6.)
The court finds no merit in Mr. Mitchell's arguments.

First, Mr. Mitchell argues that he was deprived of his
right to a fair trial because he was tried together with three
co-defendants against whom the government introduced evidence
that was completely unrelated to, and "prejudicial and
inflammatory" against, Mr. Mitchell.  (*Id*. at 4.)  Mr. Mitchell
contends that the introduction of evidence of witness threats,
his co-defendants' criminal records, and firearms and gun-
related violence caused prejudicial spillover.  (*Id*. at 4-6.)

The court previously denied Mr. Mitchell's motion for
severance of his trial from that of his co-defendants pursuant
to Rule 14 of the Federal Rules of Criminal Procedure for the
reasons stated on the record during an arraignment proceeding on
December 5, 2011.  (*See* Minute Entry dated 12/5/2011.)  As the
court then stated, even if the court granted Mr. Mitchell's
severance motion, the evidence adduced against Mr. Barret, Mr.
Scarlett, and Mr. Anderson would be admissible at a separate
trial against Mr. Mitchell as an act of a co-conspirator in
furtherance of a conspiracy due to the nature of conspiratorial
illegal activity.  Therefore, the evidence of which Mr. Mitchell
complains is "neither spillover nor prejudicial."  *United States
v. Rosa*, 11 F.3d 315, 341 (2d Cir. 1993).  Moreover,

"disparit[ies] in the quantity of evidence and of proof of culpability are inevitable in any multi-defendant trial, and by themselves do not warrant a severance." *United States v. Cardascia*, 951 F.2d 474, 482 (2d Cir. 1991).

Furthermore, to the extent Mr. Mitchell complains that the admission of evidence at a joint trial was unfairly prejudicial, the court notes that throughout the trial, the court attempted to strike the balance required by Federal Rule of Evidence 403, and excluded evidence for which the danger of unfair prejudice substantially outweighed the probative value. For example, because the court determined that the text-messaged witness threats were admissible only against Mr. Barret, the court instructed the jury not to consider such evidence against any of the other defendants on trial. (Tr. at 458.) Jurors are presumed to follow limiting instructions, and there is no reason to believe that the court's instructions were insufficient here. *See Zafiro v. United States*, 506 U.S. 534, 540 (1993) (noting that "juries are presumed to follow their instructions" (internal quotation marks and citation omitted)).

Second, Mr. Mitchell argues that he was unfairly prejudiced by Williams's testimony that in 2010, Williams told Mr. Barret to give a pound of marijuana each to Mr. Mitchell and Mr. Scarlett because both of them had recently left prison. (Tr. at 1415-16.) Mr. Mitchell claims that Williams's testimony

75

was "inflammatory in and of itself," and "left a crippling impression that Mr. Mitchell was yet another thug in a band of felons" when compounded with other testimony. (Mitchell Mem. at 5.)

As the government notes, however, the court issued a limiting instruction that struck that portion of Williams's testimony; specifically, the court instructed the jury to "disregard it and put it out of your minds." (Tr. at 1445.) The court further instructed the jury that the stricken answer was inaccurate. (*Id*.) Besides protesting that "there was no way to unring that bell," a problem endemic to any testimony that is stricken at trial, Mr. Mitchell offers no reason to depart from the presumption that the jury follows the court's limiting instructions. *See United States v. Nixon*, 779 F.2d 126, 132-33 (2d Cir. 1985) (affirming denial of Rule 33 motion for new trial where court struck and instructed jury to disregard inaccurate and prejudicial testimony, because such instruction was sufficient to remedy any prejudice that may have occurred); *see also Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987) ("We normally presume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it . . . .").

Third, Mr. Mitchell argues that a new trial is warranted because the government's inclusion of Violation Six of

Count One in the Superseding Indictment was a "transparent side swipe at Mr. Mitchell even though he was not charged in that count." (Mitchell Mem. at 5.) Violation Six charged Mr. Barret with distributing marijuana on or about October 4, 2010. (S-4 ¶ 7.) The only evidence at trial regarding this violation, which the jury deemed "not proven," was (1) video evidence of an argument between Mr. Mitchell and Mr. Barret on October 4, 2010, and (2) testimony that the argument arose because Mr. Barret believed Mr. Mitchell had stolen marijuana from Mr. Barret. (*See* Tr. at 876-78, 2241-43; Verdict at 2.) Because the government failed to present proof of Mr. Barret's distribution of marijuana on October 4, 2010, Mr. Mitchell argues that Violation Six should not have been submitted to the jury and that in fact, the government's inclusion of Violation Six "had nothing to do with . . . Mr. Barret, and everything to do with tainting Mitchell." (Mitchell Mem. at 5.) In other words, Mr. Mitchell contends that the government included Violation Six against Mr. Barret for the express purpose of including the video evidence and testimony regarding Mr. Barret's suspicions that Mr. Mitchell stole marijuana from Mr. Barret, thus allowing the evidence to show that "Barret and others regarded Mitchell as a thief." (*Id.*)

The court finds no merit in Mr. Mitchell's argument. As the government notes, Violation Six was related to Mr.

Barret's alleged distribution of marijuana because the jury
could have inferred, based on the evidence presented, that Mr.
Barret distributed marijuana to Mr. Mitchell to sell "on or
about" October 4, 2010, the day of their argument, particularly
because the impetus of the argument was Mr. Barret's belief that
Mr. Mitchell lied about the whereabouts of the marijuana in
order to keep the profits for himself. (*See* Gov. Rule 29 and 33
Opp'n at 43-44.) Furthermore, in any event, evidence regarding
the October 4, 2010 argument would have been admissible even in
the absence of the inclusion of Violation Six in the Superseding
Indictment because it is probative with respect to Mr. Barret
and Mr. Mitchell's involvement in the conspiracy charged in
Count Two. For the foregoing reasons, the court finds no basis
to grant Mr. Mitchell's motion for a new trial pursuant to Rule
33.

### 5.      Sufficiency of the Evidence

Finally, Mr. Scarlett and Mr. Mitchell rest their Rule
33 motions in part on their Rule 29 arguments regarding the
sufficiency of the evidence. (*See* Mitchell Mem. at 4; Scarlett
Rule 33 Mem. at 2.) As detailed above, however, there is ample
competent, satisfactory, and sufficient evidence from which a
rational jury could have found, beyond a reasonable doubt, each
defendant's guilt of the offenses of which he was convicted.
Accordingly, there can be no "real concern" that "an innocent

person may have been convicted." *See Sanchez*, 969 F.2d at 1414.
Where there is no "manifest injustice" in allowing the guilty
verdict to stand, the court does not have discretion to order a
new trial pursuant to Rule 33, and must deny defendants' motions
for a new trial.

## V.    **Mr. Barret's *Pro Se* Motions**

On April 24, 2012, two months after his conviction on
all six counts of the Superseding Indictment, Mr. Barret filed a
*pro se* post-trial "Memorandum of Law in Support of Supplemental
Motion for Judgment of Acquittal, or in the Alternative For a
New Trial" pursuant to Rules 29 and 33.  (*See generally* First
*Pro Se* Barret Mem.)  Shortly thereafter, Mr. Barret filed a
"Motion for Substitution of Counsel and for Production of
Section 3500 Material."  (*See generally* Second *Pro Se* Barret
Mem.)  On May 15, 2012 and June 5, 2012, Mr. Barret filed
additional memoranda regarding his Rule 29 and 33 motions,
repeating and embellishing arguments that he previously
submitted for the court's consideration.  (*See generally* Third
*Pro Se* Barret Mem.; ECF No. 551 ("Fourth *Pro Se* Barret Mem.").)
The government opposes the arguments Mr. Barret raises as
grounds for his Rule 29 and 33 motions (*see* Gov. Opp'n to *Pro Se*
Mems.), and Mr. Barret's counsel, Jack Goldberg, Esq., opposes
Mr. Barret's motions to substitute counsel (*see* First Goldberg
Resp. and Second Goldberg Resp.).  On June 4, 2012, the court

held a hearing at which the court heard oral arguments regarding these motions from Mr. Barret, Mr. Goldberg, and the government, and received testimony from Mr. Barret and Mr. Goldberg.  (*See* Minute Entry dated 6/4/2012.)

### A. Rule 29 Motion

#### 1. "Incredible" Testimony of Cooperating Witnesses

In support of Mr. Barret's Rule 29 motion for acquittal, Mr. Barret primarily contends that no rational trier of fact could have found him guilty beyond a reasonable doubt based on the trial testimony of the numerous cooperating witnesses, which was "incredible as a matter of law."  (First *Pro Se* Barret Mem. at 3.)  Mr. Barret asserts that certain cooperators were "caught in blatant purgery [sic]" when they testified about specific examples of Mr. Mitchell's involvement in the charged conspiracy, when in fact Mr. Mitchell was hospitalized or incarcerated on the relevant dates.  (*Id.*)  Apart from those instances, however, Mr. Barret generally attacks the credibility of the cooperators as "inherently diminutive [sic] [because] they [were] testifying to save themselves" and argues that the cooperators' testimony was "overwhelmingly inconsistent and unreliable and the claims made fluctuated amid the cooperators."  (*Id.*)

As explained at length *supra*, however, resolving issues of credibility is for the jury, and the court must "avoid usurping the role of the jury" in deciding Rule 29 motions. *Guadagna*, 183 F.3d at 129; *see Bala*, 236 F.3d at 93-94 (the court must "defer to the jury's assessment of witness credibility and the jury's resolution of conflicting testimony"). Moreover, the court "must draw all favorable inferences and resolve all issues of credibility in favor of the prosecution." *Jespersen*, 65 F.3d at 998 (quoting *Khan*, 787 F.2d at 34). Therefore, even assuming, *arguendo*, that the specific cooperator statements that Mr. Barret cites were incredible as a matter of law, the court would still find that there was ample physical, video, and testimonial evidence at trial to sustain Mr. Barret's convictions on all counts in light of the facts adduced at trial, as set forth in Section I.D. *supra*, and for the reasons previously stated in Section III.A.1.

## 2. Extrapolation of Drug Quantity

Mr. Barret also argues that his convictions on Counts Two and Five were unsupported by the evidence, specifically with respect to the 100-kilogram and 1,000-kilogram weights charged in the Superseding Indictment. (First *Pro Se* Barret Mem. at 3.) Mr. Barret objects to the attribution to him of the marijuana discovered on October 7, 2010 at the Barret Residence because Mr. Barret purportedly "had no control of or constructive

possession [of the marijuana], nor any ties or document or keys"
leading to the Barret Residence where the marijuana was found.
(First *Pro Se* Barret Mem. at 3.)

Mr. Barret's argument lacks merit. Contrary to Mr.
Barret's assertions, the jury did not "extrapolate" drug
quantities and wrongfully attribute them to Mr. Barret. As the
court explained in detail in Section III.A.1, there was abundant
evidence at trial that Mr. Barret agreed with others to sell
more than 1,000 kilograms of marijuana during the course of the
charged conspiracy. In addition, notwithstanding the fact that
house keys or a lease to the Barret Residence were not found on
Mr. Barret's person at the time of his arrest on October 7,
2010, the evidence at trial established that Mr. Barret was the
leader of the conspiracy and that the 100 kilograms of marijuana
seized from the Barret Residence on October 7, 2010, were
delivered to the location at his direction and under his
leadership. Accordingly, the court denies Mr. Barret's Rule 29
motion for acquittal on Counts Two and Five.

### B. Rule 33 Motion

Mr. Barret moves for a new trial pursuant to Rule 33
on several grounds: (1) Mr. Goldberg's assistance was
constitutionally deficient; (2) the government engaged in
outrageous misconduct; and (3) Count One of the Superseding

Indictment was impermissibly duplicitous. (*See generally* First *Pro Se* Barret Mem. and Second *Pro Se* Barret Mem.)

### 1.    Ineffective Assistance of Counsel

The court construes Mr. Barret's allegations of ineffective assistance of counsel as a basis for his motion for a new trial pursuant to Rule 33. *See United States v. Brown*, 623 F.3d 104, 113 n.5 (2d Cir. 2010) ("[T]he proper procedural avenue for defendants who wish to raise ineffective assistance claims after conviction but prior to sentencing is a motion for a new trial pursuant to Federal Rule of Criminal Procedure 33.").

### a. Legal Standard

The standard governing ineffective assistance of counsel claims is well-established and was set forth by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, the appropriate inquiry for ineffective assistance of counsel claims is whether petitioner was afforded "reasonably effective assistance" of counsel, such that counsel's actions neither: (1) fell below the objective standard of reasonableness ("the performance prong"); nor (2) caused a reasonable probability that the result of the trial would have been different but for counsel's unprofessional errors ("the prejudice prong"). *Id*. at 686–95.

First, in applying the performance prong of this standard, a court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. Thus, "the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* (quoting *Michel v. Louisiana,* 350 U.S. 91, 101 (1955)); *see United States v. Helgesen*, 669 F.2d 69, 72 (2d Cir. 1982) ("Trial advocacy is an art, and the advocate must be given some latitude in deciding upon an appropriate trial strategy."). Moreover, "[a]n attorney's '[f]ailure to make a meritless argument does not amount to ineffective assistance.'" *United States v. Noble,* 363 F. App'x 771, 773 (2d Cir. 2010) (quoting *United States v. Arena*, 180 F.3d 380, 396 (2d Cir. 1999)).

Second, under the prejudice prong, "[t]he benchmark . . . must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686. Accordingly, the relevant inquiry in assessing the prejudice prong is "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Henry v. Poole*, 409 F.3d 48, 63-64 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 695). Thus, even objectively unreasonable errors on the part of

counsel will not result in setting aside a judgment in a criminal proceeding if the errors can be shown to have had no effect on the judgment. *Strickland*, 466 U.S. at 691.

### b. Application

At the June 4, 2012 evidentiary hearing, Mr. Barret waived his attorney-client privilege and the court received testimony from both Mr. Barret and Mr. Goldberg regarding Mr. Barret's claim of ineffective assistance of counsel. (*See generally* Transcript of 6/4/2012 hearing ("6/4/2012 Tr.").) In light of the foregoing legal standards and based on (1) testimony from Mr. Barret and Mr. Goldberg at the June 4, 2012 hearing; (2) Mr. Goldberg's written statements dated April 24, 2012, and May 2, 2012, the truth of which Mr. Goldberg swore to at the June 4, 2012 hearing (*see id.* at 27); (3) an affidavit submitted to the court on June 26, 2012, by Samantha Weir, Mr. Barret's girlfriend (*see* ECF No. 552, Declaration of Samantha Weir ("Weir Decl.")); (4) a list of Mr. Goldberg's visits to Mr. Barret at the MDC, compiled by Mr. Goldberg from his records, which Mr. Goldberg submitted to the court on June 26, 2012 (*see* ECF No. 554, Goldberg MDC Letter); and (5) MDC visitor records submitted by the government (see ECF No. 562, MDC Records), the court addresses each of Mr. Barret's arguments.

### i. Failure to Timely Secure Assistance of Interpreter

Mr. Barret claims that a "language barrier" prevented him from effectively conferring with his attorney and understanding court proceedings because he is "semi-literate in the English language." (First *Pro Se* Barret Mem. at 2, 5-6.) Mr. Barret also asserts that Mr. Goldberg's assistance of counsel fell below constitutional standards because Mr. Goldberg failed to recognize or act upon Mr. Barret's limited command of the English language and his purported need for "a language interpreter fluent in both American English and Jamaican Patois Dialect." (First *Pro Se* Barret Mem. at 5.)

Mr. Barret claims that, despite Mr. Goldberg's knowledge that his client "could not understand much that was said in their personal conversations," Mr. Goldberg failed to visit Mr. Barret in jail until he fainted in court, and Mr. Goldberg did not use an interpreter during their conversations, and consequently, Mr. Barret was "unable to duly confer or consult [with Mr. Goldberg], the two were impeded from producing any defense strategy." (First *Pro Se* Barret Mem. at 5; 6/4/2012 Tr. at 29, 35.) Mr. Barret testified that Mr. Goldberg's failure to visit Mr. Barret at the MDC was particularly troublesome because Mr. Goldberg refused to email Mr. Barret. (6/4/2012 Tr. at 43.)

According to Mr. Barret, "but for trial counsel's deficiencies there was reasonable probability that the outcome of trial would have been different" and "Mr. Goldberg's conduct seriously harmed his client." (First *Pro Se* Barret Mem. at 5.) Mr. Barret further contends that his anxiety led to a fainting episode in open court and that it was only then that "these matters [drew] any consideration" and "at this late juncture he [Mr. Barret] was finally appointed an interpreter." (First *Pro Se* Barret Mem. at 6.)

In response, Mr. Goldberg noted that he refused to communicate with Mr. Barret via email because emails sent through the computer portal at the MDC are not privileged. (6/4/2012 Tr. at 17-18.) Mr. Goldberg further testified that although he did not communicate with his client via email, he visited Mr. Barret at the MDC on numerous occasions in advance of trial, and submitted to the court a list reflecting eleven such visits. (*See* Goldberg MDC Letter.) The MDC visitor log confirms that Mr. Goldberg visited Mr. Barret at the MDC on six occasions between March 8, 2011, and January 18, 2012.[14] (MDC Records.)

---

[14] The court notes that the MDC records do not confirm all of the MDC visits that Mr. Goldberg listed in his letter, in part because the MDC records do not include visits prior to March 2011. The MDC records do confirm that Mr. Goldberg visited Mr. Barret at the MDC on December 18, 2011, and January 18, 2012. (MDC Records.) The MDC records also indicate that Mr. Goldberg visited Mr. Barret on four other dates after March 1, 2012, but those dates do not match the dates offered in Mr. Goldberg's letter, a fact that the court attributes to the technological difficulties Mr. Goldberg experienced

In addition, contrary to Mr. Barret's assertion that Mr. Goldberg did not prepare for trial, Mr. Goldberg testified that, as reflected by the docket in this case, he filed numerous pre-trial motions on Mr. Barret's behalf[15]; reviewed the detailed criminal complaint, superseding indictments, and Rule 16 material; gathered and studied information regarding each alleged participant in the charged conspiracy; reviewed all relevant reports with Mr. Barret; and reviewed the exhibits, pole camera video, home surveillance video, and other videos produced through discovery. (6/4/2012 Tr. at 23-24.) Moreover, in addition to reviewing Mr. Barret's personal and criminal history, Mr. Goldberg conducted five or six interviews with Mr. Barret, both at the courthouse and at the MDC, regarding Mr. Barret's involvement in the charged conduct. (*Id*. at 21.)

Mr. Goldberg asserted that his client "never had a problem understanding what was being said" during their attorney-client meetings, and that he experienced no difficulty communicating with Mr. Barret without the assistance of an interpreter. (First Goldberg Resp. at 2; 6/4/2012 Tr. at 14-16, 22.) Mr. Goldberg stated that when he began representing Mr.

---

in compiling his visiting schedule (*see* Goldberg MDC Letter). In any event, as discussed *infra*, based on the MDC records submitted and Mr. Goldberg's testimony at the June 4, 2012 hearing, the court is satisfied that Mr. Goldberg visited his client multiple times at the MDC to confer with Mr. Barret about his case and to prepare for trial.

[15] *See* ECF No. 265 (fifteen pre-trial motions); ECF No. 288 (motion for a suppression hearing); ECF No. 321 (joining in Scarlett's motions *in limine*).

Barret, Mr. Goldberg obtained pedigree information about Mr. Barret's background and "copies of every single document relative to [Mr. Barret's] criminal history in Queens," and met with one of Mr. Barret's previous attorneys, who provided copies of all of the attorney's relevant files. (6/4/2012 Tr. at 15.) Mr. Goldberg received no indication from Mr. Barret's previous attorney, from the records, or from Mr. Goldberg's conversations with Mr. Barret about his extensive arrest history, that Mr. Barret required the assistance of an interpreter in order to communicate meaningfully. (*Id.* at 15, 22.)

Moreover, Mr. Goldberg testified that before trial commenced, he met with Mr. Barret at the MDC to explain and discuss the government's proposed plea agreements. (*Id.* at 19-20.) During these discussions, Mr. Goldberg did not detect that Mr. Barret had any difficulty understanding English. (*Id.* at 20, 22.) Rather, it appeared to Mr. Goldberg that Mr. Barret fully understood the terms of the plea agreement because Mr. Barret was "very adamant" and indignant in response to the plea offer, saying, "Who does the government think I am? What do they think of me? How could [they] be so cruel?" (*Id.* at 20.)

Furthermore, Mr. Goldberg stated that most recently, Mr. Barret refused the assistance of a Jamaican Patois or English interpreter during an hour-long post-trial interview with Probation Officer Patricia Sullivan, and that Officer

Sullivan can confirm that Mr. Barret understood every question asked of him during that meeting.  (First Goldberg Resp. at 2.)  In sum, until Mr. Goldberg brought the language issue to the court's attention during the trial, he never observed or perceived any difficulties by Mr. Barret regarding Mr. Barret's ability to understand English and what was transpiring at trial.  (6/4/2012 Tr. at 22.)  Mr. Goldberg also testified that immediately after Mr. Barret raised the issue for the first time at trial, Mr. Goldberg informed the court that his client requested the assistance of an interpreter.  (*Id.*; Tr. at 1627.)

        As an initial matter, the court notes that the record belies Mr. Barret's current claim that he fainted out of frustration related to his purported language difficulties.  Mr. Barret's fainting episode occurred on the third day of trial, on January 11, 2012, and followed the admission of cell phone text messages conveying threats of physical harm to an individual, indicating that he should not cooperate with or assist law enforcement regarding Mr. Barret and his co-conspirators.  (Tr. at 483; GX 591.)  Nearly two weeks of trial passed after Mr. Barret's fainting episode before Mr. Goldberg raised the language issue to the court for the first time.  (Tr. at 1627.)  Mr. Goldberg stated, "My client just said something to me, okay. I didn't understand what he said.  And his reaction was, 'If you don't understand what I said, can you get a translator?'"  (*Id.*)

Mr. Barret added, "Yes." (*Id*.) At that time, Mr. Goldberg told the court that "by [and] large I've understood what he's [Mr. Barret's] said" during the course of the trial. (*Id*.)

In addition, on January 23, 2012, the day Mr. Goldberg requested an interpreter on behalf of his client, the court had an extended dialogue with Mr. Barret in English, without the aid of an interpreter. (*Id*. at 1831-38.)[16] The court also recalls that in numerous pretrial proceedings at which Mr. Barret appeared, Mr. Barret never expressed difficulty understanding the proceedings or communications with his attorney without the assistance of an interpreter. (*See*, *e.g.*, Minute Entries dated 11/3/2010, 11/10/2010, 12/3/2010, 2/11/2011, 4/11/2011, 8/8/2011, 9/14/2011, 11/10/2011.)

Based on the court's own observations of unaided communication between Mr. Barret and Mr. Goldberg before and during trial, the court's ability to communicate with Mr. Barret and to understand Mr. Barret's oral communications with the court without an interpreter's assistance, and Mr. Goldberg's credible statements that he and his client had no difficulty communicating, the court is satisfied that Mr. Goldberg's performance regarding an interpreter was not deficient and that Mr. Goldberg's actions did not prejudice the defense. *See United States v. Sangmin Chun*, 399 F. App'x 669, 671-672 (2d

---

[16] This portion of the transcript is sealed.

Cir. 2010) (affirming district court's finding that counsel was not ineffective based on district court's "'own firsthand observations' that [defendant] and his counsel were fully able to communicate with each other without the assistance of an interpreter" and that they conversed in English during the trial). Moreover, the court is satisfied, based on Mr. Goldberg's credible testimony and the records from Mr. Goldberg and the MDC, that Mr. Barret's claim that Mr. Goldberg failed to visit him at the MDC and to work with Mr. Barret to develop a defense is unfounded.

### ii. Failure to Object to "Discriminatory" Voir Dire Process

Mr. Barret contends that Mr. Goldberg failed to object when the court purportedly empanelled the jury in a discriminatory fashion that was not designed to secure a cross-section of the population. (First *Pro Se* Barret Mem. at 2.) Mr. Barret, who is black and resided in Queens, which Mr. Barret asserts is "the 4th most racially-diverse county in the U.S.," contends that because the petit jury consisted of "9 Whites and only 1 African-American,"[17] the trial jury was "selected in

---

[17] In fact, the petit jury was selected from a pool of 125 jurors called from within the Eastern District of New York. On the petit jury, ten jurors were white, one juror was African-American, and one juror was Asian-American. Initially, the jury consisted of nine white jurors, one African-American juror, and two Asian-American jurors, but one Asian-American juror was dismissed on the first day of trial because he knew the wife of an Assistant United States Attorney. The dismissed juror was replaced with the first alternate juror (who was white). Two of the white jurors in the original petit jury were also dismissed for employment and health issues on the first

violation of Mr. Barret's 5th Amend. Rights."[18]  (*Id.*)  Mr.

Barret claims that Mr. Goldberg's assistance of counsel was

ineffective because Mr. Goldberg failed to object to the

"illegal jury selection" that "served to discriminate against

African Americans and others," and failed to communicate with

Mr. Barret about the jury selection process as it was taking

place.  (*Id.* at 2-3.)

    With respect to Mr. Barret's argument that his

attorney failed to communicate with him during voir dire, Mr.

Goldberg asserted that he actively communicated with his client

both before and throughout the jury selection.  (First Goldberg

Resp. at 1.)  Mr. Goldberg also expressed his belief that Mr.

Barret understood what occurred during the voir dire process.

---

day of trial, and were replaced with alternate jurors (both of whom were white).

[18] Mr. Barret also contends that based on the racial makeup of the petit jury, "it must be presumed [that the] Grand Jury process did not receive any more adequate due process." (*Id.* at 2.)  Accordingly, Mr. Barret renews his pre-trial motion to discover the grand jury minutes. (*Id.*)  The court previously denied Mr. Anderson's motion for release of the grand jury minutes – which Barret joined – in a Memorandum and Order dated November 16, 2011. (*See* 11/16/2011 M&O.)  As the court explained in that Memorandum and Order, maintaining the secrecy of grand jury proceedings is a tradition in the United States that pre-dates the birth of the nation itself.  *In re Craig*, 131 F.3d 99, 101 (2d Cir. 1997) (citing *In re Biaggi*, 478 F.2d 489, 491 (2d Cir. 1973)).  Consequently, in order to overcome the strong presumption in favor of the "indispensable secrecy of grand jury proceedings," a defendant must satisfy a heavy burden of showing "compelling necessity."  *United States v. Procter & Gamble Co.*, 356 U.S. 677, 682 (1958).  In the Second Circuit, "[a] review of grand jury minutes is rarely permitted without specific factual allegations of government misconduct."  *United States v. Torres*, 901 F.2d 205, 233 (2d Cir. 1990).  Because Mr. Barret's motion is devoid of *any* specific factual allegations regarding the grand jury proceedings, which "carry a 'presumption of regularity,'" *id.* at 232 (quoting *Hamling v. United States*, 418 U.S. 87, 139 n. 23 (1974)), the court finds that Mr. Barret has failed to satisfy his heavy burden and again denies Mr. Barret's motion to release grand jury minutes.

(*Id.*)  As explained *supra* in Section V.B.1.b.i, the court finds Mr. Goldberg to be credible in this respect, as Mr. Goldberg's account is consistent with the court's own observations of Mr. Goldberg's continual consultation with Mr. Barret throughout pre-trial and trial proceedings.  Mr. Goldberg also testified that in his professional judgment, he saw no need to object to the *voir dire* process, apart from his objection to the anonymous jury, which Mr. Goldberg addressed in an opposition memorandum submitted in advance of trial (*see* ECF No. 310, Memorandum in Opposition to Government's Motion for an Anonymous and Partially Sequestered Jury by Christopher Barret).  (6/4/2012 Tr. at 26.)

Moreover, Mr. Goldberg's assistance did not fall below constitutional standards merely because Mr. Goldberg did not object to the voir dire process, because "[f]ailure to make a meritless argument does not amount to ineffective assistance." *Arena*, 180 F.3d at 396.  First, Mr. Barret does not allege that the government exercised its peremptory strikes in a racially discriminatory manner, as prohibited by *Batson v. Kentucky*, 476 U.S. 79 (1986).  Rather, Mr. Barret points to the racial makeup of the final petit jury and claims that discrimination must be presumed because African-Americans were underrepresented in the petit jury.  (*See* First *Pro Se* Barret Mem. at 2-3.)  The Second Circuit has held that although the Sixth Amendment requires courts to draw jury panels from a source representing a "fair

cross-section" of the defendant's community, "[t]his fair cross-section requirement applies only to the larger pool serving as the source of names and not to the petit jury." *United States v. Jackman*, 46 F.3d 1240, 1244 (2d Cir. 1995). Consequently, "the Sixth Amendment guarantees the *opportunity* for a representative jury venire, not a representative venire itself." *Id.*

Second, in order to successfully challenge the fair cross-section requirement, Mr. Barret must show:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*United States v. Miller*, 116 F.3d 641, 659 (2d Cir. 1997) (quoting *Duren v. Missouri*, 439 U.S. 357, 364 (1979)). Although the group Mr. Barret claims to have been excluded, African-Americans, is a "distinctive" group in the community, Mr. Barret has not shown — nor could he have shown — that the representation of African-Americans in the overall jury venire of 125 individuals was unfair and unreasonable, or that African-Americans were systematically excluded during the voir dire process. Accordingly, because the objection would have been meritless, Mr. Goldberg's failure to object did not amount to

ineffective assistance.  Moreover, to the extent that Mr. Barret moves for a new trial on grounds that the petit jury was not comprised of a representative cross-section of the community, the court denies Mr. Barret's motion for the reasons stated above.

### iii. Failure to Challenge Superseding Indictment On Grounds of Double Jeopardy

Mr. Barret contends that Mr. Goldberg provided ineffective assistance because Mr. Goldberg was "not schooled in the art of deciphering" Count One of the Superseding Indictment, for continuing criminal enterprise.  (First Barret *Pro Se* Mem. at 9-10; *see also* Third *Pro Se* Barret Mem. at 4.)  Citing *Rutledge v. United States*, 517 U.S. 292 (1996), Mr. Barret argues that Counts Two, Three, Four, and Five are all lesser-included offenses of Count One (continuing criminal enterprise), and that Mr. Barret's convictions of Counts Two through Five should therefore be vacated.  (First Barret *Pro Se* Mem. at 9-10.)  Mr. Barret also argues that because Mr. Goldberg did not move to vacate these convictions, Mr. Goldberg's assistance falls below constitutional standards.

Mr. Barret correctly states that some of the counts included in the Superseding Indictment are lesser-included offenses of Count One, and that the doctrine of double jeopardy prohibits the court from entering any judgment against Mr.

Barret that includes a conviction for Count One *and* a conviction for any lesser-included offense. In *Rutledge*, the Supreme Court held that because conspiracy, as defined in 21 U.S.C. § 846, is a lesser-included offense of continuing criminal enterprise, the defendant could not be convicted of and sentenced for both offenses. 517 U.S. at 307. Because Counts Two (conspiracy to distribute marijuana) and Three (conspiracy to maintain a stash house) of the Superseding Indictment are offenses under 21 U.S.C. § 846, they are lesser-included offenses of Count One, and the court must not and will not enter judgment against Mr. Barret for Count One *and* Counts Two and Three, or sentence Mr. Barret based on all three Counts.[19] *See id.* (vacating conviction of conspiracy offense and concomitant sentence because "[a] guilty verdict on a [continuing criminal enterprise] charge necessarily includes a finding that the defendant also participated in a conspiracy").

Because these are issues that may properly be dealt with at the sentencing phase, which has not yet taken place, the fact that Mr. Goldberg has not raised the issue does not render his assistance of counsel ineffective. Accordingly, the court denies Mr. Barret's motion on this ground.

---

[19] Because Counts Four (maintaining a stash house) and Five (distribution of marijuana) are not conspiracy offenses, they are not lesser-included offenses of a continuing criminal enterprise, and therefore not within the scope of the Supreme Court's discussion in *Rutledge*.

### iv. Other Grounds

Mr. Barret cites a variety of additional grounds to support his claim that Mr. Goldberg's assistance of counsel was ineffective, including that (1) Mr. Goldberg was disrespectful toward Mr. Barret after Mr. Goldberg learned that Mr. Barret could no longer pay his legal fees, and that the only time Mr. Goldberg contacted individuals referred to him by Mr. Barret was when Mr. Goldberg sought payment of his legal fees; (2) Mr. Goldberg did not permit Mr. Barret to review impeachment material produced by the government pursuant to 18 U.S.C. § 3500 ("3500 Material"); (3) Mr. Goldberg failed to explain the charges that Mr. Barret faced, and Mr. Goldberg failed to notify Mr. Barret of, or dissuaded Mr. Barret from accepting, plea offers that resulted in "5, 10, 15 years max terms of jail time" and threatened to "walk off the case" if Mr. Barret pleaded guilty; and (4) Mr. Goldberg failed to call as witnesses various character and material witnesses that he identified, including co-defendant Andre Wilson and Mr. Barret's cousin Georgia, and that Mr. Goldberg failed to explain why Mr. Goldberg did not choose to call those witnesses. (First *Pro Se* Barret Mem. at 5-6; Second *Pro Se* Barret Mem. at 2; 6/4/2012 Tr. at 31-38.)

Through his written responses and during his testimony at the June 4, 2012 hearing, Mr. Goldberg denied all of Mr. Barret's allegations. First, Mr. Goldberg denied that he was

disrespectful to his client.  (First Goldberg Resp. at 2;
6/4/2012 Tr. at 24-25.)  Mr. Goldberg specifically refuted Mr.
Barret's claim that Mr. Goldberg told Mr. Barret that he was the
worst client Mr. Goldberg had ever had.  (*Id.* at 25.)  Mr.
Goldberg also denied that he and his client had contentious
conversations or arguments.  Mr. Goldberg explained that
although Mr. Barret often *appeared* to be yelling at his
attorney, Mr. Barret was "screaming because he didn't like the
position he was in," not expressing anger or frustration toward
his attorney.  (*Id.* at 25-26.)

        Mr. Goldberg also insisted that he would have defended
Mr. Barret despite his client's inability to pay.  (First
Goldberg Resp. at 2; 6/4/2012 Tr. at 24.)  Mr. Goldberg
testified that "[a]s a criminal lawyer, there are many cases
where there are fee difficulties, but . . . my ethics are such
that I couldn't drop the ball for any client because of the
fee."  (*Id.* at 25.)

        Mr. Goldberg further contended that he carefully
reviewed the 3500 Material and, when permitted in accordance
with the terms of the court's Protective Order (*see* ECF No.
384), he discussed and reviewed the 3500 Material with Mr.
Barret in court.  (First Goldberg Resp. at 3; 6/4/2012 Tr. at
12.)  Mr. Goldberg also testified that he explained in detail to
Mr. Barret the contents of any documents Mr. Goldberg provided

to his client. (*Id.* at 13.) As a result of this review, Mr. Barret "made important contributions" and "suggested additional areas and subjects to focus upon" during cross-examination, and Mr. Goldberg "took Mr. Barret's suggestions seriously and responded to his many questions," and incorporated many of Mr. Barret's ideas into his cross-examinations. (First Goldberg Resp. at 3; 6/4/2012 Tr. at 16-17.)

Although Mr. Barret contended during the June 4, 2012 hearing that Mr. Goldberg refused to cross-examine Mr. Forrest concerning certain testimonial statements that Mr. Barret believed to be untrue (*see id.* at 5, 44), Mr. Goldberg explained that he rejected that particular suggestion because he believed that such cross-examination would "not only create[] a negative inference against [Mr. Barret] but [would also] open[] up Pandora's box." (*Id.* at 23.) Mr. Goldberg also noted that Mr. Barret repeatedly complimented counsel before and during trial, particularly after Mr. Goldberg's cross-examination of various cooperating witnesses. (First Goldberg Resp. at 2.) Mr. Barret acknowledged that he complimented Mr. Goldberg for doing a good job during cross-examination at least once during trial. (6/4/2012 Tr. at 38.)

Mr. Goldberg also asserted that he explained the charges of each superseding indictment to his client, with particular emphasis on the Continuing Criminal Enterprise

charge.  (*Id*. at 14.)  Moreover, when the Fourth Superseding Indictment was issued, Mr. Goldberg met with Mr. Barret that same afternoon and discussed Mr. Goldberg's observation that "17 of the 20 original specifications [violations] were changed, the dates, the times and a new 21st specification was added to [the Superseding Indictment]."  (*Id*.)

Mr. Goldberg testified that he provided copies of all proposed plea agreements, and discussed the terms and sentencing consequences of the plea offers with his client on several occasions.  (First Goldberg Resp. at 3; 6/4/2012 Tr. at 17-20.) Mr. Goldberg also attempted – unsuccessfully – to convince the government to offer a more favorable plea deal.  (*Id*. at 19.) Mr. Goldberg denied that he dissuaded his client from taking a plea; on the contrary, Mr. Goldberg recommended that Mr. Barret plead guilty in lieu of proceeding to trial.  (*Id*. at 17-19.)

According to Mr. Goldberg, Mr. Barret went to trial against Mr. Goldberg's advice because Mr. Barret "believed [the plea offers] were unrealistic and . . . rejected every offer" despite Mr. Goldberg's efforts to inform him of the benefits of accepting or rejecting the plea offers and the exposure Mr. Barret would face if he were convicted at trial.  (First Goldberg Resp. at 3; 6/4/2012 Tr. at 17-21.)  The government also noted that, contrary to Mr. Barret's assertions, the government never made plea offers to Mr. Barret with maximum

jail terms of five, ten, or fifteen years. (Gov. Opp'n to *Pro Se* Mems. at 8 n.1.) Moreover, although Mr. Barret testified that he expressed a desire to accept a plea deal that involved a fifteen-year minimum prison term, on the Friday before jury selection took place on January 3, 2012, the government informed the court that at that time, that particular plea offer had long since expired. (6/4/2012 Tr. at 57-59.) Mr. Goldberg also testified that although at one time Mr. Barret wanted to testify on his own behalf, Mr. Barret never identified the names of any other character or material witnesses whom Mr. Barret thought could be helpful to his defense. (*Id.* at 11.)

Mr. Barret testified at the June 4, 2012 hearing that Mr. Goldberg was disrespectful toward him, and that Mr. Goldberg hung up the telephone in the middle of their conversations, saying "I don't want to talk to you [Mr. Barret]" while Mr. Barret was at the MDC. (*Id.* at 31.) Mr. Barret further testified that his counselor at the MDC, "Mr. Sommerville," could corroborate Mr. Barret's claim. (*Id.* at 31-32.) Although the court gave Mr. Barret an opportunity to obtain a sworn statement from Mr. Sommerville about this issue (*see* Minute Entry dated 6/4/2012), the court received no response from Mr. Sommerville.

Mr. Barret also testified that his girlfriend, Samantha Weir, informed Mr. Barret that Mr. Goldberg was

similarly dismissive toward her, though Mr. Goldberg denied it at the June 4, 2012 hearing. (6/4/2012 Tr. at 32, 35, 42.) Ms. Weir submitted an affidavit to the court on June 26, 2012, attesting that Mr. Goldberg "hanged up the phone on me repeatedly and screamed at me as if I was his child." (Weir Decl. at 1.) Ms. Weir also stated that "the way he [Mr. Goldberg] speaks to people is very disrespectful and he never tried to establish a relationship with Christopher [Barret] nor explain things to him when he felt Christopher did not understand." (*Id.*)

The court finds, based upon the court's observations and review of the trial record, and Mr. Goldberg's credible assertions, that Mr. Goldberg provided effective assistance of counsel and that his conduct fell "within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. In addition, the court notes that for purposes of Sixth Amendment analysis, "the appropriate inquiry focuses on the adversarial process, not on the accused's relationship with his lawyer as such" because "[t]he right to the effective assistance of counsel is . . . the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing." *United States v. Cronic*, 466 U.S. 648, 656 & n.21 (1984). Here, the court finds that Mr. Goldberg was a reasonably effective and zealous advocate on behalf of Mr.

Barret, and that Mr. Goldberg meaningfully tested the government's case against his client.

Moreover, with respect to Ms. Weir's claims, the court notes that Ms. Weir's statements concerning Mr. Goldberg's interactions with Mr. Barret are unreliable and based on hearsay. Mr. Barret has been incarcerated since his arrest in October 2010. Consequently, any communications that Mr. Barret had with Mr. Goldberg took place at the MDC, in court, or on the telephone, and Ms. Weir could not have been privy to such conversations. Second, because Ms. Weir is not Mr. Goldberg's client, he was not obligated to speak with her, and Ms. Weir does not contend that she was providing information for the defense during her calls to Mr. Goldberg. Therefore, even assuming the truth of her statements regarding Mr. Goldberg's behavior toward Ms. Weir, the court does not find that Mr. Goldberg provided ineffective assistance to Mr. Barret. Accordingly, the court denies Mr. Barret's motion for a new trial on grounds of ineffective assistance of counsel.

### 2. Outrageous Government Misconduct

Mr. Barret further argues that he is entitled to a new trial due to outrageous government misconduct during the course of the underlying investigation. (First *Pro Se* Barret Mem. at 6; *see generally* Third *Pro Se* Barret Mem.) Mr. Barret contends that although the government was aware of ongoing shipments of

boxes containing marijuana from Arizona to New York during the course of the underlying investigation, the government "allow[ed] investigation subjects to transport, possess, traffic, 'stash,' and distribute drugs throughout the USA and streets of NYC" for months, for the express purpose of building a body of evidence to support the continuing criminal enterprise offense charged in Count One. (First *Pro Se* Barret Mem. at 6.) Mr. Barret asserts that this amounts to outrageous government conduct because "there must be some limit to to [sic] the quantity of drugs that the government can introduce into society." (*Id.* at 6, 8-9.)

The two cases to which Mr. Barret cites in support, *United States v. Santana*, 808 F. Supp. 77 (D. Mass. 1992), *rev'd*, 6 F.3d 1 (1st Cir. 1993), and *Hampton v. United States*, 425 U.S. 484 (1976), are inapposite. First, the conduct at issue in *Santana*, which the First Circuit concluded was *not* outrageous government misconduct warranting the dismissal of criminal charges, was the government's delivery of a small amount of narcotics (13.3 grams of heroin) to a suspect in order to facilitate an ongoing sting operation involving a massive heroin distribution ring. 6 F.3d at 2. Similarly, *Hampton* involved the sale of an illegal drug from a government informant to a defendant as part of an investigation. 425 U.S. at 485-86. The Supreme Court found no outrageous government conduct and

affirmed the defendant's conviction in *Hampton* because the
defendant was predisposed to purchase illicit drugs for resale.
*Id.* at 489.

In contrast to *Santana* and *Hampton*, the instant case
does not involve the distribution of drugs by any government
informant.  The sole distributors of drugs were Mr. Barret and
his co-conspirators, and Mr. Barret cannot appropriately blame
the government for essentially failing to stop him and his co-
conspirators from perpetuating their drug distribution scheme
during the course of its investigation.  Accordingly, the court
finds that Mr. Barret's argument lacks merit.

### 3.    Duplicitous Indictment

Mr. Barret also argues that Count One of the
Superseding Indictment was impermissibly duplicitous because it
alleged twenty-one violations, "which the government used to
improperly amplify a 'Superseding Indictment.'"  (First *Pro Se*
Barret Mem. at 3-4.)  Mr. Barret appears to argue that Count One
of the Superseding Indictment is duplicitous because it charges
one count, continuing criminal enterprise, but includes
references to twenty-one other offenses.  (*See id.* at 3.)

"[A]n indictment [is] duplicitous 'if it joins two or
more distinct crimes in a single count.'"  *United States v.
Sturdivant*, 244 F.3d 71, 75 n. 3 (2d Cir. 2001) (citing *United
States v. Aracri*, 968 F.2d 1512, 1518 (2d Cir. 1992)).  "The

rule against duplicity prohibits the Government from joining two
or more distinct offenses in a single count, because if a jury
were to return a general verdict on a duplicitous count, it
would be unclear as to whether the defendant was found guilty of
only one crime and not the other, or guilty of both." *United
States v. Coffey*, 361 F. Supp. 2d 102, 109 (E.D.N.Y. 2005)
(citing *United States v. Murray*, 618 F.2d 892, 896 (2d Cir.
1980)).

Count One of the Superseding Indictment charges Mr.
Barret with violation of 21 U.S.C. § 848(a), which makes it a
crime to engage in a continuing criminal enterprise.  "A
'continuing criminal enterprise' is defined as a violation of
the federal drug statutes, where 'such violation is a part of a
continuing series of violations,'" and "[c]ourts have
interpreted the requirement of a 'continuing series of
violations' to require proof of a minimum of three violations."
*United States v. Gotti*, 451 F.3d 133, 137 (2d Cir. 2006).
Because proof of the continuing criminal enterprise offense
requires proof of multiple violations of the federal drug laws,
the inclusion of violations in Count One of the Superseding
Indictment was necessary and proper and did not render Count One
impermissibly duplicitous.  Moreover, given the jury's verdict
as reflected in the verdict sheet, it is clear that the jury

found that nineteen of the twenty-one violations had been proven beyond a reasonable doubt. (Verdict.)

### C. Motion to Substitute Counsel

In conjunction with his motion for a new trial due to ineffective assistance of counsel, Mr. Barret moves for substitution of counsel before sentencing on grounds that there is a "complete breakdown of communication" between him and Mr. Goldberg. (*See* Second Barret *Pro Se* Mem. at 1.) Mr. Barret argues that Mr. Goldberg neglected to interview or call as witnesses any of the individuals that Mr. Barret referred, and refused to use specific cross-examination questions that Mr. Barret requested during Mr. Forrest's testimony. (*Id.* at 1-2.) Mr. Barret also reiterates many arguments set forth in his initial *pro se* memorandum and rejected by the court for the reasons stated *supra* in Section V.B.1. (*Id.* at 1-3.)

Mr. Goldberg denies any breakdown of communication with Mr. Barret prior to February 8, 2012, when the trial concluded. (Second Goldberg Resp. at 1.) Mr. Goldberg further states that Mr. Barret never complained about Mr. Goldberg's lack of zealousness or deficient performance, and that before and during trial, Mr. Goldberg consistently sought his client's version of events, provided Mr. Barret with discovery and other written material, and discussed the case with him. (*Id.*) Mr.

Goldberg also denies that Mr. Barret ever identified any potential character or fact witnesses. (*Id*. at 1-2.)

In addressing a motion to substitute counsel, the court must consider whether counsel has provided ineffective assistance and "whether the conflict between the defendant and his attorney was so great that it resulted in a total lack of communication preventing an adequate defense" and "whether the defendant substantially and unjustifiably contributed to the breakdown in communication." *United States v. John Doe No. 1*, 272 F.3d 116, 122-23 (2d Cir. 2001).

For the myriad reasons previously stated in this Memorandum and Order, the court does not find that Mr. Goldberg provided ineffective assistance. The court notes that "[d]ecisions whether to engage in cross-examination, and if so to what extent and in what manner, are . . . strategic in nature," *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1997), and therefore fall within the "wide range of acceptable professional assistance." *Dunham v. Travis*, 313 F.3d 724, 732 (2d Cir. 2002). In addition, the court finds that there has been no breakdown of communication that warrants substitution of counsel. The court credits Mr. Goldberg's statements that he consulted and conferred with Mr. Barret at all stages of the litigation, and that Mr. Barret never suggested the name of a character or fact witness. Accordingly,

having found no "complete breakdown in communication" to justify substitution of counsel, the court denies Mr. Barret's motion.

### D. Motion to Compel Provision of 3500 Material

Mr. Barret also moves "to compel the government to provide Defendant [Mr. Barret] with all Section 3500 material germane to Defendant's criminal prosecution." (Second *Pro Se* Barret Mem. at 1.) Mr. Barret previously wrote to the court on March 3, 2012 (*see* ECF No. 481), and again on March 25, 2012 (*see* ECF No. 495), requesting various case materials, including 3500 Material. In response, on March 15, 2012, the court ordered Mr. Goldberg to provide Mr. Barret with copies of the trial transcripts and exhibits, but not 3500 Material subject to the court's protective order (*see* ECF No. 384, Protective Order), which permits defense counsel to review certain 3500 Material[20] with their clients, but prohibits counsel from permitting their clients to retain the materials or copies thereof. (*See* Order dated 3/15/2012.) Mr. Goldberg served on Mr. Barret a copy of the court's order dated March 15, 2012. (*See* ECF No. 487, Certificate of Service.) In addition, on April 4, 2012, the court directed Mr. Goldberg to advise his client that the terms of the Protective Order do not permit any defendant to retain any 3500 Material, whether or not the

---

[20] The 3500 Material of certain "covered witnesses," including witnesses who did not testify at trial and whose identities have not yet been disclosed to defendants, may not be divulged, displayed, discussed, or mentioned in any way. (*See* Protective Order at 2.)

material is related to a Covered Witness.  (*See* Order dated 4/4/2012.)  Mr. Goldberg advised the court that he had complied with this Order on April 9, 2012.  (*See* ECF No. 497, Declaration of Compliance.)

Because the Protective Order remains effective, for the same reasons set forth in the court's previous orders and as Mr. Goldberg advised Mr. Barret at the court's direction, the court denies Mr. Barret's motion to compel provision of the 3500 Material.

## CONCLUSION

For the reasons set forth above, the court denies defendants' motions for a judgment of acquittal pursuant to Rule 29, or alternatively for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure.  The court also denies Mr. Barret's *pro se* motions for judgment of acquittal, a new trial, substitution of counsel, and an order compelling provision of grand jury and 3500 Material.

SO ORDERED.

Dated: August 6, 2012
Brooklyn, New York

_____/s/_____
KIYO A. MATSUMOTO
United States District Judge
Eastern District of New York